RECEIVED AND FILED
CLERK'S OFFICE USDC PR
2022 AUG 3 PM12:43

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>        v.<br><br>[1] WANDA VAZQUEZ GARCED,<br>Counts 1, 3, and 4;<br><br>[2] JULIO M. HERRERA VELUTINI,<br>Counts 1, 2, 4, 5, 6, and 7; and<br><br>[3] MARK T. ROSSINI,<br>Counts 1, 2, and 4;<br><br>    Defendants. | Criminal No. _22-342 (ADC)_<br><br>Count One: 18 U.S.C. § 371<br>(Conspiracy)<br><br>Count Two: 18 U.S.C. §§ 666(a)(2) and 2<br>(Federal Program Bribery)<br><br>Count Three: 18 U.S.C. §§ 666(a)(1)(B) and 2<br>(Federal Program Bribery)<br><br>Count Four: 18 U.S.C. §§ 1343, 1346, and 2<br>(Honest Services Wire Fraud)<br><br>Count Five: 18 U.S.C. § 371<br>(Conspiracy)<br><br>Count Six: 18 U.S.C. §§ 666(a)(2) and 2<br>(Federal Program Bribery)<br><br>Count Seven: 18 U.S.C. §§ 1343, 1346, and 2<br>(Honest Services Wire Fraud)<br><br>Forfeiture |

## INDICTMENT

TABLE OF CONTENTS

INTRODUCTION .................................................................................3

RELEVANT INDIVIDUALS AND ENTITIES .................................4

THE OCIF EXAMINATION OF THE BANK ....................................8

COUNT 1: CONSPIRACY ...................................................................8

   Purpose of Conspiracy...................................................................9

   Manner and Means of the Conspiracy........................................10

   Overt Acts in Furtherance of the Conspiracy............................11

      ➢  *Herrera and Rossini Seek OCIF Commissioner A's Removal*.................................11

      ➢  *Vazquez Terminates OCIF Commissioner A*.................................17

      ➢  *The Meeting at a Hotel in Condado on February 28, 2020*.................................18

      ➢  *Herrera Picks OCIF Commissioner B to Replace OCIF Commissioner A*..................19

      ➢  *Herrera Hires International Consulting Firm and Agrees to Form SuperPAC 1*...........20

      ➢  *Vazquez Appoints a New Commissioner of OCIF*.............................................24

COUNT 2: FEDERAL PROGRAM BRIBERY........................................27

COUNT 3: FEDERAL PROGRAM BRIBERY........................................28

COUNT 4: HONEST SERVICES WIRE FRAUD ................................29

COUNT 5: CONSPIRACY ...................................................................30

   Purpose of Conspiracy.................................................................31

   Manner and Means of the Conspiracy........................................31

   Overt Acts in Furtherance of the Conspiracy............................33

      ➢  *The Meeting at The Bank*.................................33

      ➢  *The Meeting in Guaynabo*.................................35

      ➢  *The Wiring of the Bribe Payment*.................................36

COUNT 6: FEDERAL PROGRAM BRIBERY........................................39

COUNT 7: HONEST SERVICES WIRE FRAUD................................40

FORFEITURE ALLEGATION.............................................................41

The Grand Jury charges:

## INTRODUCTION

1.      The Commonwealth of Puerto Rico's financial sector is comprised of commercial banks, savings and loan associations, securities firms, international banking entities, and other financial institutions. Financial institutions operating in Puerto Rico are subject to both federal and Puerto Rico laws and regulations.  The Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") supervises and regulates the banking system in Puerto Rico.  OCIF ensures the safety and soundness of Puerto Rico's financial sector, and ensures that financial institutions in Puerto Rico comply with numerous laws and regulations. It does so by, among other things, conducting examinations to evaluate financial institutions' compliance with federal and state regulations.  OCIF is led by a Commissioner who oversees all of its operations, including its examinations of Puerto Rico's financial institutions.  The Commissioner of OCIF is appointed by the governor of Puerto Rico.

2.      The Bank Secrecy Act ("BSA") and regulations promulgated thereunder seek to prevent money laundering through financial institutions.  Among other requirements, the BSA requires financial institutions to report suspicious transactions through the filing of Suspicious Activity Reports ("SARs") with the Financial Crimes Enforcement Network of the U.S. Department of Treasury ("FinCEN") on, among other things, "any suspicious transaction relevant to a possible violation of law or regulation."  FinCEN has overall authority for enforcement of the BSA.

3.      The governor of Puerto Rico is the popularly-elected head of government of the Commonwealth of Puerto Rico.  The Constitution of Puerto Rico provides for, in certain situations, the elevation of certain cabinet-level officials to the position of governor without

an election.  Elections for governor of Puerto Rico are held every four years.  The year 2020 was a gubernatorial election year in Puerto Rico.

4.     Beginning in 2019 and continuing through 2021, **JULIO M. HERRERA VELUTINI**, the owner of an international bank located in Puerto Rico, along with his co-conspirators, sought to interfere with the functions of both OCIF and FinCEN by paying bribes to public officials they believed had the power to intervene on the bank's behalf.  Specifically, in 2020, **HERRERA**, **MARK T. ROSSINI**, and others conspired to pay thousands of dollars to then-Governor **WANDA VAZQUEZ GARCED**, through payments to third parties that would support **VAZQUEZ's** election, with the intent of influencing her to remove a Commissioner of OCIF and replace him with an individual hand-picked by **HERRERA**.  Then, in 2021, **HERRERA** and others conspired to pay thousands of dollars to a second public official in the executive branch of the government of Puerto Rico, through payments to a close associate that would support the public official's election, with the intent of influencing him to end OCIF's examination of **HERRERA**'s international bank and to allow the bank to avoid its obligation to report suspicious activity to FinCEN.

## RELEVANT INDIVIDUALS AND ENTITIES

At all times material to this Indictment:

5.     "The Bank" was an international bank, classified as an International Banking Entity ("IBE") under Puerto Rico's International Banking Center Regulatory Act of 1989.  The Bank was licensed as an IBE by OCIF.  As an IBE, The Bank was only authorized to provide services to customers outside of Puerto Rico, including banks and other financial institutions.  IBEs are eligible to open branches in the United States outside of Puerto Rico, and they can be granted access to the Federal Reserve Wire Transfer Network ("Fedwire"),

the real-time gross settlement system operated by the Federal Reserve Bank that allows participants to transfer funds electronically between institutions. The Bank was subject to certain provisions of the BSA, including the requirement to file SARs. The Bank was wholly-owned by a holding corporation ("The Holding Corporation") organized in San Juan, Puerto Rico. The Bank conducted business with corporations located in New York, Florida, Panama, the Bahamas, and elsewhere.

6.     **JULIO M. HERRERA VELUTINI** controlled and ultimately owned The Bank and the Holding Corporation. **HERRERA** was the principal shareholder of the Holding Corporation. **HERRERA** was the Chairman of the Bank's Board of Directors and had authority and control over the Bank. **HERRERA** was a foreign national and not a citizen or legal permanent resident of the United States.

7.     **WANDA VAZQUEZ GARCED** was the Governor of Puerto Rico from August of 2019 until January of 2021. **VAZQUEZ** became the Governor after her predecessor resigned. **VAZQUEZ**'s official responsibilities as Governor included overseeing various agencies of the government of Puerto Rico and selecting, nominating, and appointing heads of such agencies, including OCIF. **VAZQUEZ** owed a fiduciary duty to Puerto Rico and its citizens to perform the duties and responsibilities of her office free from self-enrichment, deceit, concealment, and conflict between her personal interests and the interests of the citizens she served. On or about December 16, 2019, **VAZQUEZ** announced that she was running in the 2020 gubernatorial election in Puerto Rico.

8.     **MARK T. ROSSINI** was a Special Agent with the Federal Bureau of Investigation from in or around 1991 until in or around 2008. Following his separation from government service, **ROSSINI** owned and operated a professional consulting service. His

5

clients included **HERRERA**.

9.    Public Official A won the 2020 gubernatorial election in Puerto Rico and became the Governor in January of 2021.

10.    OCIF Commissioner A served as Commissioner of OCIF from in or around July 2017 until **VAZQUEZ** forced him to resign on or around February 28, 2020.

11.    OCIF Commissioner B was appointed by **VAZQUEZ** as the Commissioner of OCIF in or around May 2020.  He formerly worked for The Bank as a consultant.

12.    Frances M. Diaz ("Diaz") was the President and Chief Executive Officer of The Bank.

13.    John Blakeman ("Blakeman") was a political consultant located in Puerto Rico.  Blakeman served as a political advisor to **VAZQUEZ** during her tenure as Governor.

14.    Individual A was **VAZQUEZ**'s Deputy Chief of Staff.

15.    Individual B was **VAZQUEZ**'s Executive Assistant.

16.    Individual C was an investor residing in Puerto Rico.

17.    Individual D was an advisor to **VAZQUEZ** while she was the Governor of Puerto Rico.

18.    The International Consulting Firm was an international political consulting and lobbying firm with offices in the United States, the United Kingdom, Australia, and elsewhere.

19.    International Consulting Firm-Partner 1 was the Founding Director of International Consulting Firm's predecessor firm.

20.    International Consulting Firm-Partner 2 was the firm's Chief Global Projects Officer.

6

21.     Political Consultant A was a political consultant and author. Political Consultant A managed and advised presidential, gubernatorial, and prime ministerial candidate campaigns in the United States and around the world.

22.     SuperPAC 1 was an independent expenditure-only political action committee established by Political Consultant A to support the 2020 gubernatorial election campaign of **VAZQUEZ**.

23.     SuperPAC 2 was an independent expenditure-only political action committee established by Witness 1 to support the 2020 and 2024 gubernatorial election campaigns of Public Official A.

24.     Witness 1 was the owner of a Washington, D.C.-based accounting and consulting firm, who also set up independent expenditure-only political action committees. A political action committee is a political committee organized for the purpose of raising and spending money to elect or defeat candidates. An independent expenditure is money spent that 1) expressly advocates the election or defeat of a particular candidate and that 2) is not made in concert or cooperation with the candidate or the candidate's agents. An independent expenditure-only political action committee ("SuperPAC") solely raises money for independent expenditures. In or around May 2020, Witness 1 registered SuperPAC 2 to support the election campaigns of Public Official A. Witness 1 established SuperPAC 2 before he began operating at the direction of federal law enforcement officials. Witness 1 engaged in the other conduct described below at the direction of federal law enforcement authorities.

## THE OCIF EXAMINATION OF THE BANK

25.     In or around July 2019, OCIF Commissioner A initiated an examination of The Bank. The examination concluded on or around September 18, 2020. The examination

identified numerous areas at The Bank that OCIF determined required corrective action. Among other things, OCIF identified dozens of financial transactions that The Bank conducted on behalf of its customers that OCIF deemed suspicious and that The Bank did not report by filing SARs required by the BSA. Several of these financial transactions involved bank accounts and entities owned or controlled by The Bank's ultimate owner, **HERRERA**. **HERRERA**, Diaz, and The Bank were aware that The Bank was obligated under the BSA to report suspicious financial transactions by filing SARs.

26. A negative examination by OCIF could have had adverse consequences for The Bank, including requiring The Bank to take corrective action, subjecting The Bank to an enforcement action by OCIF that could include financial penalties, negatively impacting The Bank's ability to obtain and maintain full access to Fedwire, and potentially resulting in the loss of The Bank's license to operate as an IBE.

### COUNT 1
Conspiracy
18 U.S.C. § 371
(WANDA VAZQUEZ GARCED, JULIO M. HERRERA VELUTINI,
and MARK T. ROSSINI)

27. The preceding paragraphs of this Indictment are re-alleged and incorporated in this Count.

28. In each of the calendar years 2019 and 2020, the Commonwealth of Puerto Rico was a territory which received more than $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

29. From in or around December 2019 through in or around June 2020, in the District of Puerto Rico and elsewhere, defendants **WANDA VAZQUEZ GARCED, JULIO**

8

**M. HERRERA VELUTINI**, and **MARK T. ROSSINI** did knowingly and willfully conspire and agree together and with each other and others, both known and unknown to the Grand Jury, to commit offenses against the United States, including:

a) for **HERRERA** and **ROSSINI** to corruptly give, offer, and agree to give things of value, that is thousands of dollars in funding in support of **VAZQUEZ**'s election campaign, to **VAZQUEZ**, the Governor and an agent of the Commonwealth of Puerto Rico, with the intent of influencing and rewarding **VAZQUEZ**, in connection with any business, transaction, and series of transactions of the Commonwealth of Puerto Rico valued at $5,000 or more, to wit: the termination of OCIF Commissioner A and the appointment OCIF Commissioner B, in violation of 18 U.S.C. § 666(a)(2); and

b) for **VAZQUEZ**, the Governor and an agent of the Commonwealth of Puerto Rico, to corruptly solicit, demand, accept, and agree to accept for her own benefit, things of value, that is thousands of dollars in funding in support of **VAZQUEZ**'s election campaign, from **HERRERA** and **ROSSINI**, intending to be influenced and rewarded, in connection with any business, transaction, and series of transactions of the Commonwealth of Puerto Rico valued at $5,000 or more, to wit: the termination of OCIF Commissioner A and the appointment of OCIF Commissioner B, in violation of 18 U.S.C. § 666(a)(1)(B).

### Purpose of the Conspiracy

30.     The purpose of the conspiracy included, but was not limited to, **HERRERA**, **ROSSINI** and others, known and unknown to the Grand Jury, offering bribes in the form of things of value, specifically, funding in support of **VAZQUEZ**'s election campaign, in exchange for the specific acts of **VAZQUEZ** terminating a Commissioner of OCIF and

appointing a new Commissioner of **HERRERA**'s choosing.

## **Manner and Means of the Conspiracy**

31.     Between approximately December 2019 and approximately June 2020, **HERRERA, ROSSINI**, and their co-conspirators, gave, offered, and promised things of value to **VAZQUEZ**, including payments to the International Consulting Firm, Political Consultant A, and SuperPAC 1, each of which would support **VAZQUEZ**'s efforts to win the 2020 gubernatorial election in Puerto Rico, in exchange for specific acts favorable to **HERRERA** and The Bank, including **VAZQUEZ** terminating OCIF Commissioner A and appointing a new Commissioner of **HERRERA**'s choosing, OCIF Commissioner B.

32.     Between approximately December 2019 and June 2020, **HERRERA, ROSSINI**, and their co-conspirators met with **VAZQUEZ** in the District of Puerto Rico to discuss **HERRERA**'s request to remove OCIF Commissioner A and appoint a new Commissioner in exchange for **HERRERA**'s bribes.

33.     **HERRERA, ROSSINI, VAZQUEZ**, and their co-conspirators secretly communicated with each other directly and through intermediaries via text message, email, and internet-based messaging applications, and during in-person meetings, to discuss aspects of the agreement to pay bribes to **VAZQUEZ**.[1]

34.     **HERRERA** and **ROSSINI** were aware that Diaz, The Bank's president, had a personal relationship with Blakeman and that Blakeman had a central role in **VAZQUEZ**'s election campaign.   **HERRERA** and **ROSSINI** used Diaz, Blakeman, and others as intermediaries of **VAZQUEZ** and members of her administration.  **VAZQUEZ** and members

---

[1] Through the remainder of this Indictment, the term "text message" is used to include messages sent on all messaging applications.

of her administration, in turn, used Diaz, Blakeman, and others as messengers to **HERRERA**, **ROSSINI**, and their co-conspirators.

35.     **HERRERA** and others paid for political consulting services to benefit **VAZQUEZ**'s election campaign.

36.     **HERRERA** and others concealed the illegal and corrupt purpose of the bribes paid to benefit **VAZQUEZ** by funneling certain payments for political consulting services through bank accounts held by **ROSSINI** and third parties.

### Overt Acts in Furtherance of the Conspiracy

Herrera and Rossini Seek OCIF Commissioner A's Removal

37.     On or about December 15, 2019, **HERRERA** sent a series of text messages to Diaz that said, translated from Spanish to English, "I spoke with John last night! Must enter Fortaleza[2] and support the new governor" and "use a paving roller over OCIF and build a new structure that regulates and doesn't persecute the banks and change documents or fabricate documents" against the banking industry.

38.     On or about December 17, 2019, **HERRERA** sent Blakeman a text message containing a link to the International Consulting Firm's website and exchanged text messages with Blakeman about how the International Consulting Firm could make their "friend" win. Blakeman responded to **HERRERA**, translated from Spanish to English, that "[w]e'll present [the information to him/her] when you get here. In the meantime, I will present the information to the campaign group."

39.     On or about December 18, 2019, Individual A sent a text message to Individual

---

[2] "La Fortaleza" refers to the official residence and executive office of the governor of Puerto Rico.

C to let Individual C know that **VAZQUEZ** would be attending Individual C's wedding. Individual C responded by writing that he would be seating **VAZQUEZ** with three billionaires. Individual C then sent Individual A internet links and a screenshot providing information about the three purported billionaires, including **HERRERA**.

40. In or around January 2020, **HERRERA** told Blakeman that he wanted OCIF Commissioner A terminated from his position, and that he (**HERRERA**) wanted Blakeman to convey his dissatisfaction with OCIF Commissioner A directly to **VAZQUEZ**.

41. On or about January 3, 2020, **HERRERA** sent a text message to **ROSSINI** expressing his frustration with OCIF's examination of The Bank. **ROSSINI** responded, in part, that OCIF would "pay dearly."

42. On or about January 4, 2020, **HERRERA** attended Individual C's wedding and was seated at the same table as **VAZQUEZ**. When Blakeman sent a text message, translated from Spanish to English, to **HERRERA** during the wedding and asserted that **VAZQUEZ** would win if she had "the support from you all," **HERRERA** responded, translated from Spanish to English, "She has it!! In this table she already has 2MM," then later wrote, "but she has to resolve OCIF."

43. On or about January 6, 2020, **ROSSINI** wrote in a text message to International Consulting Firm-Partner 1, "I'll be in Puerto Rico next week for 2 days with Julio to meet the governor. I know he saw her this past weekend and she wants to see him next week. I know she is keen on [the International Consulting Firm]."

44. On or about January 7, 2020, **HERRERA** emailed International Consulting Firm-Partner 1, "I will have next week a meeting with the gobernadora ["governor"] of Puerto Rico PR to present My support and follow the conversation we had on the 4 of January with

her. . .," and that he would "like to present [the International Consulting Firm] to her and how much we can do for her."

45.   On or about January 14, 2020, **HERRERA** wrote in a text message to Diaz, translated from Spanish to English, "The solution is to fire the people who have kidnapped the Ocif and put in an Interim Commissioner that forms an International Banking Reform Board. . ."

46.   On or about January 14, 2020, **HERRERA**, Diaz, and Blakeman met with **VAZQUEZ** at Fortaleza, located in San Juan, Puerto Rico.

47.   On or about January 15, 2020, the day after **HERRERA**, Diaz, and Blakeman met with **VAZQUEZ** at her office, **ROSSINI** exchanged text messages with International Consulting Firm-Partner 1.   **ROSSINI** wrote, in part, that "the Governor wants [the International Consulting Firm]" and that **HERRERA** would pay for it: "Some campaign finances will pay for your services. The bulk will be paid by Julio."

48.   On or about January 15, 2020, **ROSSINI** reiterated to the partners at the International Consulting Firm that **HERRERA** would be paying for their services, emailing International Consulting Firm-Partner 1 and International Consulting Firm-Partner 2, in part, "As an update Julio H., met with the current Governor and her Chief of Staff yesterday. The Governor is very excited about the prospect of utilizing [the International Consulting Firm] for her re-election campaign," and "[t]he campaign is actively raising funds, and will pay for a portion of [the International Consulting Firm]'s services.  The bulk of the payment will be done by Julio H., and similarly wealthy individuals here whom are creating a super PAC. Julio H. will personally fund anything which is not covered by the campaign or PAC."

49.   On or about January 20, 2020, **ROSSINI** sent a text message to an individual

unidentified by the Grand Jury explaining that **HERRERA**, Individual C, and one other individual would "finance the campaign for the Governor in PR" and that "when they hire [the International Consulting Firm] for the campaign, [the International Consulting Firm] will hire me to be the liaison between [the International Consulting Firm] and the campaign."

50.     In or around January 2020, Blakeman, acting at the direction of **HERRERA**, told **VAZQUEZ** during one or more in-person meetings in the District of Puerto Rico that The Bank wanted OCIF Commissioner A removed from his position.

51.     In or around January 2020, **HERRERA**, **ROSSINI**, and others retained the International Consulting Firm to conduct polling and research to benefit **VAZQUEZ**'s candidacy in the upcoming election.

52.     In or around January 2020, Blakeman, acting at the direction of **VAZQUEZ**, informed Diaz that **VAZQUEZ**'s administration needed The Bank to provide the name of someone to replace OCIF Commissioner A.

53.     On or about January 21, 2020, **ROSSINI** emailed International Consulting Firm-Partner 2, confirming the date that the International Consulting Firm would provide a presentation of their services to **VAZQUEZ**: "28th of February (Friday) in the latter part of the day, is confirmed for the [International Consulting Firm] presentation to the Governor."

54.     On or about January 22, 2020, **HERRERA** sent a text message to Diaz that read, translated from Spanish to English, "[Individual C] asks that WV wanted to know who to put in Ocif." Later in the conversation, **HERRERA** also told Diaz, translated from Spanish to English, "Throw out [OCIF Commissioner A]."

55.     On or about January 29, 2020, Individual A wrote in a text message to Blakeman, translated from Spanish to English, "Working OCIF with [**VAZQUEZ**'s Chief of

Staff]!!"

56.     On or about January 29, 2020, International Consulting Firm-Partner 2 emailed **HERRERA**, with **ROSSINI** carbon-copied, asking to which entity and address their invoice for research should be sent. **HERRERA** responded by providing the name and address of a corporate entity related to The Bank.

57.     On or about January 30, 2020, Diaz wrote in a text message to **HERRERA** that she had been told that OCIF Commissioner A was going to be terminated soon.

58.     On or about February 3, 2020, Blakeman wrote in a text message to Diaz, translated from Spanish to English, that Blakeman had called Fortaleza and had been informed that "G's instruction was given," referring to **VAZQUEZ**'s instruction to her staff to terminate OCIF Commissioner A.

59.     On or about February 5, 2020, Diaz asked Blakeman, in a text message translated from Spanish to English, whether anyone told Blakeman "when they will be executing the instructions," referring to the termination of OCIF Commissioner A.

60.     On or about February 6, 2020, Diaz wrote in a text message to **HERRERA**, translated from Spanish to English, that Individual A had told Blakeman that "the lady" had already given her instruction to the Chief of Staff and that the first thing she would do when she got back to the office was to call him.

61.     On or about February 7, 2020, Blakeman asked Individual A, via text message, when OCIF Commissioner A was leaving his position.

62.     In or around February 2020, **HERRERA**, **ROSSINI**, Blakeman, Individual C, and others arranged for the International Consulting Firm to present its capabilities and research to **VAZQUEZ** on February 28, 2020, at a hotel in the Condado area of San Juan,

Puerto Rico.

63.     On or about February 11, 2020, Individual C sent a text message to Individual A that read, "Don't forget, big meeting 28!", and "She is ready for another 8 years !?" Individual A replied, "On Agenda!"

64.     On or about February 11, 2020, Individual A wrote in a text message to **VAZQUEZ**'s Chief of Staff, translated from Spanish to English, "I wanted to check with you if you talked with [OCIF Commissioner A] from OCIF??"

65.     On or about February 12, 2020, Individual A wrote in a text message to **VAZQUEZ**'s Chief of Staff that Individual A wanted to know about [OCIF Commissioner A] because **VAZQUEZ** had asked her.

66.     On or about February 20, 2020, Blakeman told Individual A and others in a text message that the International Consulting Firm's work for **VAZQUEZ**'s election campaign cost **HERRERA** five hundred thousand dollars ($500,000).

67.     On or about February 22, 2020, Individual A wrote in a text message to Individual B, translated from Spanish to English, "come here please. I told Blakeman the one from OCIF will end on Friday February 27."

68.     On or about February 23, 2020, Individual C sent **VAZQUEZ** and Individual A a presentation prepared by the International Consulting Firm entitled "[International Consulting Firm] Campaign Support Proposal for Governor Wanda Vazquez."

69.     On or about February 24, 2020, Individual C forwarded to Individual A a message sent from **HERRERA** to Individual C in which **HERRERA** wrote, "Well I am meeting [a partner from the International Consulting Firm] at 3:00 pm We need to confirm the meeting since we are 5 people crossing the Atlantic to meet her and we also need her

support for the Ocif situation that can no longer wait !! Please talk to the Governor if necessary but we should not spend money, Time and Effort in people that do not need our help!! Best Regards."

70.     On or about February 24, 2020, **HERRERA** and Diaz exchanged text messages about OCIF Commissioner A's pending termination, with Diaz writing, translated from Spanish to English, "[OCIF Commissioner A] is supposed to leave next Friday last day of the month." **HERRERA** responded, translated from Spanish to English, "That is the day of the meeting with WB," referring to **VAZQUEZ**, and "28 F," referring to February 28, 2020. Diaz later replied, translated from Spanish to English, "They already spoke with him and he is ending the month," referring to OCIF Commissioner A.

71.     In and around February 2020, **VAZQUEZ**, Blakeman, Individual A, Individual B, and others met at Fortaleza to discuss **HERRERA**'s offer to financially support **VAZQUEZ**'s election campaign in exchange for **VAZQUEZ** terminating OCIF Commissioner A.

<u>Vazquez Terminates OCIF Commissioner A</u>

72.     In or around the last week of February 2020, **VAZQUEZ**'s Chief of Staff summoned OCIF Commissioner A to a meeting at Fortaleza. There, at **VAZQUEZ**'s direction, **VAZQUEZ**'s Chief of Staff told OCIF Commissioner A that he had to resign from his position by February 28, 2020.

73.     On or about February 27, 2020, Individual A wrote in a text message to Individual C, "See u on friday @ 6pm. [Individual D], Blakeman and [**VAZQUEZ**'s Secretary of Public Affairs] are coming with us. FYI. Today I talked to [OCIF Commissioner A]. He's resigning effective February 28. Finally!"

74.     On or about February 27, 2020, **HERRERA** told **ROSSINI**, via text message, that OCIF Commissioner A would be "leaving" on Friday, February 28, 2020.

75.     On or about February 28, 2020, hours before the scheduled meeting at the hotel in Condado between **VAZQUEZ**, **HERRERA**, **ROSSINI**, members of the International Consulting Firm, and others, Individual A forwarded a screenshot of OCIF Commissioner A's resignation letter to Individual C, followed by, "FYI *heart emoji*." Individual C responded, "Miss. See you 6pm!"

76.     Also on or about February 28, 2020, Individual A sent a text message to Blakeman containing a photograph of OCIF Commissioner A's resignation letter.

<u>The Meeting at a Hotel in Condado on February 28, 2020</u>

77.     On the evening of February 28, 2020, **VAZQUEZ** met with **HERRERA**, **ROSSINI**, Blakeman, Diaz, Individual A, Individual C, and partners from the International Consulting Firm at a hotel in the Condado area of San Juan, Puerto Rico so that the International Consulting Firm could present the services it could offer **VAZQUEZ** in support of her gubernatorial campaign.

78.     Prior to the meeting, Blakeman sent a group text message to Individual A, Individual D, and a third individual, asking to delay the start of the meeting. In response, Individual A wrote that they must start at 6 p.m., and that once the meeting started, nobody would be able to enter.

79.     During the February 28, 2020 meeting, the partners from the International Consulting Firm gave a presentation of the services it could offer to **VAZQUEZ** in support of her election campaign, including research and campaign strategy formulation.

80.     During the February 28, 2020 meeting or shortly thereafter, Blakeman

informed **VAZQUEZ** that **HERRERA** paid for or would be paying for the International Consulting Firm's services to benefit **VAZQUEZ**'s upcoming election campaign.

81.     During the February 28, 2020 meeting, **HERRERA**, **ROSSINI**, and others discussed creating a SuperPAC to support **VAZQUEZ**'s election campaign.

82.     On or about February 28, 2020, hours after the meeting at the hotel in Condado, **VAZQUEZ** sent a text message to Individual A, translated from Spanish to English, asking for the name of "the guy from the FBI."   Individual A responded, "Mark Rossini," followed by three *lips sealed* emojis.

<u>Herrera Picks OCIF Commissioner B to Replace OCIF Commissioner A</u>

83.     Beginning in or around February 2020, **HERRERA** and others from The Bank, through intermediaries, including Blakeman, communicated to **VAZQUEZ** that they wanted **VAZQUEZ** to appoint OCIF Commissioner B as the new OCIF Commissioner.

84.     On or about February 28, 2020, **HERRERA** sent a text message to Blakeman that read, translated from Spanish to English, "Dear John: After today's presentation we need 15 minutes with the lady to explain some details of the next steps and coordinate the final objective of our regulator and the people that act irregularly inside the office. In short to make a coordinated plan of action. Of course, your presence is important in that private discussion." In response, Blakeman wrote to **HERRERA**, translated from Spanish to English, "Of course. Count me in."

85.     On or about February 29, 2020, the day after termination of OCIF Commissioner A and the meeting at the hotel, **HERRERA** called OCIF Commissioner B and asked if he was interested in becoming Commissioner.  OCIF Commissioner B then emailed **HERRERA** his resume.  **HERRERA** forwarded, via text message, OCIF Commissioner B's

resume to **ROSSINI**, writing, "This is our men for Ocif Job."

86.     On or about February 29, 2020, Diaz wrote in a text message to **HERRERA**, translated from Spanish to English, "I think [OCIF Commissioner B] is the perfect one…" **HERRERA** later responded, translated from Spanish to English, "[OCIF Commissioner B] is convinced and understands that this is a State problem!! We need guarantees for him and an open line with Fortaleza but he is convinced that it's a necessity."

87.     On or about March 2, 2020, **HERRERA** sent a text message to Blakeman that read, translated from Spanish to English, "With [OCIF Commissioner B's first name] we have the banks and federal regulators calmed.  This way I can dedicate time and money to her campaign. Tomorrow I am in San Juan and I have a call with the campaign expert from Washington then I travel to London to set up the long-term strategy."   Minutes later, Blakeman forwarded this message to Individual A.

<u>Herrera Hires International Consulting Firm and Agrees to Form SuperPAC 1</u>

88.     In or around February 2020, **HERRERA**, through intermediaries, including Blakeman, conveyed to **VAZQUEZ** his willingness to create a SuperPAC to support her election campaign in exchange for her removal of OCIF Commissioner A.

89.     On or about February 29, 2020, the day after the termination of OCIF Commissioner A and the meeting at the hotel in Condado, **ROSSINI** sent International Consulting Firm-Partner 1 a text message that read, in part, "Julio agreed for the contract and will pay [the International Consulting Firm] on Monday 250 pounds for the first phase which is the research and thereafter the campaign at around 200 a month until the election in November.  I hope [the International Consulting Firm] knows I only bring you the best clients."

90.     On or about February 29, 2020, **HERRERA** and **ROSSINI** exchanged text messages about establishing a SuperPAC to support **VAZQUEZ**'s election campaign, with **HERRERA** referring to Blakeman as a "messenger boy."

91.     On March 3, 2020, **HERERRA** sent a text message to **ROSSINI** about the need for a "campaign manager," and how he "didn't want then to put a monkey from Puerto Rico."  **ROSSINI** responded that the International Consulting Firm would find someone from Washington, D.C., and that "[w]e need someone that is ours."

92.     On March 3, 2020, **ROSSINI** emailed International Consulting Firm-Partner 2, copying International Consulting Firm-Partner 1: "I was on the phone with Julio earlier today and reinforced his desire/need for an experienced campaign manager working for Wanda ASAP.  He hopes you have or can find a person that he can present to campaign pronto."

93.     On March 4, 2020, Individual A sent Individual B a screenshot of a text message conversation Individual A had with **VAZQUEZ**'s Chief of Staff.  In the screenshot of Individual A's conversation with the Chief of Staff, Individual A told the Chief of Staff that OCIF Commissioner B is the person that will need to be appointed as deputy commissioner of OCIF, which Individual A understood would lead to his becoming acting Commissioner of OCIF upon OCIF Commissioner A's last day as Commissioner on March 6, 2020.  After sharing the screenshot with Individual B, Individual A said, translated from Spanish to English, "I sent this to [**VAZQUEZ**'s Chief of Staff]. Please call him so he does it!!!"

94.     On March 5, 2020, Individual A wrote in a text message to Individual B, translated from Spanish to English, "Remember to tell [the Chief of Staff] that [OCIF Commissioner A] needs to appoint the deputy commissioner today!!"  Individual B

responded, translated from Spanish to English, "[OCIF Commissioner A] is not going to appoint anyone before he leaves," and then, "[OCIF Commissioner A] expressed that he knows why he's being removed."

95.     On or about March 25, 2020, **HERRERA** wrote in a text message to Blakeman, translated from Spanish to English, "We are continuing with our plan." **HERRERA** then wrote to Blakeman, translated from Spanish to English, "I believe that now that no one is interested in Ocif because of everything else is the moment! Don't waste the opportunity," and "Speak with the lady." Blakeman responded that he will be following-up on the matter and that he believed he would be seeing **VAZQUEZ** the following day.

96.     On or about March 25, 2020, **HERRERA** paid the International Consulting Firm £263,000 GBP, then equivalent to approximately $315,000, for political research in connection with the 2020 Puerto Rico gubernatorial election.

97.     On or about March 30, 2020, **HERRERA** sent a text message to Blakeman containing Political Consultant A's resume. **HERRERA** wrote, "Superpac political coordinator!!"

98.     Also on or about March 30, 2020, Individual C sent a text message to **VAZQUEZ** containing Political Consultant A's resume. Individual C wrote, "Superpac coordinator."

99.     In or around March 2020, **HERRERA**, **ROSSINI**, and others hired Political Consultant A to manage the SuperPAC that they agreed to form to support **VAZQUEZ**, and conveyed to **VAZQUEZ** through intermediaries that they had made this hire.

100.    On or about April 8, 2020, Political Consultant A registered SuperPAC 1 with the Federal Election Commission.

101.   On or about April 8, 2020, Individual C sent a text message to **VAZQUEZ** containing a report prepared by the International Consulting Firm with the message, "Governor. The first survey is in." Attached to the text message was a document prepared by International Consulting Firm summarizing the results of its polling and research conducted in Puerto Rico. **VAZQUEZ** responded to Individual C that the report "looked pretty good." Individual C later wrote to **VAZQUEZ** that "[**ROSSINI**] will contact you to set up a video call to share the research and next steps."

102.   On or about April 9, 2020, **ROSSINI** sent Blakeman via text message a report prepared by the International Consulting Firm, with the message, "John: This is the report by the London folks. PLEASE DO [sic] PRINT OR SHARE with anyone. Please let me know when we can speak on this."

103.   On or about April 9, 2020, Blakeman sent a group text message to Individual A, Individual B, and Individual D in which he stated that he hoped they were able to review the report that he had prepared for them, and that if they looked at it closely, they would see what the next steps are for the group to follow in the coming months. He then sent the group a copy of a report prepared by the International Consulting Firm.

104.   On or about April 10, 2020, Blakeman followed up with Individual A, Individual B, and Individual D in a group text message and asked if anyone was able to read the report he sent them the day before. Individual D responded, translated from Spanish to English, "I'm on it."

105.   On or about April 14, 2020, **ROSSINI** sent a text message to Blakeman to inquire whether the International Consulting Firm's report had been shared with **VAZQUEZ**, asking if Blakeman "had a chance to discuss the report with the principal subject."

106. On or about April 18, 2020, **HERRERA** sent a text message to Diaz containing the internet link for SuperPAC 1's website and two documents, one entitled "Why_Act_Now_v1.pdf", and the second entitled, "[SuperPAC 1's initials]_C4_Wiring_Instructions.pdf." **HERRERA** subsequently wrote to Diaz, "The ball is in the lady's possession," and Diaz responded in agreement.

<u>Vazquez Appoints a New Commissioner of OCIF</u>

107. In or around March 2020, Blakeman met with **VAZQUEZ** at Fortaleza and conveyed **HERRERA**'s and **ROSSINI**'s message that **VAZQUEZ** needed to appoint OCIF Commissioner B before **HERRERA** would begin funding SuperPAC 1.

108. On or about March 30, 2020, **HERRERA** forwarded to Blakeman a text message that **HERRERA** had received from OCIF Commissioner B. In his message to **HERRERA**, OCIF Commissioner B stated that he was having difficulty getting in touch with Fortaleza to discuss his possible nomination. OCIF Commissioner B also asked that **HERRERA** assist him by reaching out to Fortaleza to follow-up on the matter. After **HERRERA** forwarded OCIF Commissioner B's message to Blakeman, Blakeman responded, translated from Spanish to English, "Perfect!! I will pass it along immediately."

109. On or about May 6, 2020, **ROSSINI** sent Blakeman a text message containing a document titled "Talking Points" and suggestions on campaign strategy, which Political Consultant A had provided to **ROSSINI**.

110. On or about May 6, 2020, **ROSSINI** wrote in a text message to Blakeman that the "PAC will kick into high gear and publicly she can see the PAC's actions and follow through and expand upon it." Blakeman responded that he was on his way to Fortaleza.

111. On or about May 6, 2020, **ROSSINI** wrote in a text message to **HERRERA**,

"Update. Per [Individual C]. John is seeing her at 5pm. I've been in touch with John over the last hour. He is aware." **ROSSINI** later informed **HERRERA** via text message that he had just received a message from "John" that "he is on his way to see his friend. I provided him all the materials, except of course the budget breakdown."

112.    On or about May 6, 2020, Blakeman met with **VAZQUEZ** at Fortaleza.

113.    On or about May 7, 2020, **ROSSINI** sent a text message to Blakeman to inquire how Blakeman's meeting had gone and whether Blakeman had spoken with **HERRERA** or Individual C.  Blakeman responded that he had spoken to Individual C the night before and that, "It was a great meeting.  This morning they asked me for the number of the proposed new director of OCIF. (What Julio needed)." **ROSSINI** responded, "Fantastic.  Great news," and forwarded a copy of Blakeman's message to **HERRERA**.

114.    On or about May 7, 2020, **ROSSINI** sent Blakeman a text message that read, in part: "Hi John: I just spoke to a mutual friend whom advised that if/when that gentleman is installed as the OCIF director that with 72 hours the 'switch will be turned on' and the PAC will be on the island and forging ahead." **ROSSINI** then sent that same message to **HERRERA** with the explanation, translated from Spanish to English, "What I sent."

115.    On or around May 7, 2020, Blakeman texted **HERRERA** to ask for OCIF Commissioner B's contact information and told **HERRERA** that OCIF Commissioner B should expect a call between May 7 and May 8.

116.    On or about May 12, 2020, **ROSSINI** sent a text message to Blakeman about the status of OCIF Commissioner B's appointment, asking "if the advice provided has been implemented."  Blakeman responded to **ROSSINI** that "they are implementing the recommendations" and "[t]he guy for OCIF went to Fortaleza and was interviewed."

117.   On or about May 12, 2020, **ROSSINI** forwarded Blakeman's message to **HERRERA** regarding OCIF Commissioner B's interview and opined, "That's a relief. She gets it now." **HERRERA** responded, "Yes but not with her !!!  He just meet with the secretary." **HERRERA** later added, "They are moving but very slow."

118.   On or about May 14, 2020, **VAZQUEZ** appointed OCIF Commissioner B as the new Commissioner of OCIF.

119.   On or about May 14, 2020, **ROSSINI** sent a text message to Blakeman to inquire about the status of the appointment of OCIF Commissioner B, writing, "Hi John. Just checking in again. [Political Consultant A] is waiting to get there.  Hope your friend is following through on the recommendations… gracias."

120.   On or about May 14, 2020, in response to **ROSSINI**'s text message asking whether Blakeman's "friend" was "following through," Blakeman sent **ROSSINI** a copy of **VAZQUEZ**'s formal announcement appointing OCIF Commissioner B.

121.   On or about May 14, 2020, **ROSSINI** forwarded to **HERRERA**, via text message, the official announcement of OCIF Commissioner B's appointment. In response, **HERRERA** instructed **ROSSINI** to "[p]repare [Political Consultant A]," and then, "Looks like we are playing balls."

122.   On or about May 14, 2020, Blakeman sent a text message to **HERRERA** containing a document announcing that **VAZQUEZ** had appointed a new OCIF Commissioner.

123.   On or about May 14, 2020, Individual D sent a text message to Blakeman containing a document announcing that **VAZQUEZ** had appointed a new OCIF Commissioner.

124.   On or about May 14, 2020, **ROSSINI** sent a text message to an employee of the International Consulting Firm, "Hi.  Sorry for the late hour.  Just got word to 'prepare [Political Consultant A].'  Talk tomorrow."  The employee of the International Consulting Firm responded, "Prepare for take off?"  **ROSSINI** replied, "Buckle your seatbelts."

125.   On or about May 14, 2020, Individual C congratulated **HERRERA** in a text message, "Finally u have power here sir," then informed **HERRERA** that OCIF Commissioner B would be confirmed by the Puerto Rico Senate "as soon as senate is in session."  In response, **HERRERA** wrote, "amen" and that they should "keep it very ND." Individual C replied that power "wont last" unless it is "always silent."

All in violation of 18 U.S.C. § 371.

**COUNT 2**
Federal Program Bribery
18 U.S.C. §§ 666(a)(2) and 2
(JULIO M. HERRERA VELUTINI and MARK T. ROSSINI)

126.   The allegations contained in paragraphs 1 through 26 and 30 through 125 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

127.   In each of the calendar years 2019 and 2020, the Commonwealth of Puerto Rico was a territory which received more than $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

128.   From in or around December 2019 through in or around May 2020, in the District of Puerto Rico and elsewhere, defendants **JULIO M. HERRERA VELUTINI** and **MARK T. ROSSINI**, did corruptly give, offer, and agree to give things of value, that is thousands of dollars in funding in support of **VAZQUEZ**'s election campaign, to **VAZQUEZ**,

27

the Governor and an agent of the Commonwealth of Puerto Rico, with the intent of influencing and rewarding **VAZQUEZ** in connection with any business, transaction, and series of transactions of the Commonwealth of Puerto Rico valued at $5,000 or more, to wit: the termination of OCIF Commissioner A and the appointment OCIF Commissioner B.

All in violation of 18 U.S.C. §§ 666(a)(2) and 2.

## COUNT 3
Federal Program Bribery
18 U.S.C. §§ 666(a)(1)(B) and 2
(WANDA VAZQUEZ GARCED)

129.    The allegations contained in paragraphs 1 through 26 and 30 through 125 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

130.    In each of the calendar years 2019 and 2020, the Commonwealth of Puerto Rico was a territory which received more than $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

131.    From in or around December 2019 through in or around May 2020, in the District of Puerto Rico and elsewhere, defendant **WANDA VAZQUEZ GARCED**, the Governor and an agent of the Commonwealth of Puerto Rico, did corruptly solicit, demand, accept, and agree to accept for her own benefit things of value, that is thousands of dollars in funding in support of **VAZQUEZ**'s election campaign, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of the Commonwealth of Puerto Rico valued at $5,000.00 or more, to wit: the termination of OCIF Commissioner A and the appointment OCIF Commissioner B.

All in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2.

28

## COUNT 4
Honest Services Wire Fraud
18 U.S.C. §§ 1343, 1346, and 2
(WANDA VAZQUEZ GARCED, JULIO M. HERRERA VELUTINI and MARK T.
ROSSINI)

132.    The allegations contained in paragraphs 1 through 26 and 30 through 125 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

133.    Beginning in or around December 2019 and until or about May 2020, in the District of Puerto Rico and elsewhere, defendants **WANDA VAZQUEZ GARCED, JULIO M. HERRERA VELUTINI, MARK T. ROSSINI**, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of Puerto Rico of their right to the honest services of a public official, namely the honest services of **VAZQUEZ**, the Governor of Puerto Rico, through bribery and kickbacks.

134.    On or about April 14, 2020, in the District of Puerto Rico and elsewhere, the defendants **VAZQUEZ, HERRERA** and **ROSSINI**, aided and abetted by each other and by others known and unknown to the Grand Jury, having devised and intended to devise the above-described scheme and artifice to defraud and deprive, by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds, to wit: a wire transfer of $40,000 from an account ending in 6524 held at Chase Bank to an account ending in 4246 held at PNC Bank.

All in violation of 18 U.S.C. §§ 1343, 1346, and 2.

29

**COUNT 5**
Conspiracy
18 U.S.C. § 371
(JULIO M. HERRERA VELUTINI)

135.    The allegations contained in paragraphs 1 through 26 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

136.    In the calendar year of 2021, the Commonwealth of Puerto Rico was a territory which received more than $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

137.    From in or around April 2021 through in or around August 2021, in the District of Puerto Rico and elsewhere, defendant **JULIO M. HERRERA VELUTINI** did knowingly and willfully conspire and agree with others, both known and unknown to the Grand Jury, to commit offenses against the United States, including:

a) to corruptly give, offer, and agree to give things of value, that is at least $25,000 in funding in support of Public Official A's election campaign, to Public Official A, an agent of the Commonwealth of Puerto Rico, with the intent of influencing and rewarding Public Official A in connection with any business, transaction, and series of transactions of the Commonwealth of Puerto Rico valued at $5,000 or more, to wit: the resolution of the OCIF examination of The Bank on terms favorable to and specified by The Bank, in violation of 18 U.S.C. § 666(a)(2); and

b) to willfully violate the Bank Secrecy Act, specifically, 31 U.S.C. §§ 5318 and 5322, and regulations issued thereunder, namely 31 C.F.R. § 1020.320, by not filing with the United States Department of Treasury required reports of suspicious activity, in violation of 31 U.S.C. §§ 5318(g); 5322; and 31 C.F.R. § 1020.320.

30

**Purposes of the Conspiracy**

138.    The purposes of the conspiracy included, but were not limited to, the following:

a)  for **HERRERA**, Diaz, Blakeman, and others, known and unknown to the ~~United States~~ Grand Jury, to offer bribes in the form of things of value, including payments to SuperPAC 2 to support Public Official A's election, intending that the bribes be in exchange for Public Official A directing and exerting influence on public officials to resolve the OCIF examination of The Bank on terms favorable to The Bank; and

b)  for **HERRERA**, Diaz, Blakeman and others, both known and unknown, to enrich themselves and The Bank by corruptly obtaining favorable treatment by OCIF, including the resolution of the OCIF examination of The Bank on terms favorable to The Bank and the determination that The Bank was not required to file SARs, in accordance with the BSA, for certain transactions conducted at The Bank.

**Manner and Means of the Conspiracy**

139.    After **VAZQUEZ** lost the primary election in or around August 2020, **HERRERA** financially supported the gubernatorial campaigns of both Public Official A and Public Official A's opponent in the general election.  Public Official A won the general election in November 2020.  After the general election, **HERRERA** and his co-conspirators, including Blakeman and Diaz, attempted to bribe Public Official A with financial political support in exchange for a specific act, to wit: Public Official A directing and exerting influence on certain public officials at OCIF in a manner benefitting **HERRERA**.

140.    Specifically, between approximately April 2021 and approximately August 2021, **HERRERA** and his co-conspirators gave, offered, and promised things of value intended for Public Official A, including payments to SuperPAC 2, through Witness 1 (who

represented himself to be an intermediary of Public Official A), intending that they be in exchange for Public Official A directing and exerting influence on public officials to resolve OCIF's examination of The Bank in a manner favorable to The Bank. In fact, Witness 1 was operating at the direction of law enforcement officials, was not actually serving as an intermediary of, or acting on behalf of, Public Official A, and made statements to Blakeman and Diaz to further the undercover investigation.

141.    Additionally, **HERRERA** and his co-conspirators sought to have Public Official A direct and exert influence on other public officials to ensure that The Bank would not have to enter into an agreement with OCIF acknowledging violations of the BSA, and that The Bank would not have to file SARs for certain transactions conducted at The Bank.

142.    Acting on behalf of **HERRERA**, Diaz and Blakeman met with purported associates of Public Official A, including Witness 1, in the District of Puerto Rico. During these meetings, they discussed **HERRERA**'s specific requests regarding the resolution of OCIF's examination of The Bank in exchange for **HERRERA**'s donations to SuperPAC 2, which principally supported Public Official A.

143.    **HERRERA** and his co-conspirators secretly communicated with each other via text message, email, and internet-based messaging applications, and during in-person meetings, to discuss aspects of the agreement to pay bribes to influence the OCIF examination.

144.    **HERRERA** and his co-conspirators attempted to conceal their bribe payments to influence the OCIF examination as donations to SuperPAC 2 in order to conceal the illegal and corrupt purpose of the payments.

## Overt Acts in Furtherance of the Conspiracy

### The Meeting at The Bank

145.    On or about April 23, 2021, **HERRERA** wrote in a text message to Diaz, translated from Spanish to English, "The office of the commissioner must be purged."

146.    On or about April 29, 2021, Diaz wrote in a text message to **HERRERA**, translated from Spanish to English, "Sorry for the late hour but a meeting has just come up tomorrow at 8 am with the people of the governor." **HERRERA** responded by sending a *praying* emoji, writing "Amen," and "You know what to do."

147.    On or about April 29, 2021, **HERRERA** wrote in a text message to Diaz, translated from Spanish to English, "the snake must be killed by its head." Diaz responded, translated from Spanish to English, "There is no other way."

148.    On or about April 30, 2021, Blakeman and Diaz met with Witness 1, whom they understood to be a fundraiser for Public Official A, along with several other individuals whose identities are known to the Grand Jury, at The Bank's office in San Juan, Puerto Rico, to discuss OCIF's examination of The Bank. During the meeting, Diaz communicated to Witness 1 the four objectives that **HERRERA** and The Bank wished to accomplish: 1) that The Bank would not need to sign a Memorandum of Understanding[3] with OCIF regarding The Bank's deficiencies; 2) that The Bank would not need to file SARs for certain transactions involving bank accounts and entities owned or controlled by **HERRERA**; 3) that OCIF's examination of The Bank would end on terms favorable to The Bank; and 4) that certain employees of OCIF would be removed from their positions.

---

[3] A Memorandum of Understanding between OCIF and The Bank would likely have required The Bank to acknowledge deficiencies in its anti-money laundering/BSA policies and practices.

149.    On or about May 3, 2021, Witness 1 called Diaz and told Diaz that he had an upcoming meeting with Public Official A and wanted to confirm The Bank's four requests with regard to OCIF.  Witness 1 asked Diaz to prioritize The Bank's requests, and Diaz responded that The Bank's priorities were that they not be required to sign a Memorandum of Understanding with OCIF and that they not be required to file SARs for certain transactions involving bank accounts and entities owned or controlled by **HERRERA**.

150.    On or about May 4, 2021, Diaz wrote in a text message to **HERRERA**, translated from Spanish to English, "The gentleman just wants to clarify some questions about the priorities with respect to what we want."

151.    On or about May 11, 2021, Blakeman had a follow-up meeting with Witness 1 concerning The Bank's requests regarding OCIF.  During the meeting and to further the undercover investigation, Witness 1 told Blakeman that Public Official A could deliver on three of The Bank's four requests with a single phone call: 1) that The Bank would not need to sign OCIF's Memorandum of Understanding; 2) that The Bank would not need to file SARs for **HERRERA**'s banking transactions; and 3) that the OCIF examination would be resolved on terms favorable to The Bank.  When Witness 1 reminded Blakeman that everything they discussed "needs to stay here" (translated from Spanish to English), Blakeman agreed.

152.    During the May 11, 2021 meeting, Witness 1 told Blakeman that Witness 1 heard that **HERRERA** had previously offered to make a political donation benefitting Public Official A.  To further the undercover investigation, Witness 1 suggested to Blakeman that **HERRERA** could make a donation in exchange for Public Official A fulfilling The Bank's requests.  Blakeman responded that Witness 1 could count on **HERRERA**'s commitment to

donate money as long as The Bank's requests were satisfied.

153.   On or about May 12, 2021, Blakeman sent Witness 1 a text message asking if Witness 1 had been able to discuss the matter with "the boss," referring to Public Official A. As part of and to further the undercover investigation (even though no such communication had taken place), Witness 1 responded that he had, and that he would follow up with Public Official A regarding the timeline for accomplishing three of The Bank's four objectives.   In the same conversation, Witness 1 reminded Blakeman "to give me a hand with the contribution."

The Meeting in Guaynabo

154.   Between May 18 and May 24, 2021, Diaz and Witness 1 exchanged text messages for the purpose of coordinating another in-person meeting to discuss The Bank's requests to influence the OCIF examination.

155.   On or about May 27, 2021, Blakeman and Diaz met with Witness 1 at a restaurant in Guaynabo, Puerto Rico, to discuss **HERRERA** and The Bank's requests to influence the OCIF examination.   During the meeting, Witness 1 discussed an agreement with Blakeman and Diaz for a $50,000 payment to benefit Public Official A, intending that the payment be in exchange for Public Official A directing and exerting influence on public officials to cause three of the four objectives that The Bank wished to accomplish: 1) that The Bank would not need to sign a Memorandum of Understanding with OCIF regarding The Bank's deficiencies; 2) that The Bank would not need to file SARs for certain transactions involving bank accounts and entities owned or controlled by **HERRERA**; and 3) that OCIF's examination of The Bank would end on terms favorable to The Bank.

156.   During the May 27, 2021 meeting, Witness 1 stated that **HERRERA**,

Blakeman, and Diaz should let Witness 1 know when they were ready to make a payment to support Public Official A. As part of and to further the undercover investigation, Witness 1 represented that at that point, Public Official A could move forward with The Bank's requests with respect to OCIF. Diaz and Blakeman each responded that they were already at that point.

157. At the May 27, 2021 meeting, in response to Witness 1's question about whether **HERRERA** was aware of what Witness 1, Diaz, and Blakeman were discussing, Diaz responded that **HERRERA** was knowledgeable of what Diaz and Blakeman were requesting.

158. During the May 27, 2021 meeting, Witness 1 stated, translated from Spanish to English, that what they were discussing "cannot leave this table" and stressed that they must emphasize to **HERRERA** the need for secrecy. Blakeman responded by acknowledging the need for secrecy, and later stated that it would not be convenient for The Bank if it was known "that Fortaleza is intervening in any way."

159. At the May 27, 2021 meeting, Witness 1 told Blakeman and Diaz that he would send Blakeman the instructions for wiring the money that The Bank was pledging for Public Official A. When Witness 1 indicated that he did not like to talk or text about "this" on the phone, Diaz responded, translated from Spanish to English, "Exactly," and then, "One doesn't know who might be listening."

<u>The Wiring of the Bribe Payment</u>

160. In or around May or June 2021, Diaz informed **HERRERA** of Witness 1's representation that in exchange for **HERRERA**'s $50,000 payment to SuperPAC 2, Public Official A would ensure that 1) The Bank would not need to sign a Memorandum of

36

Understanding with OCIF; 2) The Bank would not need to file SARs for certain transactions; and 3) OCIF's examination of The Bank would be resolved on terms favorable to The Bank.

161.    On or about May 28, 2021, Witness 1 sent Blakeman via text message the wiring instructions for the account into which The Bank's monetary payment to benefit Public Official A should be deposited.

162.    On or about June 9, 2021, Witness 1 met with Blakeman at a restaurant in San Juan, Puerto Rico. During the meeting, and in furtherance of the investigation, Witness 1 told Blakeman that Public Official A asked Witness 1 to confirm with Blakeman that, translated from Spanish to English, "their commitment is still on." Blakeman confirmed that "the commitment is still on."

163.    During the meeting on June 9, 2021, Blakeman told Witness 1, translated from Spanish to English, "they need a light from the commissioner that says 'we are working on it.'" Later in the conversation, Witness 1 told Blakeman, translated from Spanish to English, that Witness 1 would try to get Blakeman "a sign that everything is all right."

164.    On or about June 9, 2021, **HERRERA** asked Diaz in a text message if there was anything new. Diaz responded that she was waiting for Blakeman to finish lunch with "a friend." Later that day, Diaz informed **HERRERA** in a text message, translated from Spanish to English, "He already called me...they need help but we reiterated that it will be after what we are waiting for happens." In response, translated from Spanish to English, **HERRERA** wrote, "1000% Committed," and then, "...paid music does not play," a figure of speech meaning that one should not pay for something before receiving it.

165.    On June 9, 2021, Blakeman sent a text message to Witness 1, telling Witness 1 that the current OCIF Commissioner needed to call The Bank for a meeting and to sign an

agreement, which "will be useful to Julio for what we spoke about," translated from Spanish to English.

166.   On June 10, 2021, Diaz asked Blakeman whether Witness 1 had responded to Blakeman. When Blakeman said Witness 1 had not, Diaz asked if Blakeman could call Witness 1 because **HERRERA** told her that, translated from Spanish to English, a "paid musician doesn't play."

167.   On June 11, 2021, acting at the direction of law enforcement, an OCIF official called Blakeman to inform Blakeman that the official himself/herself was directly addressing Blakeman's concerns. After receiving the call, Blakeman wrote in a text message to Witness 1, translated from Spanish to English, "Call received!! Super. I already told Frances. It's late for Julio but I'll call him tomorrow."

168.   In or around July 2021, **HERRERA** agreed to make a $25,000 payment to SuperPAC 2.

169.   On or about July 20, 2021, Blakeman sent a text message to Witness 1 which read, translated from Spanish to English, "Greetings!  Where do I send the half of what we talked about?" Witness 1 responded, translated from Spanish to English, "Hi!  I thought that this agreement had been forgotten, I'm happy to know that's not the case," and sent Blakeman a screenshot of SuperPAC 2's bank account information.

170.   On or about July 21, 2021, Diaz wrote in a text message to **HERRERA**, translated from Spanish to English, "Hello, the payment we are talking about is a super pac. Therefore, the money can be sent." The following morning, **HERRERA** responded, translated from Spanish to English, "perfect."

171.   On or about July 22, 2021, Diaz asked **HERRERA** in a text message, "tell me

what account please," and **HERRERA** responded, "It will be that we can send it from my personal account from London."

172.    On or about August 10, 2021, Diaz sent an email to The Bank's Accounting Manager, translated from Spanish to English, "[P]lease transfer $25 thousand from Mr. Herrera's account to the holding account. Mr. Herrera already authorized the same," with **HERRERA** carbon copied to the email.

173.    On or about August 10, 2021, the Senior Vice President of The Bank's Treasury Department sent an email to a Bank employee which read, translated from Spanish to English, "Per [the Accounting Manager's] instructions, please issue a payment from the [The Bank's] Holding account at Firstbank for the amount of $25,000 with the coordinates indicated in the attached document." The attached document was the bank account information for SuperPAC 2.

174.    On or about August 10, 2021, an employee of The Bank caused $25,000 to be transferred from The Bank's FirstBank of Puerto Rico account to an account held by SuperPAC 2.

All in violation of 18 U.S.C. § 371.

### COUNT 6
Federal Program Bribery
18 U.S.C. §§ 666(a)(2) and 2
(JULIO M. HERRERA VELUTINI)

175.    The allegations contained in paragraphs 1 through 26 and 138 through 174 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

176.    In the calendar year of 2021, the Commonwealth of Puerto Rico was a territory which received more than $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of

assistance.

177.    From in or around April 2021 through in or around August 2021, in the District

of Puerto Rico and elsewhere, defendant **JULIO M. HERRERA VELUTINI** did corruptly

give, offer, and agree to give a thing of value, that is at least $25,000 in funding in support of

Public Official A's election campaign, to any person intending to influence and reward Public

Official A, an agent of the Commonwealth of Puerto Rico, in connection with any business,

transaction, and series of transactions of the Commonwealth of Puerto Rico valued at $5,000

or more, to wit: the resolution of the OCIF audit of The Bank on terms favorable to and

specified by The Bank.

All in violation of 18 U.S.C. §§ 666(a)(2) and 2.

**COUNT 7**
Honest Services Wire Fraud
18 U.S.C. §§ 1343, 1346, and 2
(JULIO M. HERRERA VELUTINI)

178.    The allegations contained in paragraphs 1 through 26 and 138 through 174 of

this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

179.    Beginning in or around April 2021 and until or about August 2021, in the

District of Puerto Rico and elsewhere, defendant **JULIO M. HERRERA VELUTINI**, and

others known and unknown to the Grand Jury, devised and intended to devise a scheme and

artifice to defraud and deprive the citizens of Puerto Rico of their right to the honest services

of a public official, namely the honest services of Public Official A, the Governor of Puerto

Rico, through bribery and kickbacks.

180.    On or about August 10, 2021, in the District of Puerto Rico and elsewhere, the

defendant **HERRERA**, aided and abetted by others known and unknown to the Grand Jury,

having devised and intended to devise the above-described scheme and artifice to defraud and

40

deprive, by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds, to wit, a wire transfer of $25,000 from an account ending in 9763 held at FirstBank Puerto Rico to account ending in 0116 held at Citibank.

All in violation of 18 U.S.C. §§ 1343, 1346, and 2.

## FORFEITURE ALLEGATION
28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C)

181.   The preceding paragraphs of this Indictment are re-alleged and incorporated in this Allegation.

182.   Pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), the United States gives notice to the defendants  **JULIO M. HERRERA VELUTINI**, **MARK T. ROSSINI**, and **WANDA VAZQUEZ GARCED** that in the event of a conviction for an offense charged in Counts One through Seven of this Indictment, all property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from such offense, is subject to forfeiture.

### **Money Judgment**

183.   Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

### **Substitute Assets**

184.   Defendants are notified that if property subject to forfeiture, as a result of any act or omission of Defendants,

     a.   cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of Defendant up to the total value of the property subject to forfeiture pursuant to 21 U.S.C. § 853(p), as incorporated by reference in 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1).

W. STEPHEN MULDROW
United States Attorney

By: _____
Seth A. Erbe
Chief, Financial Fraud and Public
Corruption Section

COREY AMUNDSON
Chief, Public Integrity Section

By: _____
Ryan R. Crosswell
Trial Attorney

By: _____
Erica O. Waymack
Trial Attorney

By: _____
Nicholas W. Cannon
Trial Attorney

FORE PERSON
DATE August 6, 2022

42