## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

V.

WANDA VAZQUEZ GARCED,
Defendant.

CRIMINAL NO. 22-cr-0342-01 (RAM)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WANDA VAZQUEZ GARCED'S PRE-TRIAL MOTION TO DISMISS THE INDICTMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

ARGUMENT ................................................................................................................ 11

                  *The Legal Standard on a Motion to Dismiss the Indictment* ................................ 12

                  I.   Political Contributions and the First Amendment........................................... 15

                  II.   The Meaning of McCormick's "Explicit" Requirement................................ 21

                  III.   The Facts in *McCormick*................................................................................ 22

                  IV.   The Rule in McCormick Applies Here......................................................... 24

                  V.   The Indictment Does Not Allege the Requisite Explicit Quid Pro Quo........ 26

CONCLUSION................................................................................................................ 36

CERTIFICATE OF SERVICE ...................................................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Buckely v. Valeo*, 424 U.S. 185, 204 (2014) ................................................................ 16

*Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 223 (1989) ..................... 16

*Evans v. United States*, 504 U.S. 255, 272-73 (1992) ................................................... 21

*Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1653 (2022) ................. 2, 15, 26

*Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 457 (2007) ................. 16, 18

*Gov't of Virgin Islands v. Moolenaar*, 133 F.3d 246, 249 (3d Cir. 1998) ................................... 14

*Hamling v. United States* , 418 U.S. 87, 117 (1974)....................................................... 12

*King v. United States*, 965 F.3d 60, 66 (1st Cir. 2020)................................................... 13

*McCormick v. United States*, 500 U.S. 257, 273 (1991)........................................... passim

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 204 (2014) ....................................... 15, 18

*U.S. v. Palumbo Bros., Inc.*, 145 F.3d 850, 860 (7th Cir. 1998)........................................... 14

*United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993)........................................... 25, 26

*United States v. Benjamin, 2022 WL 17417038 at 1 (s.D.N.Y. Dec. 5, 2022)* ...................... 20, 26

*United States v. Bobo*, 344 F.3d 1076, 1083-84 (11th Cir. 2003) ................................... 13

*United States v. Bohai Trading Co.*, 45 F.3d 577, 578 n.1 (1st Cir. 1995)................................... 15

*United States* v. *Carll*, 105 U.S. 611, 612 (1882)........................................................ 13

*United States v. Covington*, 395 U.S. 57, 60-61 (1969)................................................... 14

*United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993) ................................................... 26

*United States v. Cruzado–Laureano*, 404 F.3d 470, 482 (1st Cir. 2005) ............................... 18

*United States v. DeSalvo*, 41 F.3d 505, 513 (9th Cir. 1994)........................................... 14

*United States v. Donagher*, 520 F.Supp.3d 1034, 1043 (N.D. Ill. 2021)....................................... 24

*United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996) ................................................... 14

*United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993)................................................... 21

*United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) ............................................... 15

*United States v. McDonough*, 727 F.3d 143, 155 n.4 (1st Cir. 2013)........................................... 18

*United States v. Menendez*, 132 F. Supp. 3d 635, 644 (D.N.J. 2015)................................... 25, 26

*United States v. Menendez*, 15-cr-00155 (WHW)(D.N.J. Apr. 1, 2015) ....................................... 26

*United States v. Menendez*, 291 F. Supp. 3d 606, 623 (D.N.J. 2018)........................................... 26

*United States v. Miller*, 471 U.S. 130, 136 (1985)..........................................................14

*United States v. Parigian*, 824 F.3d 5, 9 (1st Cir. 2016) ...............................................12

*United States v. Pawlowski*, 351 F. Supp. 3d 840, 849-50 (E.D. Pa. 2018) ...........25, 26

*United States v. Pirro*, 212 F.3d 86, 93 2d Cir. 2000) ...................................14, 15, 26

*United States v. Rodriguez-Rivera*, 918 F.3d 32, 34 (1st Cir. 2019) ...........................14

*United States v. Savarese* , 668 F.3d 1, 6 (1st Cir. 2012) .............................................12

*United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011)..............................26

*United States v. Sun–Diamond Growers*, 526 U.S. 398, 404–05 (1999)......................13

*United States v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012)..........................................18

*United States v. Yefsky* , 994 F.2d 885, 893 (1st Cir. 1993) ..........................................12

*Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 446 (2015) ................................................17

## STATUTES

18 U.S.C. §§ 1343 and 1346 ......................................................................................3, 25

18 U.S.C. §201 ..............................................................................................................25

18 U.S.C. §371................................................................................................................3

18 U.S.C. §666..........................................................................................................3, 25

18 US.C. § 1951 ............................................................................................................22

## RULES

Fed. R. Crim. P. 12(b)...................................................................................................14

Fed. R. Crim. P. 12(b)(3)(B)........................................................................................14

## TREATISES

BLACK'S LAW DICTIONARY (10th ed. 2014).......................................................13

Black's Law Dictionary (11th ed. 2019)......................................................................22

Defendant Wanda Vazquez-Garced ("Vazquez-Garced") respectfully submits this memorandum of law in support of her motion to dismiss Counts One, Three and Four of the Indictment based upon the failure of Plaintiff United States of America ("Plaintiff" or the "Government") to allege an explicit *quid pro quo*.

## **INTRODUCTION**

A bribery case requires not simply a *quid* and a *quo*, but most crucially, a *pro* – that is, an agreement to exchange one thing for another. In the context of this case, where the Government alleges that the "bribe" consisted of the campaign contributions to a public official (or, more precisely, the promise to make campaign contributions in the future), rather than personal payments, the Supreme Court has articulated a heightened standard: the *pro* must be explicit. An explicit *pro* is the constitutional circuit breaker against governmental overreach to transform otherwise legal campaign contributions and routine government actions into a prosecution for bribery and honest services fraud.

The Supreme Court inserted this circuit breaker because it found that the Government must tread carefully when it seeks to regulate or prosecute activities involving campaign contributions, as the ability of campaign contributors to express their views and support for public officials by contributing to their campaign is considered a core principle of a functioning democracy, and a right protected by the First Amendment. Moreover, officials' responsiveness to their contributors and other supporters is both wholly lawful and recognized as a healthy aspect of our democracy rather than a crime that should be prosecuted.

The Government can only meet this heightened pleading standard if the alleged agreement to exchange campaign contributions for an official action is explicit: *i.e.,* not inferred from

ambiguous statements or a circumstantial chronology of events, but *explicit*, meaning an actual, clear and unambiguous agreement expressed by and between the charged parties. *McCormick v. United States*, 500 U.S. 257, 273 (1991) ("The receipt of such contributions is … vulnerable under the [Hobbs] Act as having been taken under the color of official right, but only if the payments are made *in return for an explicit promise or undertaking by the official to perform or not to perform an official act.* In such situations the official conduct *will be controlled* by the terms of the promise or undertaking") (emphasis added).

And yet, notwithstanding the Supreme Court's clear mandate, the Government decided to indict a former Governor - with no prior political experience and appointed to her post by the Supreme Court of Puerto Rico in the midst of Puerto Rico's gravest constitutional crisis – based on text messages between third parties to infer an illegal *pro* – exactly what the Supreme Court has prohibited the Government from doing. A *pro* reached by inference is simply no *pro* at all, much less one that meets the heightened "explicit" standard. Nowhere in the Indictment can Vazquez-Garced's "explicit promise" be found. The Government's failure to allege in the Indictment a required element of the offense warrants its dismissal.

The position adopted by the Government is so aggressive that if allowed to continue it would effectively criminalize, and certainly chill, the kinds of lawful interactions between our elected officials and their constituents that occur every day in this country, and which enable this country's privately funded campaign finance system to function as intended - which the Supreme Court has said are a "central feature of our democracy." *Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1653 (2022).

Vazquez-Garced is charged in three of the seven counts in the Indictment. All three counts against Vazquez-Garced are contingent on the Government's core allegation of a bribery scheme involving Vazquez-Garced and co-defendant Julio Herrera Velutini ("Herrera"). Count One charges a conspiracy to commit bribery (18 U.S.C. §371); Count Three charges bribery (18 U.S.C. §666(a)(1)(B) and (2); and Count Four charges honest services wire fraud (18 U.S.C. §§ 1343 and 1346). Accepting the allegations raised in the Indictment as true for purposes of this motion, the Government has failed to allege any *quid pro quo*, let alone an explicit *quid pro quo*. Accordingly, the prosecution has failed to allege a bribery scheme under the relevant statutes, and the Court should dismiss these Counts pursuant to *McCormick v. United States, supra,* as other courts have done at the indictment stage in cases in which the Government's attempt to criminalize otherwise First Amendment-protected campaign activity falls short; even in cases where the allegations of a *quid pro quo* were much stronger than they are here. We respectfully submit that this case should be dismissed given the fatal deficiencies of the charges in the Indictment.

## <u>BACKGROUND</u>

The charges in the Indictment stem from a purported bribery scheme relating to Vazquez-Garced's 2020 primary campaign for Governor of Puerto Rico. Broadly, the Government alleges that during this campaign period Vazquez-Garced agreed to terminate the Commissioner of the Office of Financial Institutions ("OCIF") and appoint a new Commissioner of Julio Herrera's ("Herrera") choosing, exclusively in exchange for "funding in support of Vazquez's election campaign" - rather than any personal benefit to Vazquez herself. (See Indictment, Dkt. No. 3 at ¶ 30.)

In support of this purported conspiracy, the Indictment alleges the following:[1]

In or around July 2019, OCIF initiated an examination of an international bank (the "Bank") described in the Indictment as an International Banking Entity ("IBE") established under Puerto Rico's International Banking Center Regulatory Act of 1989.  The Bank was licensed as an IBE by OCIF. The ultimate owner of the Bank was Herrera. (*See id.* at ¶25.)

According to the Indictment, the examination identified certain areas at the Bank that OCIF determined required corrective action.   For example, OCIF purportedly identified financial transactions that the Bank conducted on behalf of its customers that OCIF deemed suspicious, but that were not reported by filing suspicious activity reports ("SARs") as required by the BSA. (*Id.* at ¶¶ 25 – 26.)

OCIF's actions were viewed by many in the Puerto Rico financial sector, including Herrera and representatives of the Bank, as misinformed and heavy-handed.  As such, Herrera and others sought to support the newly appointed Governor Vazquez-Garced  and "build a new structure [in OCIF] that regulates and doesn't persecute the banks and change documents or fabricate documents' against the banking industry." (*See id.* at ¶ 37.)

On or about December 17, 2019, Herrera exchanged text messages with John Blakeman ("Blakeman"), a political consultant, regarding an "International Consulting Firm," and how "the International Consulting Firm could make their 'friend' win the primary election." (*Id.* ¶38.) Although the Government infers that the "friend" referenced in this correspondence was Governor

---

[1] Vazquez-Garced disputes the accuracy of the allegations in the Indictment.  The following recitation is set forth only to articulate the allegations in the Indictment that are relevant to the instant motion.

Vazquez-Garced, the Indictment *does not* allege – because it simply cannot – that Vazquez-Garced was involved in, or even remotely aware of, these communications.

The next day, Governor Vazquez's deputy chief of staff sent a text message to Individual C to let him know that Vazquez-Garced would be attending Individual C's wedding. Individual C responded that *he* would sit Vazquez "with three billionaires." (*Id*. at ¶ 39.) (emphasis added.) The Indictment does not allege that Vazquez-Garced knew that her deputy chief of staff had sent the text to Individual C, nor that she was to be seated with three "billionaires."

Herrera was seated at the same table as Vazquez-Garced at Individual C's wedding, along with a number of other influential businesspeople. (*See id.* at ¶ 42.)  According to the Government, at some point during the wedding, Blakeman sent a text message to Herrera stating that Vazquez-Garced would win the election if she had "the support from you all," to which Herrera responded that she "has it. In this table she already has 2MM," but, "she ha[d] to resolve" ongoing issues with respect to the longstanding mismanagement and abuses of OCIF. (*Id.* at ¶¶ 37, 42.)  However, and crucially, the Indictment does not detail *any* conversations between Herrera and Vazquez-Garced during the wedding, much less that they entered into an explicit *quid pro quo* relating to campaign funding. In fact, the Indictment does not allege that *anyone* at the wedding, including the other "billionaire[s]," in attendance agreed to contribute any money to her primary campaign or participate in any unlawful *quid pro quo* arrangement.

It is further alleged that, on or about January 6, 2020, Defendant Mark Rossini ("Rossini"), another political consultant, corresponded with "Partner 1" of the International Consulting Firm, and allegedly indicated that "I'll be in Puerto Rico next week for 2 days with [Herrera] to meet the governor.  I know he saw her this past weekend and she wants to see him next week. I know she

is keen on [International Consulting Firm]." (*Id.* at ¶ 43.)  The Indictment indicates that, on January 7, 2020, Herrera separately corresponded with Partner 1, and allegedly represented that "I will have next week a meeting with the gobernadora [governor] of Puerto Rico PR to present My support and follow the conversation we had on the 4 of January with her," and that Herrera would "like to present [the International Consulting Firm] to her and how much we can do for her." (*Id.* at ¶ 44.)

On or about January 14, 2020, Governor Vazquez-Garced and her staff allegedly held a meeting with Herrera, [Bank employee Frances] Diaz and Blakeman at La Fortaleza. (*Id.* at ¶46.) The Indictment is silent as to what transpired during the meeting and does not allege that any *quid pro quo* agreement whatsoever was reached.

The next day, Rossini exchanged messages with International Consulting Firm Partner 1 to let him know that "the Governor wants [the International Consulting Firm]" and that "[s]ome campaign finances will pay for your services. The bulk will be paid by [Herrera]." (*Id.* at ¶ 47.) As before, the Indictment does not allege that Governor Vazquez-Garced was involved, or even aware, of Rossini's independent correspondence and the representations made therein.

The Indictment next broadly alleges that "[i]n or around January 2020, Herrera, Rossini, and others retained the International Consulting Firm to conduct polling and research to benefit Vazquez's candidacy in the upcoming campaign." (*Id.* at ¶ 51.)  The Indictment further alleges that "[o]n about January 21, 2020, Rossini emailed International Consulting Firm Partner 2, confirming the date that the International Consulting Firm would provide a presentation of their services to Vazquez." (*Id.* at ¶ 53.) The Indictment does not, for instance, allege that such research was prepared solely for Governor Vazquez-Garced's campaign or whether her campaign even

6

requested or utilized – much less benefited from – this research. In fact, the work done by ICF merely consisted of general "political research in connection with the 2020 Puerto Rico gubernatorial campaign." (*Id*. at ¶ 96.)

The Indictment goes on to allege that, in or around the end of January 2020, "Blakeman, acting at the direction of Vazquez, informed [Bank employee Frances] Diaz that Vazquez's administration needed the Bank to provide the name of someone to replace OCIF Commissioner A." (*Id*. at ¶ 52.) As alleged, Herrera corresponded with Diaz and stated that "[Individual C] asks that WV wanted to know who to put in Ocif." (*Id*. at ¶ 54.) Approximately one week later, Individual A wrote in a text to Blakeman that they were "working OCIF with [Vazquez's Chief of Staff]!!" (*Id*. at ¶ 55.) Although the Indictment does allege that Blakeman acted "at the direction of Vazquez," it does not allege the context in which the alleged "direction" was given nor that his inquiry was the result of Vazquez's acquiesce to any previous explicit agreement with Herrera. In fact, the Indictment does not have a single allegation stating that there was an explicit agreement between them prior to this date. Regarding Individual A's text, at no point across these allegations does the Indictment remotely indicate that Governor Vazquez-Garced had authorized, or was even aware of, such communication or representation.

On or about January 30, 2020, "Diaz wrote in a text message to Herrera that she had been told that OCIF Commissioner A was going to be terminated soon." (*Id*. at ¶ 57.)  It is further alleged that, shortly thereafter, on or about February 3, 2020, "Blakeman wrote in a text message to Diaz, translated from Spanish to English, that Blakeman had called Fortaleza and had been informed that 'G's instruction was given,' referring to Vazquez's instruction to her staff to terminate OCIF Commissioner A." (*Id*. at ¶ 58.)  Ultimately, "[i]n or around the last week of February 2020, Vazquez's Chief of Staff summoned OCIF Commissioner A to a meeting at

7

Fortaleza.  There, at Vazquez's direction, Vazquez's Chief of Staff told OCIF Commissioner A that he had to resign from his position by February 28, 2020." (*Id*. at ¶ 72.)

With respect to the International Consulting Firm, the Indictment alleges that, "[o]n or about February 23, 2020, Individual C sent Vazquez and Individual A a presentation prepared by the International Consulting Firm entitled '[International Consulting Firm] Campaign Support Proposal for Governor Wanda Vazquez." (*Id*. at ¶ 68.) Thereafter, on or about February 28, 2020, "Vazquez met with Herrera, Rossini, Blakeman, Diaz, Individual A, Individual C, and partners from the International Consulting Firm at a hotel in the Condado area of San Juan, Puerto Rico so that the International Consulting Firm could present the services it could offer Vazquez in support of her gubernatorial campaign." (*Id*. at ¶ 77.)  According to the Indictment, "[d]uring the February 28, 2020 meeting, the partners from the International Consulting Firm gave a presentation of the services it *could* offer to Vazquez in support of her election campaign, including research and campaign strategy formulation."  (*Id*. at ¶ 79) (italics added.)  Moreover, the Indictment alleges that "[d]uring the February 28, 2020 meeting or shortly thereafter, Blakeman informed Vazquez that Herrera paid for or would be paying for the International Consulting Firm's services to benefit Vazquez's upcoming election campaign." (*Id*. at ¶ 80.)  Notably, the Indictment fails to address Vazquez's reaction, if any, to the presentation, whether the International Consulting Firm's proposal ever was acted upon, because ultimately the International Consulting Firm *was not* retained directly or indirectly by Vazquez-Garced and *did not* provide any consulting services to the Vazquez-Garced campaign.[2]

---

[2] This allegation is made by the fact that the Indictment does not allege, because it cannot allege, that the ICF was ever engaged by the campaign or that it provided any services to it.

8

Separately, the Indictment alleges that, "[d]uring the February 28, 2020 meeting, Herrera, Rossini, and others discussed creating a SuperPAC to support Vazquez's campaign." (*Id*. at ¶ 81.) It is further alleged that, "[i]n or around March 2020, Herrera, Rossini, and others hired Political Consultant A to manage the SuperPAC that they agreed to form to support Vazquez, and conveyed to Vazquez through intermediaries that they had made this hire." (*Id*. at ¶ 99.)  Thereafter, Political Consultant A registered "SuperPAC 1" with the Federal Election Commission on or about April 8, 2020. (*Id*. at ¶ 100.)  Notably absent from the Indictment, however, is any acknowledgement that – beyond registration – SuperPAC 1 was *ever funded* by any of the parties for the benefit of Governor Vazquez-Garced, nor was it ever used to benefit Vazquez-Garced.

Lastly, the Indictment alleges that, "[o]n or about February 29, 2020, the day after termination of OCIF Commissioner A and the meeting at the hotel, Herrera called OCIF Commissioner B and asked if he was interested in becoming Commissioner." (*Id*. at ¶ 85.)  The Indictment further alleges that, on or about March 30, 2020, Herrera received a text message from OCIF Commissioner B to let him know that he "was having difficulty getting in touch with Fortaleza to discuss his possible nomination." (*Id*. at ¶ 108.) Herrera forwarded the email to Blakeman who responded that he would "pass it along immediately." (*Id*.)  Thereafter, "[o]n or about May 12, 2020, Rossini sent a text message to Blakeman about the status of OCIF Commissioner B's appointment, asking 'if the advice provided has been implemented.' Blakeman responded to Rossini that 'they are implementing the recommendations,' and that 'the guy for OCIF went to Fortaleza and was interviewed." (*Id*. at ¶ 116.)  Crucially, although the Indictment therefore acknowledges – however broadly – that Commissioner B was formally vetted and interviewed for the position of Commissioner, the Indictment fails to similarly assert that

Commissioner B was the *only* candidate being considered by Governor Vazquez-Garced for this position, and that no *other* potential candidates would be vetted during this same period.

Ultimately, on or about May 14, 2020, Governor Vazquez-Garced appointed OCIF Commissioner B as the new Commissioner of OCIF.  (*Id*. at ¶ 118.)  As a recurring theme throughout the Indictment, it is wholly absent from the timeline constructed by the Government any allegations that Governor Vazquez-Garced was aware of the correspondence occurring between other parties, or that Governor Vazquez-Garced had entered into any explicit agreement with such parties relating to the appointment of OCIF Commissioner B.  Notably, also absent from the Indictment is any allegation about whether or not Commissioner B recused himself from any oversight or involvement in matters related to the Bank or intervened in any ongoing audits of the Bank.[3] (*See e.g.,* ¶¶ 148 and 155.)

The charges in the Indictment rest on the claim that there was a corrupt promise to help the gubernatorial campaign in exchange for Commissioner A's termination. The Government hopes that a reader might infer from the allegations that Herrera linked his help to Vazquez-Garced's gubernatorial campaign to Commissioner A's termination. But, there is no allegation that Vazquez-Garced explicitly agreed to it. None. She can only be indicted for her own actions – not those done by others.

The allegations in the Indictment only refer to text messages between Herrera, Diaz, Blakeman and Individuals A and C.  Whether or not *they* thought that there was a *quid pro quo* is

---

[3] The Indictment alleges that, after Vazquez-Garced lost the election, the co-defendants attempted to bribe Public Official A to resolve ongoing audits of the Bank. Thus, it can be reasonably inferred from the Indictment that Commissioner B *did not* intervene to derail the ongoing audit in order to benefit Herrera.

irrelevant. It only matters what Vazquez-Garced explicitly agreed to do.  And, while the Government may also hope that a reader might infer from the allegations that an *implicit* agreement arose between the parties, *McCormick* has long held that such allegations are wholly insufficient to plead a viable claim. In reality, the Indictment is entirely silent as to Governor Vazquez-Garced's state of mind, and lacks a single allegation stating that Vazquez-Garced agreed to anything – much less that her future conduct would "*be controlled* by the terms of [an explicit] promise." *See McCormick,* 500 U.S. at 273.

Neither the factual allegations nor the charging language of Counts One, Three and Four allege the existence of an explicit *quid pro quo* - precisely what the Supreme Court, and many other courts following its seminal decision in *McCormick*, have said cannot and should not be prosecuted.

## **ARGUMENT**

For the reasons that follow, the Counts One, Three and Fourth of the Indictment must be dismissed because they fail to allege an explicit *quid pro quo*, which is an essential element of the bribery and honest services wire fraud charges against Vazquez-Garced.

This is the most aggressive purported political bribery case ever attempted in this District. It was filed against a career prosecutor who was appointed governor by the Supreme Court of Puerto Rico in the midst of the gravest constitutional crisis ever experienced in Puerto Rico.

It was also filed despite well-established Supreme Court precedent establishing an extremely high bar that the Government must overcome to allege bribery and honest services fraud based on campaign contributions and legal government actions. Given the prosecutions that courts have dismissed based on far more egregious facts, the Government has overreached here by

bringing a case against a former Governor where the alleged official actions were in no way predicated upon an any explicit agreement between the parties, nor even benefited the alleged donor(s) of the contributions. In fact, there is no allegation in the Indictment that Vazquez Garced in any way intervened with the ongoing OCIF investigation of the Bank, nor that she directed OCIF Commissioner B to stop or derail the investigation.  To the contrary, the investigation continued unaltered after the appointment of Commissioner B. (*See, e.g.,* ¶¶ 138(b), 139 and 148.)

Most significantly, and as the Supreme Court made clear in *McCormick*, this prosecution poses a direct threat to the most fundamental principle that our elected officials can and should be responsive to the interests and needs of their constituents, who in turn can and should show their support for actions they approve of, including by providing campaign contributions.

### The Legal Standard on a Motion to Dismiss the Indictment

An indictment is sufficient "if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend and enables him to enter a plea without fear of double jeopardy." *United States v. Yefsky* , 994 F.2d 885, 893 (1st Cir. 1993) (citing *Hamling v. United States* , 418 U.S. 87, 117 (1974)). A well-pleaded indictment can parrot "the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged." *United States v. Savarese* , 668 F.3d 1, 6 (1st Cir. 2012); *United States v. Parigian*, 824 F.3d 5, 9 (1st Cir. 2016) (same).

In meeting these requirements, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," but only "as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary

12

to constitute the offence intended to be punished." *Id.* (quoting *United States* v. *Carll*, 105 U.S. 611, 612 (1882)." *Hamling v. United States*, 418 U.S. at 117.

Even when construed in a common-sense way, "[a]n indictment that requires speculation on a fundamental part of the charge is insufficient." *United States v. Bobo*, 344 F.3d 1076, 1083-84 (11th Cir. 2003). As noted, under 18 U.S.C. §§ 666(a)(2) and 1343 and 1346, the Government must prove the existence of a *quid pro quo*, or a specific intent to give or receive something of value in exchange for an official act. *McDonnell v. United States*, 579 U.S. 550 (2016); *United States v. Sun–Diamond Growers*, 526 U.S. 398, 404–05 (1999). However, the Supreme Court has expressly held that there is a heightened pleading standard when the thing of value representing the "quid" is a political contribution. *McCormick*, 500 U.S. at 274. As such, when campaign contributions are involved, the case law makes clear that an *explicit quid pro quo* <u>is an essential element of the offenses</u> of federal bribery and honest services fraud.

An element of the offense is a "constituent part[ ]' of a crime's legal definition that a jury must find to be true to convict the defendant." (*Elements of Crime*, BLACK'S LAW DICTIONARY (10th ed. 2014)). In general, "[a]n element is a 'constituent part[ ] of a crime's legal definition' that a jury must find to be true to convict the defendant." *King v. United States*, 965 F.3d 60, 66 (1st Cir. 2020). *McCormick* and its progeny made clear that the government must prove an explicit *quid pro quo* to sustain a conviction under 8 U.S.C. §§ 666(a)(2) and 1343 and 1346.

"When 'one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense.'" *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)

13

(quoting *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996). This makes sense. It is not enough for an indictment to possibly or even plausibly imply an essential element.  Rather, the element must be "necessarily implied." *U.S. v. Palumbo Bros., Inc.*, 145 F.3d 850, 860 (7th Cir. 1998) ("The indictment must be "read to include facts which are necessarily implied" and "construed according to common sense.") (citations omitted); *accord Gov't of Virgin Islands v. Moolenaar*, 133 F.3d 246, 249 (3d Cir. 1998); *United States v. DeSalvo*, 41 F.3d 505, 513 (9th Cir. 1994).

This requirement is essential to the validity of the grand jury process: "if the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury or that the grand jury acted properly in indicting him." *Pirro*, 212 F.3d at 92. After all, "[a]n indictment must include all of the essential elements of the crimes alleged therein, and each basis for conviction must be "clearly set out in the indictment." *United States v. Miller*, 471 U.S. 130, 136 (1985).

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without trial of the issue." Fed. R. Crim. P. 12(b); *see also United States v. Covington*, 395 U.S. 57, 60-61 (1969) (holding that where determinative questions of law are decided in his favor, defendant was entitled to dismissal of indictment).

Specifically, a motion claiming a defect in the indictment, such as lack of specificity or the failure to state an offense, must be raised in a pretrial motion when the basis for the motion is "reasonably available" and the motion can be determined without a trial on the merits. Fed. R. Crim. P. 12(b)(3)(B); *see also United States v. Rodriguez-Rivera*, 918 F.3d 32, 34 (1st Cir. 2019) ("For this reason, the district court was certainly correct to entertain such a pretrial motion claiming

that the indictment failed to state a criminal offense."). When considering a motion to dismiss under Rule 12(b), the court must accept the factual allegations in the indictment as true. *See United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011); *United States v. Bohai Trading Co.*, 45 F.3d 577, 578 n.1 (1st Cir. 1995).

Ultimately then, where the Government has set out detailed allegations in an indictment, the Court must nonetheless dismiss the indictment if those allegations, even if true, do not establish criminal liability.  *See, e.g., Pirro*, 212 F.3d at 92 (dismissing tax fraud and perjury counts because conduct alleged in the indictment did not violate applicable statute); *Aleynikov*, 676 F.3d at 76-79 (dismissing indictment because transferring computer source code, as alleged in the indictment, did not constitute an offense under the National Property Act). Thus, where, as is the case here, the Indictment alleges a political campaign contribution as the basis of charges for federal program bribery and honest services fraud, but fails to allege any "explicit promise" that was made in return for those contributions, the Indictment must be dismissed.

I.   <u>Political Contributions and the First Amendment</u>

The Court's analysis and conclusions should be guided by a paramount constitutional protection: The First Amendment. This case implicates democratic and First Amendment values that lie at the heart of our political process. The Supreme Court has made clear on numerous occasions that campaign contributions are political speech implicating fundamental constitutional guarantees. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 204 (2014) (characterizing campaign contributions as an exercise of one's "expressive and associational" rights under the First Amendment); *Buckely v. Valeo*, 424 U.S. 185, 204 (2014) (observing that campaign contributions implicate "the contributor's freedom of political association" under the First

Amendment). The Court recently reiterated this point stating that "[t]he First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Fed Election Comm'n v. Cruz*, 142 S.Ct. 1638, 1650 (2022) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

The Government must overcome a very high burden when seeking to criminalize making and receiving political contributions.  "[C]ontributing money to, and spending money on behalf of, political candidates implicates core First Amendment protections." *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 486 (2007) (Scalia, J., concurring). When the Government seeks to criminalize political contributions, it "operate[s] in an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). These First Amendment principles are at their pinnacle during political campaigns, *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 223 (1989), and, while the Government may target "*quid pro quo*" corruption in this context, *Buckley*, 424 U.S. at 26-27, it must tread carefully when it does so.

This conclusion is compelled by the Supreme Court's reasoning in *McCormick*, which held that when the Government seeks to criminalize a political contribution, it must allege that the official and the donor engaged in an explicit *quid pro quo*. 500 U.S. at 274. In other words, the Indictment must allege that the contribution was "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id*. To allow prosecutions based on anything less would chill constitutionally protected conduct, such as a donor's constitutionally-protected efforts to "garner influence over or access to elected officials" through provision of campaign support, *McCutcheon*, 572 U.S. at 208-09, or a politician's efforts "to be appropriately responsive to the preferences of [her] supporter," *Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 446 (2015).

16

As such, the Supreme Court held that the receipt of campaign contributions is criminal under the statute "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, 500 U.S. at 273. The Court further explained, "*[i]n such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking*." *Id.* (emphasis added).

> Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.

*McCormick*, 500 U.S. at 272. The rule that McCormick established, requiring an explicit *quid pro quo*, has since served to draw a clear line between a corrupt bargain and legitimate campaign fundraising to prevent prosecutors from chilling democratic participation and punishing conduct that is necessary and central to our system of elective government. And here, counts One, Three and Four of the Indictment, which allege political contributions to be bribes, fail to allege an explicit *quid pro quo* between Governor Vazquez-Garced and her co-defendants. Thus, these Counts should and must be dismissed.

This is a case where First Amendment principles are not tangential to the validity of the prosecution, but rather central to it. In drawing the line between *quid pro quo* corruption and general influence, "the First Amendment requires [the Court] to err on the side of protecting

17

political speech rather than suppressing it. *McCutcheon*, 572 U.S. at 209 (quoting *Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 457 (2007).

Courts in this Circuit have acknowledged the application of the *McCormick* pleading standard in circumstances where the indictment alleges bribery in the form of campaign contributions. *See, e.g.*, *United States v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012) (citing *McCormick* when holding that "a specific quid pro quo is necessary for conviction . . . when an official receives a political contribution") (internal quotation marks omitted); *United States v. Cruzado–Laureano*, 404 F.3d 470, 482 (1st Cir. 2005) (same); *United States v. Perez-Otero*, 2023 WL 2351900 at 5 (D.P.R. Mar. 3, 2023).[4] The *McCormick* explicit *quid pro quo* standard "applies only in the context of campaign contributions." *United States v. McDonough*, 727 F.3d 143, 155 n. 4 (1st Cir. 2013) (citing *Turner*, 684 F.3d at 253-54.)

Meanwhile, in *United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021),  the district court dismissed counts charging bribery under §666 as insufficiently explicit under *McCormick*. There, the Government had alleged that the defendant had bribed county clerks so that they would be hired to collect fines, fees, and other court-related debts owed to the court. The indictment described a series of interactions between the defendants and clerk reflecting that the defendants had increased their contributions above those competing debt-collectors in order to obtain additional business from the county.  In one instance, the indictment alleged that one of the

---

[4] The Court in *Perez-Otero* ultimately declined to apply the *McCormick* standard in that case, since "[a]s a threshold matter, a careful reading of the indictment against Pérez-Otero show[ed] that the government did not charge him with soliciting, demanding, accepting or receiving a campaign contribution." *Id.*  In contrast, campaign contributions are the *only* alleged *quid* in the charged scheme in the instant case.

18

defendants had made additional payments because a clerk had "busted [his] stones and said [another debt-collection company] ponied up another 10K." *Donagher*, 520 F. Supp. 3d at 1041. In another instance, after a clerk told a defendant that a competing debt-collector had contributed a certain amount to her campaign, the defendant directed his employees to give that same amount "plus a dollar," and subsequently hosted a birthday party in her honor. *Id.* According to the indictment, the defendant even told his political lobbyist that "we made a shitload of [election] calls for [the Clerk]. Have you all received the numbers we requested to make sure everything is equal?" *Id*. The court dismissed the indictment under *McCormick*.  In so doing, the court held that – while a reader of the indictment could "plausibly infer that Defendants gave their contributions with the mere hope that the Clerk would confer favorable treatment upon [the defendants' company] in return, without any understanding or agreement as to how their efforts would be received" (*id.* at 1046) – the Government had nonetheless failed to allege an explicit *quid pro quo*, which, under *McCormick*, must be "clear and unambiguous, leaving no uncertainty about the terms of the bargain." *Id.* at 1045.

Even though the allegations in *Donagher* suggested a much closer link than here between contributions and the official action – including conduct and statements creating a strong inference that the bribers were increasing their contributions in order to win business with the county – those allegations fell short under *McCormick*.  Therefore, the court held that it was necessary to dismiss the indictment, as "doing so is necessary to shield ordinary, constitutionally protected campaign financing activities from criminal prosecutions." *Id.* at 1046 (citing *McCormick*, 500 U.S. at 271-73).

Lastly, and perhaps most notably, the court in *United States v. Benjamin* recently examined in detail the heightened pleading standard required of campaign contribution-based bribery charges.  There, the court dismissed at the pretrial stage three counts of an indictment which charged defendant Brian Benjamin, a public official, with charges identical to those filed against Vazquez: bribery under 18 U.S.C. § 666(a)(1)(B), honest services wire fraud under 18 U.S.C. § 1346, and conspiracy to commit those offenses, because "the Indictment fail[ed] to allege an explicit *quid pro quo*, which is an essential element of the bribery and honest services wire fraud charges brought against Benjamin." *Benjamin*, 2022 WL 17417038 at 1 (S.D.N.Y. Dec. 5, 2022).[5] Instead, the *Benjamin* court concluded, "for criminal liability for bribery in the context of campaign contributions, there must be a *quid pro quo* that is ***clear and unambiguous***, meaning that (1) the link between the official act and the payment or benefit — the *pro* — must be shown by something more than mere implication, and (2) ***there must be a contemporaneous mutual understanding*** that a specific *quid* and a specific *quo* are conditioned upon each other."  *Id*. at 12 (emphasis added).

Whether this Court adopts *Benjamin*'s language is not determinative of how this Motion should be decided because – as aforementioned – the Indictment fails to meet the foundational *McCormick* standard, as nowhere does it allege any "explicit promise or undertaking" made by Governor Vazquez-Garced in return for the "campaign contributions" purportedly provided by Herrera.  In essence, the *Benjamin* decision simply further highlights the notable deficiencies inherent in this Indictment.

---

[5] The case is currently under appeal.

II.     The Meaning of McCormick's "Explicit" Requirement

What is the meaning of an explicit or express promise? The Second Circuit tackled this question in *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), where it explained the distinction between the *Evans* standard for non-campaign contribution cases[6] and the *McCormick* standard for campaign contribution cases.

There, the Second Circuit held that, when the alleged bribe consists of campaign contributions, the *quid pro quo* must be explicit – which means it must be "express." *Ganim*, 510 F.3d at 142-43 (Sotomayor, J.).  Moreover, the Second Circuit made clear that, under *McCormick*, "proof of an *express* promise is necessary when the [allegedly corrupt] payments are made in the form of campaign contributions." *Id*. at 142 (italics added). Citing its prior decision in *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993), the court distinguished such cases from those that do not involve campaign contributions.  With regard to the latter involving personal benefits, the *quid pro quo* may be implicit – that is, it may be "implied from [the official's] words and actions." *Id*. at 414 (citing *Evans v. United States*, 504 U.S. 255, 272-73 (1992) (Kennedy, J.), concurring in part and concurring in judgment)).[7] But with regard to campaign contribution cases, as here, the explicit (or "express," as *Ganim* requires) standard governs.

One thing is clear, an "explicit" promise cannot be satisfied by implication, as it would be contradictory to hold that a *quid pro quo* agreement could be simultaneously "explicit" and

---

[6] *Evans v. United States*, 504 U.S. 255, 272-73 (1992).

[7] On this basis, the Second Circuit distinguished *Evans v. United States*, a Supreme Court case which followed *McCormick* and involved an allegation of bribes that were not campaign contributions, from *McCormick* itself.

"implicit." *Compare: Implied*, Black's Law Dictionary (11th ed. 2019) (defining "implied" as "[n]ot directly or clearly expressed; communicated only vaguely or indirectly," or "[r]ecognized by law as existing inferentially"), with *Explicit, Id*., (defining "explicit" as "[c]lear, open, direct, or exact" or "[e]xpressed without ambiguity or vagueness; leaving no doubt") and *Express, Id.*, (defining "express" as "[c]learly and unmistakably communicated; stated with directness and clarity").

Perhaps the best evidence of the meaning of *McCormick*'s explicit *quid pro quo* comes from the facts of *McCormick* itself.  Whatever an "explicit" *quid pro quo* might entail, it must be more explicit than the exchange in *McCormick* – in which the Court reversed the defendant's conviction for lack of a sufficiently "explicit" *quid pro quo*.

III.        The Facts in *McCormick*

In *McCormick* the Government charged the defendant, a West Virginia legislator, with Hobbs Act[8] extorsion in connection with payments he received during his campaign from a lobbyist. As a legislator who represented a district with a shortage of medical doctors, the defendant supported a state program allowing foreign medical school graduates to obtain temporary practice permits. When certain members of the legislature sought to end the program, a lobbyist on behalf of foreign doctors worked to extend it. The defendant sponsored legislation extending the program, which ultimately passed, and then, after discussions with the lobbyist, agreed to sponsor future legislation granting permanent medical licenses.

---

[8] *See* 18 US.C. § 1951.  The statute defines "extortion" as among other things, "the obtaining property from another, with his consent, … under color of official right."

During his subsequent reelection campaign, the defendant told the lobbyist that his campaign was "expensive," that he had spent substantial money "[from] his own pocket," and that he "had not heard anything from the foreign doctors." *McCormick*, 500 U.S. at 260. The lobbyist responded that he would reach out to the foreign doctors and "see what he could do." After he did so, the foreign doctors sent multiple cash payments to the defendant, and the lobbyist delivered to him an envelope containing nine $100 bills. *Id.* The defendant did not list any of the payments as campaign contributions or report them on his personal tax returns.[9] He then sponsored and advocated for the permanent licensing bill, which was passed and signed into law. Two weeks later, the defendant received another cash payment from the foreign doctors. *Id.* The defendant was charged with extortion and convicted at trial.

The Supreme Court reversed. Below, the Court of Appeals had adopted a multifactor test to determine whether campaign contributions were "illegitimate, extortionate payments" that looked to factors including "whether the official acted in his official capacity at or near the time of the payment of the payor, whether the official had supported legislation before the time of the payment; and whether the official had directly or indirectly solicited the payor for the payment." *Id*. at 271-72. The Supreme Court concluded that, even if each of those inquiries went against McCormick "as they very likely [did] in the Court of Appeals' view," he still would not have violated the Hobbs Act. *Id.* at 272.

---

[9] The cash payments were not listed in the campaign's ledger as contributions; they were instead "accompanied only by initials of other codes signifying that the money was for" the defendant. *Id*. at 260.

Instead, the Supreme Court held that the receipt of campaign contributions is criminal under the statute "only if the payments are made in return for an **explicit promise or undertaking** by the official to perform or not to perform an official act." *Id*. at 273 (emphasis added). The Court further explained, "[i]n such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *Id.*

In *McCormick* there was a clear *quid* (political contributions); a clear *quo* (sponsoring legislation favorable to the lobbyist's clients); and circumstantial evidence supporting a *pro* – i.e., a direct connection between the two – including the public official telling a lobbyist that his campaign was "expensive," that he had spent substantial money "[from] his own pocket," and that he "had not heard anything from the foreign doctors." Even the lobbyist's promise to "see what I could do" and giving the defendant an envelope with cash. *McCormick*, 500 U.S. at 260. *McCormick*'s point was that the *pro* itself must also be clear and unambiguous – and characterized by more than proximity and vague phrases like "let me see what I can do." Nothing of the sort is alleged in this case: no requests of political contributions by Vazquez-Garced; no cash given to her in envelopes and no tangible benefit to the alleged donor.

IV.   The Rule in McCormick Applies Here

*McCormick* was a Hobbs Act extortion case, but its rule requiring an explicit *quid pro quo* has been recognized to apply equally to federal bribery and honest services fraud cases involving campaign contributions. *McCormick* "placed little reliance upon the text and structure of the Hobbs Act itself." *Donagher*, 520 F. Supp. 3d at 1043; *see also McCormick*, 500 U.S. at 277 (Scalia, J., concurring) (explaining that the majority's reasoning is not grounded in the text of the Hobs Act).

Instead, "what animated the Court's analysis was concern about criminalizing everyday interactions between politicians and their constituents." *Donagher*, F. Supp. 3d at 1043.

Accordingly, courts have applied *McCormick's* explicit *quid pro quo* requirement at the motion to dismiss stage in political bribery cases involving campaign contributions under 18 U.S.C. §§666 and 1343 / 1346. *See Donagher*, F. Supp. 3d at 1044-45 (granting motion to dismiss bribery charges under 18 U.S.C. §666 in light of *McCormick*; "the Court concludes that the government must allege an explicit *quid pro quo*, as an implied element of the offense, where the 'thing of value' under §666(a)(2) consists of a campaign contribution."); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 849-50 (E.D. Pa. 2018) ( "Although *McCormick* involved a prosecution for Hobbs Act extortion under color of official right, courts have applied its explicit quid pro quo requirement to prosecutions for honest services fraud and bribery when the thing of value offered in exchange for an official act is a campaign contribution."); *United States v. Menendez*, 132 F. Supp. 3d 635, 644 (D.N.J. 2015) (granting motion to dismiss bribery counts under 18 U.S.C. §201 for failure to meet *McCormick's* "heightened pleading standard" requiring an explicit *quid pro quo). See also*: *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobs Act: absent some fairly explicit language otherwise, accepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act.").

Indeed, the United States has conceded in other cases that *McCormick* applies to prosecutions under 18 U.S.C. §§ 666 and 1343/1346 where the alleged bribe is a campaign

contribution.  *See, e.g., Pawlowski*, 351 F. Supp. 3d at 849 ("[T]he parties agree [in a bribery prosecution under §666] that where the '*quid*' or thing of value offered is a campaign contribution, the Government must prove a *quid pro quo* that is explicit – i.e., an explicit *quid pro quo*."); *Menendez*, 132 F. Supp.3d at 641-43("The government has not disputed the application of the *McCormick* requirement to the bribery and honest service fraud charges…"(citation omitted)).

## V.     The Indictment Does Not Allege the Requisite Explicit Quid Pro Quo

The Indictment does not come close to meeting the pleading standards set forth in *McCormick* and its progeny.  As detailed above, the Indictment alleges that – between in or around December 2019 and in or around June 2020 – Herrera and Rossini planned to provide financial support to Vazquez's election campaign in return for Vazquez firing OCIF Commissioner A and appointing OCIF Commissioner B.  However, the Government does not allege the existence of any explicit promises or agreements to do so, and instead seeks to **infer** the existence of a *quid pro quo* agreement from the timing and circumstances of Herrera's and Rossini's offers of political support, on the one hand, and Vazquez's official actions, on the other.

The allegations of the Indictment fall well short of the heightened burden applicable to campaign finance-based bribery charges.  Indeed, the allegations in this case are far weaker than those in *McCormick* and other cases where courts have dismissed the bribery charges at the indictment stage.  As set forth in greater detail below, whether or not Herrera or any other party sought to contribute to Governor Vazquez-Garced with the desire to advance their own interests, or whether Governor Vasquez-Garced may have taken an official action with the desire to receive contributions, are entirely immaterial, as "[a]n official act taken in the hope that it will yield

26

campaign contributions is not a bribe; it is a basic aspect of the American political system." *See Benjamin*, 2022 WL 17417038, at 12.

At the outset, much of the Indictment appears to rely upon innuendo and supposition in order to allege – at best – the mere *inference* of an agreement being entered into between the parties. As an initial example, the Indictment recounts the wedding of Individual C in early January 2020, which was attended by – among many others – Governor Vazquez-Garced and Herrera. And, while the Indictment details purported correspondence between Herrera and Blakeman during this event, (*see* Indictment at ¶ 42), what is notably *absent* from this narrative is any allegation that Governor Vazquez-Garced and Herrera even spoke to one another during the event, much less that they mutually and knowingly entered into an explicit *quid pro quo* agreement. Rather, and even from a generous reading of the allegations in the Indictment, Governor Vazquez-Garced never agreed "resolve OCIF" in return for any hypothetical political contributions. Under the Government's strained interpretation of the law, a potential campaign contributor could fall afoul of bribery statutes if he or she made contributions in an effort to influence official action, and an official could be charged if he or she agreed to be influenced by a political contributor.

To the contrary, such vague allusions to future action have been repeatedly rejected as a basis for campaign contribution bribery charges. *See, e.g.*, *United States* v. *Menendez*, 132 F. Supp. 3d 635 (D.N.J. 2015). In *Menendez*, the indictment alleged, among other things, that the alleged briber had made substantial political donations to benefit Senator Menendez, "in return for Menendez being influenced in the performance of official acts, as opportunities arose." *United States v. Menendez*, 2:15-CR-00155 (WHW) (D.N.J. Apr. 1, 2015), ECF No. 457 at ¶¶ 242-49. Relying on *McCormick*, the court dismissed multiple counts of the indictment, concluding instead such allegations did not amount to an explicit *quid pro quo*, but were instead a "generalized

27

expectation of some future favorable action barred by *McCormick*." 132 F. Supp. 3d at 644 (internal quotation marks and citation omitted); *see also United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (discussing *McCormick* and finding that where campaign contributions are involved, "[v]ague expectations of some future benefit should not be sufficient to make a payment a bribe.").

The Indictment further alleges that "Blakeman, acting at the direction of Herrera, told Vazquez … that The Bank wanted OCIF Commissioner A removed from his position," (*see* Dkt. 3 at ¶ 50), and that "Blakeman, acting at the direction of Vazquez, informed Diaz that Vazquez's administration needed The Bank to provide the name of someone to replace OCIF Commissioner A" (*see id.* at ¶ 52). These allegations fail the standard set by *McCormick* for several reasons. First, the Indictment alleges that Blakeman was "acting at the direction of Herrera" and then "of Vazquez," but does not allege any conversation between Blakeman and Herrera or Blakeman and Governor Vazquez-Garced where she agreed that her official conduct "will be controlled by the terms of [Herrera's] promise or undertaking." *McCormick*, 500 U.S. at 273. In other words, the Indictment fails even to allege the participation of the co-conspirators in these purported overt acts. Second, the Indictment does not allege that Governor Vazquez-Garced told Blakeman that she would appoint the Bank's preferred candidate for OCIF Commissioner only if Herrera provided financial support to her electoral campaign, which would be necessary under *McCormick* to constitute an explicit agreement.  Finally, as stated above, "[v]ague expectations of some future benefit should not be sufficient to make a payment a bribe." *Allen*, 10 F.3d at 411.

The Indictment goes on to allege that, in or around January and February 2020, Vazquez-Garced decided to fire OCIF Commissioner A, and that individuals who worked for Vazquez-Garced and Herrera exchanged communications regarding that decision.  For example, the

Indictment alleges that Individual A texted Blakeman, "[w]orking OCIF with [Vazquez's Chief of Staff]!!" (*See* Dkt. 3 at ¶ 55.)  In addition, "Diaz wrote in a text message to Herrera that she had been told that OCIF Commissioner A was going to be terminated soon."  (*Id.* at ¶ 57.)  And finally, on or about February 6, 2020, allegedly in reference to firing OCIF Commissioner A, "Diaz wrote in a text message to Herrera … that Individual A had told Blakeman that 'the lady' had already given her instruction to the Chief of Staff and that the first thing she would do when she got back to the office was to call him."  (*Id.* at ¶ 60.)

Even accepting these allegations as true, this was far from an explicit agreement to take official action in return for a bribe. First and foremost, none of these communications can be attributed to Vazquez-Garced.  There is no allegation that she agreed to anything nor that she had any knowledge of the messages between Individual A, Blakeman and Diaz. Unlike the facts in *McCormick*, Vazquez-Garced did not solicit any contributions from Herrera, nor did she remotely hint that contributions were desired, such as by implying that her "campaign was expensive."  *See, e.g.*, *McCormick*, 500 U.S. at 260.

Thereafter, the Indictment alleges in a broad and conclusory manner that "[i]n and around February 2020, Vazquez, Blakeman, Individual A, Individual B, and others met at Fortaleza to discuss Herrera's offer to financially support Vazquez's election campaign in exchange for Vazquez terminating OCIF Commissioner A." (*Id.* at ¶ 71.)  The Indictment then alleges that Vazquez terminated OCIF Commissioner A on or about February 27, 2020, and then – on or about February 28, 2020 – that "Vazquez, Herrera, Rossini, members of the International Consulting Firm, and others" met at a hotel in Condado, "so that the International Consulting Firm could present the services it could offer Vazquez in support of her gubernatorial campaign." (*Id.* at ¶ 77.) Again, accepting these allegations as true, this was far from an explicit agreement to take official

29

action in return for a bribe.  For instance, the Indictment does not allege that Herrera or Rossini actually contributed to Governor Vazquez-Garced's campaign, that the ICF did any work on behalf of her campaign, that SuperPac-1 was ever funded, or that Vazquez-Garced threatened to retaliate unless the alleged promises were fulfilled.  There is not even an allegation that Vazquez-Garced sought assurances that she would receive campaign contributions should she terminate Commissioner A.  And, most importantly, there is no allegation that Vazquez-Garced agreed that her future actions would be "controlled by the term of the promise or undertaking." *McCormick*, 500 U.S. at 273.

According to the Indictment, Governor Vazquez-Garced had decided as early as January 2020 to fire OCIF Commissioner A (*see* ¶ 52), and up to that point, had not received any promise of campaign contributions from Herrera. In fact, according to the Indictment's allegations, it can be inferred that Vazquez was not informed of Herrera's offer to provide funding for her election campaign until February 28 "or shortly thereafter." (*See* ¶ 80.)  And, as for the meeting at the Condado hotel, the Indictment does not allege that OCIF was discussed at this meeting, and it would have been impossible for the parties to have reached the alleged *quid pro quo* at this meeting because Vazquez had already fired OCIF Commissioner A.

To repeat the obvious, *McCormick* holds that an elected official's acceptance of campaign contributions is sanctionable "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.  In such situations the official asserts that his official conduct *will be controlled* by the terms of the promise of undertaking." 500 U.S. at 273 (italics added). The second sentence is key to understanding the limits of the *McCormick* rule: the explicit agreement must precede the official conduct. It then

follows that if the official act is done *prior* to any agreement, then there is no criminal conduct - the official conduct *must* have been controlled by the terms of the explicit agreement.

The Indictment also fails to allege that the "report" prepared by the International Consulting Firm following the meeting at the Condado hotel was a thing of value provided to Vazquez or that it was in any way conditioned on Vazquez terminating OCIF Commissioner A. According to the Indictment, this report, which was issued in or around April 2020 after Vazquez had already fired OCIF Commissioner A, simply "summarized the results of the [International Consulting Firm's] polling and research conducted in Puerto Rico." (*Id.* at ¶ 101.) The Indictment fails to allege that such a report was even tailored to the Vazquez campaign, offered specific strategy recommendations, or that Vazquez and/or her campaign solicited, had input into, or even used the report in connection with any campaign activities.

These kinds of allegations – which rely entirely upon base speculation and inference – are wholly deficient under *McCormick* and cannot support a bribery indictment. Mere temporal proximity between soliciting a campaign donation, receiving it, and taking official action furthering the interests of the donor cannot establish an explicit *quid pro quo*. *See McCormick*, 500 U.S. at 271-72 (rejecting argument that those factors taken together made a campaign contribution illegal and instead concluding that an explicit *quid pro quo* was required). In the *Menendez* case, where, as cited above, the court dismissed counts from the indictment for failing to comply with *McCormick*, the court dismissed additional bribery counts following presentation of the evidence at trial. *See United States v. Menendez*, 291 F. Supp. 3d 606, 623 (D.N.J. 2018). As to those counts, the court found as a matter of law that, under *McCormick*, the government could not ask the jury to simply infer from the timing of certain political contributions to Menendez that they were made in exchange for Menendez's intervention with executive agencies on the alleged

31

briber's behalf.  *Id*. at 623–35. The court rejected the government's invitation to "infer an explicit *quid pro quo* from 'context'" – namely that the alleged briber did not agree to donate until Menendez had set up a meeting for him and Menendez's support supposedly "escalated" following the donation, *id*. at 627 – holding that "[a] close temporal relationship between political contributions and favorable official action, without more, is not sufficient to prove the existence of an explicit quid pro quo."  *Id*. at 624 (citing *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("The official must agree to take or forego some specific action in order for the doing of it to be criminal under § 666. In the absence of such an agreement on a specific action, even a close-in-time relationship between the donation and the act will not suffice.")).

The remainder of the Indictment – which concerns the period that followed the February 28 meeting, including the appointment of OCIF Commissioner B – suffers from the same temporal deficiencies and fatal speculation.  For example, while the Indictment alleges that Herrera's financial support of Governor Vazquez-Garced was also conditioned upon the appointment of OCIF Commissioner B, the Indictment fails to allege any actual contact between Governor Vazquez-Garced and Herrera or Rossini between February 28 and May 14, which is when Vazquez allegedly decided to appoint OCIF Commissioner B.  The Indictment is also devoid of any allegation containing an explicit or express agreement to that effect, even between others on Vazquez's and/or Herrera's behalf.  And that makes sense because the Indictment itself makes clear that such an agreement would have been impossible.  Specifically, the Indictment alleges that Herrera made financial expenditures to the International Consulting Firm on March 25, 2020, that a report by the International Consulting Firm was provided to the Vazquez campaign on April 9, 2020, and that additional campaign support, such as related talking points, were provided through

April 2020. And yet, according to the Indictment, it was not until "on or about May 12, 2020" that the Vazquez team even interviewed OCIF Commissioner B, let alone agreed to the appointment.

Ultimately, the Indictment appears to rest upon vague catch-all phrases that gesture towards an agreement, such as:

- The purpose of the charged conspiracy was for Herrera and Rossini to offer "bribes in the form of things of value, specifically, funding in support of **VAZQUEZ**'s election campaign, in exchange for the specific act[] of **VAZQUEZ** terminating a Commissioner of OCIF and appointing a new Commissioner of HERRERA's choosing." (Indictment at ¶ 30.)[10]

- "[I]n and around February 2020, **VAZQUEZ**, Blakeman, Individual A, Individual B, and others met at Fortaleza to discuss **HERRERA**'s offer to financially support **VAZQUEZ**'s election campaign in exchange for **VAZQUEZ** terminating OCIF Commissioner A." (*Id.* at ¶ 71.)

- "[I]n or around February 2020, HERRERA, through intermediaries, including Blakeman, conveyed to **VAZQUEZ** his willingness to create a SuperPac to support her campaign in exchange for her removal of OCIF Commissioner A." (*Id.* at ¶ 88.)

But, an allegation that a meeting took place "to discuss" Herrera's alleged offer, or that Herrera's offer was "conveyed" to Vazquez-Garced, does nothing to meet the explicit requirement

---

[10] Including the adjective "specific" to link the alleged *quid* to a particular *quo* is of no legal significance under the *McCormick* standard. An implicit quid pro quo can be similarly restricted. It is synonymous to the other allegations in the indictment that the *quid* was offered "in exchange" for a *quo*.

under *McCormick*. A discussion about Herrera's offer, as well as letting Vazquez-Garced know about his "willingness" to support her campaign, does not constitute an "explicit agreement" between Herrera and Vazquez-Garced. The Indictment does not allege that Vazquez-Garced agreed to do anything during that meeting or after she allegedly learned about Herrera's offer to help; and certainly, there was no explicit promise that she would dismiss Commissioner A if Herrera established and funded a SuperPac. While the Government may attempt to argue that a jury might infer a *quid pro quo* from those allegations; that is precisely what *McCormick* forbids in campaign contribution cases. *McCormick* requires an agreement that is clear and unambiguous and in turn controls the official action. Moreover, this requirement means that there must be a ***contemporaneous mutual understanding*** between the parties. *See Benjamin, supra*. An explicit agreement requires a meeting of minds at a specific point in time.  The Indictment is devoid of any allegation that remotely suggests a meeting of minds between Vazquez-Garced and Herrera. This is of particular importance because it is the meeting of minds that must control the *future* official conduct. Nowhere in the 42-page Indictment does the Government allege when did Herrera and Vazquez-Garced entered into an explicit agreement. This is key, since it is only official actions that are controlled after an explicit agreement is reached that may be prosecuted under the bribery and honest services fraud statutes.

Likewise, phrases like "in exchange for" do not satisfy the explicit requirement under *McCormick*.  An indictment relying on an implicit statutory element must allege it explicitly. *See Pirro*, 212 F.3d at 93. To do so, it follows that the Government must directly state the implicit element – or a direct synonym for it – in the indictment.  "In exchange for" is not synonymous with explicit or express. A person gives something "in exchange for" something else in any *quid pro quo*, whether an explicit *quid pro quo* under *McCormick* or an implicit *quid pro quo* under the

34

*Evans* standard for non-campaign contribution cases. Indeed, this is evident from cases like *Ganim* and *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993), where "in exchange for" was used in the jury instructions where the defendant was charged with bribery that was not based on campaign contributions. *See Ganim*, 510 F.3d at 144 ("Both parties appear to agree that the language in the first paragraph [of the jury instructions] – requiring the defendant know 'that the payment was made in return for official acts,' and 'that the payment was made in exchange for a specific exercise of the defendant's official powers' – accurately portrays the applicable *quid pro quo* standard."); *accord Coyne*, 4 F.3d at 113-14.

In fact, "in exchange for" was the language used for the jury instructions in *Evans*. ("However, if a public official demands or accepts money **in exchange for** [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act…" (emphasis added) *Evans*, 504 U.S. at 258.) But, in this case the pleading standard that controls is set forth in *McCormick*, not *Evans*.  Therefore, here, the use of "in exchange for" was thus insufficient to fully appraise the grand jury of a necessary element of counts One, Three and Four.

In sum, the allegations in this case no more make out an explicit *quid pro quo* than did the government's allegations in *McCormick*, *Menendez* and *Benjamin*, as they similarly rely on strained inferences the Government seeks to draw from vague statements made by third parties and the chronology of events that followed those statements — rather than upon an actual, explicit agreement between Vazquez and Herrera that the purported campaign contributions were to be made only if Vazquez-Garced fired OCIF Commissioner A and appointed OCIF Commissioner B.

## **CONCLUSION**

In the three decades since *McCormick*, the Supreme Court has carefully policed the line between corrupt *quid pro quo* arrangements and legitimate fundraising.  By failing to allege any agreement between Herrera and Vazquez-Garced to exchange campaign contributions for official action – much less an explicit agreement – the government's Indictment in this case utterly disregards that line, at the expense of core democratic principles and the First Amendment. Dismissal is not only warranted under *McCormick*, it is also necessary to remedy the chilling effect – what the Supreme Court called the "pall of potential prosecution," *McDonnell*, 579 U.S. at 575 – that the government's decision to proceed with this case will otherwise have on lawful interactions between representatives and their constituents.  Indeed, dismissal is required to comply with the Supreme Court's admonition, disregarded by the government, that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Cruz*, 142 S.Ct. at 1649.

The Government's failure to allege an essential element of the offense means that the grand jury indicted Vazquez-Garced without receiving evidence of an element of the offense and acted improperly in indicting her. It is therefore constitutionally impermissible for this case to continue.

Counts One, Three and Four should be dismissed.

WHEREFORE, we respectfully pray from this Honorable Court to GRANT this motion, and, accordingly, dismiss counts One, Three and Four of the Indictment.

 RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, May 2, 2023.

**s/ Ignacio Fernández de Lahongrais**
IGNACIO FERNANDEZ DE LAHONGRAIS
USDC - PR 211603
255 Avenida Ponce de León, Suite 1210
MCS Plaza
San Juan, Puerto Rico 00918-1475
Tel. 787-923-5789
ignacio@bufetefernandezalcaraz.com


**s/ Luis A. Plaza-Mariota**
Luis A. Plaza-Mariota
USDC - PR 124806
Luis A. Plaza Law Offices
P.O. Box 362122
San Juan, PR  00936-2122
Tel: (787) 764-0310
plaza@luisplazalaw.com

**s/ Peter John Porrata**
PETER JOHN PORRATA
USDC – PR 128901
POB 3943
Guaynabo, PR 00969-3943
Tel.  407-953-9888
peterjohnporrata@gmail.com
*Attorneys for Wanda Vazquez Garced*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this same date, the undersigned attorney filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for all parties in this action.

In San Juan, Puerto Rico, May 2, 2023.

<u>**s/ Ignacio Fernández de Lahongrais**</u>
IGNACIO FERNANDEZ DE LAHONGRAIS
USDC - PR 211603
255 Avenida Ponce de León, Suite 1210
MCS Plaza
San Juan, Puerto Rico 00918-1475
Tel. 787-923-5789
ignacio@bufetefernandezalcaraz.com

38