IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CRIM. NO. 22-342 (SCC) |
| WANDA VÁZQUEZ-GARCED [1], JULIO M. HERRERA-VELUTINI [2], AND MARK T. ROSSINI [3], | |
| Defendants. | |

## OPINION AND ORDER

Pending before the Court is Defendant Wanda Vázquez-Garced's ("Vázquez") Motion to dismiss all charges against her. *See* Docket No. 193. Defendant Julio M. Herrera-Velutini ("Herrera") joins her motion as to all charges against him.[1] *See* Docket No. 198; 205. Defendant Mark T. Rossini ("Rossini") joins her motion only as to Counts One and Four.[2] *See* Docket No. 199; 205. For the reasons below, the Court **DENIES** the Motion to Dismiss at Docket No. 193 as to all relevant counts and defendants.[3]

---

[1] Vázquez is not charged in Count Two, but Herrera is. The Court construes Herrera's request to join and to dismiss Count Two as premised on the same legal theory Vázquez presents in support of dismissing Count Three.

[2] Rossini reserved the right to file a separate motion to dismiss as to Count Two, in which only he and Herrera are charged. *See* Docket No. 199, pg. 2.

[3] The instant Motion to Dismiss, as supplemented by the Motions for Joinder, only addresses the Indictment's first four counts. *See* Docket Nos.

## I.  BACKGROUND

The Court begins with a brief overview of the alleged scheme, reserving a more nuanced discussion of the Indictment's allegations for its analysis.

In August 2022, the Government charged Vázquez, Herrera, and Rossini with conspiracy, federal program bribery, and honest services wire fraud in a seven-count Indictment.[4] *See* Docket No. 3. Allegedly, Vázquez, former Governor of Puerto Rico, along with Herrera, ultimate owner of Bancrédito bank,[5] Rossini, a professional consultant, and others[6] engaged in a bribery scheme in which Vázquez replaced the head of Puerto Rico's banking regulator

---

193, 198, 199. Herrera separately moved to dismiss Counts Five, Six, and Seven in which he alone is charged with a distinct bribery scheme. *See* Docket No. 224. Herrera also moved to dismiss the Indictment in its entirety, alleging that outrageous government misconduct tainted the investigation. *See* Docket No. 262.

[4] Count One charges a conspiracy under 18 U.S.C. § 371. Counts Two and Three charge federal program bribery under 18 U.S.C. §§ 666(a)(2) and 2 and 18 U.S.C. §§ 666(a)(1)(B) and 2 respectively. Count Four charges honest services wire fraud under 18 U.S.C. §§ 1343, 1346, and 2. The remaining counts pertain to a distinct bribery scheme.

[5] Bancrédito is an international bank that conducted business in Puerto Rico during the time covered by the Indictment. *See* Docket No. 3, para. 5.

[6] Certain intermediaries were not indicted in this case.

("OCIF") with a Commissioner of Herrera's choosing in exchange for Herrera providing campaign contributions and political consulting services.[7] *See id.* paras. 5–8; 29–36. This personnel change followed OCIF investigations into alleged regulatory violations by Bancrédito. *See id.* paras. 25–26.

Defendants now move to dismiss Counts One through Four on grounds that the Indictment fails to allege an implied element of § 666 bribery involving campaign contributions: an explicit quid pro quo. *See* Docket No. 193, pg. 1; Docket No. 193-1, pg. 7. Defendants draw this element from *United States v. McCormick* and its progeny. *See United States v. McCormick*, 500 U.S. 257 (1991); Docket No. 193-1, pg. 7. They argue that because the Government did not identify an express agreement between Vázquez and Herrera, this Court should dismiss the bribery counts as well as the conspiracy and honest services wire fraud counts contingent upon them. *See* Docket No. 193-1, pgs. 7, 25.

---

[7] "OCIF" is the Spanish-language acronym for the Office of the Commissioner of Financial Institutions of Puerto Rico.

## II. LEGAL STANDARD

"[A]n indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy." *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "A well-pleaded indictment can parrot 'the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged.'" *United States v. Parigian*, 824 F.3d 5, 9 (1st Cir. 2016) (quoting *United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012)).

Hyper-technical deficiencies will not thwart an indictment that satisfies that standard. Courts "must reject arguments that embrace technical niceties at the expense of common sense." *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018). And judicial glosses, "though helpful in interpreting a criminal statute, need not be included verbatim in the charging document." *United States v. Troy*, 618 F.3d 27, 35 (1st Cir. 2010).

When evaluating challenges to an indictment's sufficiency, courts take as true the allegations therein. *See*

*United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011). The Government is under no obligation to "recite all of its evidence in the indictment." *Stepanets*, 879 F.3d at 372 (citing *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. 1993)). Accordingly, "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." *Guerrier*, 669 F.3d at 4.

### III. ANALYSIS

In light of this standard, the Court considers, and necessarily rejects, the Defendants' challenges to the Indictment, count by count.

### A. Counts Two and Three: Federal Program Bribery (18 U.S.C. §§ 666(a) and 2)[8]

What precisely must an indictment allege to sufficiently charge federal program bribery? Defendants argue that *McCormick*, a Hobbs Act extortion case, supplies the applicable standard. *See* Docket No. 193-1, pg. 7. Under *McCormick*, the Government must identify an explicit quid pro quo where an alleged bribe takes the form of a campaign contribution. *McCormick*, 500 U.S. at 273. Because all Parties

---

[8] Vázquez is charged in Count Three under 18 U.S.C. §§ 666(a)(1)(B) and 2 as an agent of the Commonwealth of Puerto Rico. Herrera and Rossini are charged in Count Two under 18 U.S.C. §§ 666(a)(2) and 2. The Court addresses both bribery counts together.

request to import that standard for purposes of addressing Defendants' Motion to Dismiss, the Court assumes arguendo, and without deciding, that *McCormick* and its progeny applies to federal program bribery.[9]

In *McCormick*, a state legislator appealed his conviction for extortion under color of official right in violation of the

---

[9] The Government does not concede that *McCormick* applies but asks the Court to evaluate the Defendants' motion as if it does. *See* Docket No. 201, pg. 7 n.2. This request is not unfounded. *See United States v. Allen*, 10 F.3d 405, 410–11 (7th Cir. 1993) (recognizing that *McCormick* may apply to federal bribery statutes because "extortion . . . and bribery are really different sides of the same coin"). Various courts have applied the *McCormick* explicit quid pro quo requirement to § 666 bribery charges where the "thing of value" is a campaign contribution. *See, e.g., United States v. Donagher*, 520 F. Supp. 3d 1034, 1043–46 (N.D. Ill. 2021) (applying *McCormick* and dismissing federal program bribery charges because the indictment failed to allege an explicit quid pro quo); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 849–51 (E.D. Pa. 2018) (applying *McCormick* when evaluating a Rule 29 challenge to a federal program bribery conviction); *United States v. Siegelman*, 640 F.3d 1159, 1169–72, 1190 (11th Cir. 2011) (affirming federal program bribery convictions because a *McCormick* jury instruction was given and evidence supported an explicit quid pro quo finding); *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, *4, *13, *17 (S.D.N.Y. Dec. 5, 2022) (dismissing federal program bribery counts because the indictment failed to allege an explicit quid pro quo under *McCormick*); *see also United States v. Menendez*, 132 F. Supp. 3d 635, 642 (D.N.J. 2015) (finding that "the *McCormick* standard applies to alleged bribery under 18 U.S.C. § 201(b)"). Furthermore, the First Circuit has found § 666 bribery "analogous" and therefore instructive when assessing whether the quid pro quo requirement in a Hobbs Act extortion case was met. *United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022). Because the Court considers the Parties' request to be made in good faith, it evaluates whether the Indictment alleges an explicit quid pro quo.

Hobbs Act.[10] *See McCormick*, 500 U.S. at 265–66. Robert McCormick ("McCormick") had long championed a program permitting graduates of foreign medical schools to practice under temporary permits while studying for the state licensing exam. When the state legislature moved to end that program, foreign doctors organized and hired a lobbyist to push legislation extending it. *See id.* at 259–60. McCormick sponsored that bill and agreed to sponsor legislation providing for permanent licenses based on experience, not test scores. *See id.* at 260. While running for reelection, McCormick informed the doctors' lobbyist "that his campaign was expensive" and "that he had not heard anything from the foreign doctors." *Id.* The lobbyist said he would contact the doctors and "see what he could do." *Id.* Subsequently, the lobbyist delivered $900 in cash to McCormick from the doctors. *See id.* Three additional payments worth thousands of dollars followed. *See id.* McCormick did not report the money as campaign contributions or income, and the doctors' organization used coded accounting entries indicating payments went to McCormick. *See id.* McCormick sponsored the permanent

---

[10] *See* 18 U.S.C. § 1951.

licensing legislation, which ultimately passed. *See id.* Two weeks later, McCormick received another cash payment from the doctors. *See id.*

A jury convicted McCormick of tax evasion and one Hobbs Act count for accepting the initial $900 cash payment. *See id.* at 265. The jury could not reach verdicts on the Hobbs Act counts concerning the subsequent four payments. *See id.*

On appeal, the Fourth Circuit "rejected McCormick's contention that conviction of an elected official under the Act requires, under all circumstances, proof of a *quid pro quo*." *Id.* at 265–66 (emphasis in original). Instead, the Court questioned whether the payments were intended as "*legitimate* campaign contributions." *Id.* at 271 (emphasis in original). Finding they were not, the Court affirmed McCormick's convictions. *See id.* at 266.

The Supreme Court reversed, holding proof of an explicit quid pro quo was absent but necessary for McCormick's Hobbs Act extortion conviction. *See id.* at 274. While the majority agreed that it is "proper to inquire whether payments made to an elected official are in fact campaign contributions, and . . . the intention of the parties is a relevant consideration," it explained that Hobbs Act violations do not turn on payments' intended legitimacy or illegitimacy. *Id.* at

271. The Court emphasized that legislators are dutybound to support legislation that benefits their constituents yet operate within a privately funded campaign system. *See id.* at 272. As a result, beneficiaries of legislation inevitably make contributions shortly before or after legislators act to their benefit. *See id.* To clarify the scope of illegal conduct targeted by Congress, the Court held that "receipt of . . . [campaign] contributions is . . . vulnerable under the [Hobbs] Act as having been taken under color of official right[] . . . only if the payments are *made in return for an explicit promise or undertaking* by the official to perform or not to perform an official act. In such situations the official *asserts that his official conduct will be controlled* by the terms of the promise or undertaking." *Id.* at 273 (emphasis added).

The following term, the Supreme Court added color to *McCormick*'s quid pro quo requirement. In *Evans*, an elected member of the Board of Commissioners of DeKalb County, Georgia, appealed his Hobbs Act extortion conviction for accepting $7,000 in cash and a $1,000 check payable to his campaign in exchange for his assistance rezoning a tract of land. *Evans v. United States*, 504 U.S. 255, 257 (1992). Evans reported the check, but not the cash, as a campaign contribution. *See id.* He did not report the cash as income on

his tax return. *See id.* The jury instructions reflected Evans' contention that the entire $8,000 constituted a campaign contribution. *See id.* Evans argued that the jury instructions permitted conviction on the basis of passively accepting a contribution and failed to properly describe the *McCormick* quid pro quo requirement applicable if the jury found the payment was a campaign contribution.[11] *See id.* at 267. The Supreme Court found the instruction sufficient under *McCormick* and held that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return

---

[11] The District Court's instruction on the extortion count, in relevant part, reads:

> The defendant contends that the $8,000 he received from agent Cormany was a campaign contribution. The solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.

> However, if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution.

*Evans*, 504 U.S. at 257–58.

for official acts." *Id.* at 268.

So what exactly does an "explicit" quid pro quo entail? Per *McCormick*, "payments . . . *made in return for an explicit promise or undertaking* by the official to perform or not to perform an official act" where "the official *asserts that his official conduct will be controlled* by the terms of the promise or undertaking" suffices. *McCormick*, 500 U.S. at 273 (emphasis added). Explicitness ostensibly requires something more than a politician's comment on campaign expenses, a lobbyist's promise to help, and cash from recently benefited constituents. *See id.* at 260, 274. But the Supreme Court left the explicitness threshold vague. Per *Evans*, "the Government need only show that a public official has obtained a payment to which he was not entitled, *knowing* that the payment was made in return for official acts." *Evans*, 504 U.S. at 268 (emphasis added).

Since *McCormick* and *Evans*, circuit courts have indicated that "[e]xplicit[] . . . does not mean *express*."[12] *United*

---

[12] The Second Circuit has read "explicit" to mean "express." *See United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) (construing *McCormick* as requiring "proof of an express promise . . . when the payments are made in the form of campaign contributions"); *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, *8–15 (S.D.N.Y. Dec. 5, 2022) (following *Ganim*). The Defendants have not cited, nor has this Court found, any First Circuit case embracing this interpretation. Moreover, *Evans*—in part a

*States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011); *see United States v. Allinson*, 27 F.4th 913, 925 (3d Cir.), cert. denied, 143 S. Ct. 427 (2022); *see also Evans*, 504 U.S. at 274 (Kennedy, J., concurring). Instead, courts have interpreted "*McCormick* [to] require[] . . . that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain." *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992). Consistent with that interpretation, this Court has previously construed "explicit" as "refer[ring] 'not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated.'" *United States v. Lopez-Martinez*, No. CR 15-739 (PAD), 2020 WL 5629787, at *40 (D.P.R. Sept. 21, 2020) (quoting *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994), *cert. denied*, 514 U.S.

---

campaign contribution case—affirmed a jury instruction that merely required a finding that Evans "accept[ed] money in exchange for [a] specific requested exercise of his . . . official power" without requiring a finding that the agreement was "express." *Evans*, 504 U.S. at 258 (second alteration in original). Absent binding precedent instructing otherwise, this Court will not find that when the Supreme Court said "explicit" it really meant "express." *See Evans*, 504 U.S. at 274 (Kennedy, J., concurring) ("The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.").

1095 (1995)), *rev'd in part, vacated in part on other grounds sub nom. United States v. Falcón-Nieves*, 79 F.4th 116 (1st Cir. 2023). Therefore, while the agreement's terms must be "specific," *United States v. Turner*, 684 F.3d 244, 253 n.4 (1st Cir. 2012) (quoting *United States v. Cruzado–Laureano*, 404 F.3d 470, 482 (1st Cir. 2005)), "there is no requirement that th[e] agreement be memorialized in a writing[] . . . [or] overheard by a third party." *Siegelman*, 640 F.3d at 1171; *United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022) ("We hold, therefore, that it was well within the jury's province . . . to infer the existence of an explicit quid pro quo between Pichette and the defendant"); *Carpenter*, 961 F.2d at 827 (explaining that a quid pro quo "understanding need not be verbally explicit.").

Any other rule would halt the routine use of circumstantial evidence in bribery prosecutions. *See, e.g., Carpenter*, 961 F.2d at 827 ("The jury may consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds on a quid pro quo."); *United States v. Terry*, 707 F.3d 607, 615 (6th Cir. 2013) (affirming a public official's conspiracy and bribery-based honest services fraud convictions because "the jury rejected any legitimate explanation for Russo's contributions in the face of strong

circumstantial evidence . . . [of] a corrupt bargain"). The implications of such a rule defy common sense. Instead of juries considering "matters of intent," defendants would have had to have expressly declared their intent for a bribery indictment or conviction to stand. *McCormick*, 500 U.S. at 270 (citing *Cheek v. United States*, 498 U.S. 192, 203 (1991)). As Justice Kennedy observed in his *Evans* Concurrence, such a rule would allow "the law's effect . . . [to] be frustrated by knowing winks and nods." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring).

Defendants argue "the Indictment fails to meet the foundational *McCormick* standard, as nowhere does it allege any 'explicit promise or undertaking' made by Governor [Vázquez]-Garced in return for the 'campaign contributions' purportedly provided by Herrera." Docket No. 193-1, pg. 24. This defect, Defendants argue, boils down to the Indictment never identifying when, where, and how the Defendants formed an "express" agreement to exchange a certain quid for a certain quo. *See* Docket No. 193-1, pgs. 25, 30–33, 38.

In essence, Defendants ask this Court to dismiss their charges, pre-trial, based on a Second Circuit gloss on an implied element in a different statute than the one they

allegedly violated.[13] That "express" agreement gloss has not been adopted by most circuits, lacks support in First Circuit case law, and this Court declines to apply it here. Instead, the Court considers whether the Indictment would satisfy the *McCormick* and *Evans* express quid pro quo requirement, as interpreted by most courts, if indeed applicable to § 666 bribery.[14]

To start, the Indictment tracks the statutory language of § 666(a)(2) and § 666(a)(1)(B). *See* Docket No. 3, paras. 128, 131. It further alleges that Herrera and Rossini gave, offered, and promised payments for political consulting services and campaign funding to Vázquez *in exchange for* a specific exercise of her official power: the termination of OCIF Commissioner A and the appointment of a new Commissioner chosen by Herrera.[15] *See id.* paras. 31, 126, 129.

The Indictment further alleges that the Defendants and their intermediaries discussed aspects of the agreement via

---

[13] *See*, *supra*, note 12.

[14] Because the Indictment alleges an explicit quid pro quo, this Court need not reach the question of whether an explicit quid pro quo is an implied element of § 666 federal program bribery.

[15] Counts Two and Three re-allege and incorporate by reference allegations contained in paragraphs 1–26 and 30–125 of the Indictment. *See* Docket No. 3, paras. 126, 129.

text, email, messaging applications, and in-person meetings. *See id.* para. 33. It quotes a message from Rossini stating that Herrera and Vázquez saw each other the weekend of January 4, 2020, that Vázquez wanted to see Herrera the following week, and that Vázquez was "keen on" the political consulting firm whose services Herrera subsequently retained for her benefit. *Id.* para. 43. The Indictment quotes an email from Herrera to that consulting firm in which Herrera states he had a "conversation" with Vázquez "on the 4 of January[, 2020,]" the date of Individual C's wedding, and indicates his interest in presenting the firm to Vázquez. *Id.* para. 44. Vázquez, Herrera, Rossini, and others allegedly met on January 14, and the Indictment quotes a text message from Rossini from the following day stating that Vázquez wanted the consulting firm and Herrera would pay for it. *See id.* paras. 46–47. The Indictment further alleges that in February 2020, Herrera conveyed, through intermediaries, to Vázquez his willingness to support her reelection campaign through a SuperPAC. *See id.* para. 88.

      In the midst of Herrera's alleged engagement with Vázquez and discussions regarding support, the Indictment

alleges that John Blakeman[16] ("Blakeman"), "acting at the direction of [Herrera,] told [Vázquez] during one or more in-person meetings . . . that The Bank [owned by Herrera] wanted OCIF Commissioner A removed from his position." *Id.* para. 50. The Indictment further alleges that Vázquez directed Blakeman to tell Bancrédito's President Frances Díaz ("Díaz") that her administration needed Bancrédito to identify someone to replace OCIF Commissioner A. *See id.* para. 52. Her request allegedly made its way to Herrera. *See id.* para. 54.

Based on the Indictment's allegations, which the Court must take as true at this juncture, *see Guerrier*, 669 F.3d at 3–4, Vázquez and Herrera's terms were specific, unambiguous, and communicated to one another and their co-conspirators, *see* Docket No. 3, paras. 31–76. This indisputably apprises Defendants of the "quid" and "quo" allegedly exchanged.

That leaves the "pro"—the lynchpin of Defendants' explicit quid pro quo theory. The Indictment not only alleges that Vázquez took specific, official acts "in exchange for" Herrera's campaign contributions but also sets out specific

---

[16] According to the Indictment, Blakeman "was a political consultant located in Puerto Rico . . . [who] served as a political advisor to [Vázquez] during her tenure as Governor. Docket No. 3, para. 13.

conduct and statements by the Defendants and their intermediaries consistent with a mutually conditional agreement. Specifically, the Indictment alleges meetings, follow ups, and statements that campaign support would not issue until Vázquez took specific, official actions. *See, e.g., id.* paras. 53, 69, 107, 114, 116–22.

Per the Indictment, on January 21, 2020, Rossini confirmed the date that the political consultants would present their services to Vázquez: February 28, 2020. *See id.* para. 53. On February 3, Blakeman allegedly informed Díaz that Vázquez had given the instruction to terminate Commissioner A. *See id.* para. 58. Two days later, Díaz inquired about the timing for "executing the instructions." *Id.* para. 59. Then, the Indictment proceeds to outline a pattern of follow up between Vázquez and Herrera's intermediaries regarding the status of Commissioner A's firing. These exchanges allegedly occurred between February 6 up until a few hours before the February 28 political consultant meeting. *See id.* paras. 60–76. Specifically, the Indictment alleges that Herrera expressed need to "confirm the meeting," need for "[Vázquez's] support for the Ocif [sic] situation that can no longer wait," and hesitancy to "spend money, Time and Effort

in [sic] people that do not need our help."[17] *Id.* para. 69. On February 24, 2020, this message was allegedly forwarded by newlywed Individual C to Vázquez's Deputy Chief of Staff, making Vázquez's staff aware that the meeting confirmed by Rossini as of January 21 was not—in Herrera's view—confirmed due to the OCIF situation. *See id.* Also on February 24, Díaz informed Herrera that Commissioner A had been spoken to by Fortaleza and would finish out the month of February. *See id.* para. 70. Per the Indictment, Vázquez's Chief of Staff, at Vázquez's direction, told Commissioner A that he had to resign from his position by February 28—the day of the political consultant meeting. *See id.* para. 72. Hours before that meeting, Vázquez's Deputy Chief of Staff sent images of OCIF Commissioner A's resignation letter to Individual C and Blakeman. *See id.* paras. 14, 75–76.

Additionally, on the date of the political consultant meeting, Herrera texted Blakeman expressing need to speak with Vázquez after the presentation to "explain some details of the next steps and coordinate the final objective of our regulator . . . . In short to make a coordinated plan of action." *Id.* at 84. Starting the next day, February 29th, the Indictment

---

[17] The Court notes that the Indictment does not provide the date that Herrera sent this message.

alleges another pattern of follow up and communication between the Parties regarding the appointment of Herrera's Commissioner candidate, Commissioner B, in exchange for campaign funding via a SuperPAC. *See id.* paras. 95, 107–08, 113–17, 120–21.

In late February or early March, Herrera allegedly identified his candidate, but Vázquez did not make the appointment immediately after the February 28 meeting. *See id.* paras. 85–87, 93–95, 118. The Indictment alleges that in March 2020, Blakeman met with Vázquez at Fortaleza and conveyed a message from Herrera and Rossini: Vázquez had to appoint OCIF Commissioner B before Herrera would fund the SuperPAC. *See id.* para. 107. In April, Herrera, Rossini, and others allegedly hired Political Consultant A to create and manage the SuperPAC. *See id.* paras. 99–100. The SuperPAC was subsequently registered, but not funded. *See id.* paras. 100, 107. On May 7, Rossini allegedly texted Blakeman that he "just spoke to a mutual friend whom [sic] advised that if/when that gentleman is installed as the OCIF director that with [sic] 72 hours the 'switch will be turned on' and the PAC will be on the island and forging ahead." Rossini sent the same message to Herrera explaining it was "[w]hat I sent." *Id.* para. 114. On May 12, the Indictment alleges that Rossini

texted Blakeman to ask whether "the advice provided has been implemented." *Id.* para. 116. Blakeman responded that "they are implementing the recommendations" and "[t]he guy for OCIF went to Fortaleza and was interviewed." *Id.* (alteration in original). Rossini allegedly forwarded Blakeman's message to Herrera, who responded, "[t]hat's a relief, she gets it now," and "[t]hey are moving but very slow." *Id.* para. 117. On May 14, Vázquez appointed Commissioner B. *See id.* para. 118. Rossini informed Herrera, who allegedly instructed Rossini to prepare Political Consultant A, the SuperPAC's manager. *See id.* para. 121. These allegations suggest that, at some prior point, the Defendants agreed and understood that their conduct was controlled by the terms of their alleged bargain. In sum, the Indictment sufficiently alleges the explicit conditionality needed to transform a representative's actions benefiting a politically engaged constituent into an illegal bribe.

Defendants argue that the Indictment never identifies *when* they reached a quid pro quo agreement. *See* Docket No. 193-1, pg. 38. Whether and when the Defendants reached an explicit quid pro quo agreement are questions of fact. The Indictment alleges that the Defendants discussed the agreement in person and through intermediaries on multiple

occasions. *See, e.g.*, Docket No. 3, paras. 33, 43–44, 46, 59, 71, 77, 84, 88, 107, 114, 116, 120. The Indictment alleges that Defendants' own written communications reference those discussions. *See, e.g., id.* paras. 43–44. And the Indictment lays out a pattern of alleged conduct and statements by the Defendants and their co-conspirators consistent with a conditional agreement. *See, e.g., id.* paras. 53–75, 108–25. It is for a jury to decide whether an agreement was formed, prior to the giving or acceptance of a thing of value, in light of whatever evidence the Government presents at trial.

Vázquez argues that the Indictment doesn't sufficiently connect her to the alleged deal or demonstrate her knowledge of or assent to the deal. *See* Docket No. 193-1, pgs. 11–15. This is a sufficiency of the evidence argument not properly raised in a motion to dismiss. The Indictment sufficiently alleges that her office staff and political advisors acted as her intermediaries, arranging the alleged deal with Herrera's staff and personal connections. *See, e.g.*, Docket No. 3, paras. 33, 52, 88, 93, 95, 107, 114, 116, 120. The Indictment further alleges that Vázquez and Herrera spoke and met with each other on various occasions to discuss the alleged agreement. *See, e.g., id.* paras. 33, 43–44, 46, 77, 84, 88. The Government must prove beyond a reasonable doubt that

Vázquez had the requisite mens rea at trial, but not in the Indictment.

In sum, the Indictment sufficiently alleges the elements of federal program bribery, an explicit quid pro quo, and the factual circumstances underlying Counts Two and Three. Defendants have received fair notice of the charges they face and the alleged conduct underlying them. *See Yefsky*, 994 F.2d at 893; *Savarese*, 686 F.3d at 6. This is all that is required for an indictment to survive a motion to dismiss. Whether the Government's evidence will prove sufficient to substantiate those allegations and convict is a wholly separate question reserved for trial.

### B. Count Four: Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346, and 2)

Defendants argue that the honest services wire fraud charges are contingent upon the sufficiency of the Indictment's bribery scheme allegations. *See* Docket No. 193-1, pg. 7; Docket No. 213, pg. 11; *see also Skilling v. United States*, 561 U.S. 358, 368 (2010) ("§ 1346 covers only bribery and kickback schemes."). Because the Indictment sufficiently alleges federal program bribery, the honest services wire

fraud charges do not fail on that ground.[18]

### C.  Count One: Conspiracy (18 U.S.C. § 371)

The Defendants argue that the conspiracy charge must fall with the federal program bribery and honest services wire fraud charges. *See* Docket No. 193-1, pg. 7. Because the Indictment is not defective as to either, Defendants have presented no ground upon which to dismiss their conspiracy charges.

### IV. Conclusion

Accordingly, the Court **DENIES** the Motion to Dismiss at Docket No. 193 as to all Defendants on all applicable counts.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 7th day of March 2024.

<u>S/ SILVIA CARREÑO-COLL</u>
UNITED STATES DISTRICT COURT JUDGE

---

[18] Herrera brings various recent cases to the attention of the Court. *See* Docket Nos. 198, 279. The Court reviewed the authority he identifies and does not find it instructive on issues raised by Defendants' Motion to Dismiss at Docket No. 193.