## UNITED STATES DISTRICT COURT
## OF PUERTO RICO
### CASE NO. 22-CR-00342-SCC-HVR

UNITED STATES OF AMERICA,
               Plaintiff,

v.

MARK T. ROSSINI,
               Defendant.

_____/

### MOTION TO DISMISS AND REQUEST FOR EVIDENTIARY HEARING

Mark Rossini ("Mr. Rossini" or "Rossini"), through his counsels and pursuant to Fed. R. Crim. P. 12(b)(3)(B), moves to dismiss Counts One, Two, and Four of the Indictment as legally insufficient. This motion goes beyond those previously filed by Governor Wanda Vázquez Garced ("Governor Vázquez" or "Vázquez") [ECF No. 193] and Julio Herrera Velutini ("Mr. Herrera" or "Herrera") [ECF Nos. 224 and 262], by directly addressing the Indictment's most glaring deficiency: its failure to establish the "corrupt intent" essential to sustaining charges of bribery and honest services fraud.

Count One charges Governor Vázquez, Mr. Herrera, and Mr. Rossini with conspiracy to commit federal funds bribery and honest services fraud, in violation of 18 U.S.C. § 371, 18 U.S.C. § 666(a)(2) and 2, and 18 U.S.C. § 1343, 1346, and 2. Count Two and Count Four further accuse Rossini and Herrera of federal funds bribery and honest services fraud, respectively. [ECF No. 3].

The government alleges that Mr. Rossini and Mr. Herrera conspired to bribe Governor Vázquez to benefit Mr. Herrera's bank, Bancrédito[1], by offering a political survey, Super PAC funding for her campaign, and payments to a political consultant. In exchange for these benefits, Vázquez was allegedly expected to remove George Joyner ("Joyner") from his role as OCIF[2] Commissioner and appoint Victor Rodríguez Bonilla ("Rodríguez Bonilla") in his place. [ECF No. 3, ¶ 31-36]. The government's theory, however, is deeply flawed.

The charges against Mr. Rossini require the government to prove that he acted with "corrupt intent." *See* 18 U.S.C. § 666(a)(2). This means that the government must prove that Mr. Rossini gave, offered, or agreed to give something of value with the specific purpose of improperly influencing Governor Vázquez. *Id*. The Supreme Court has made it clear that for an act to be considered "corrupt," there must be an agreement in place before the "official act" takes place. *Snyder v. United States*, 144 S.Ct. 1947 (2024). Here, the government's own evidence and timeline undermine their claim of a corrupt scheme between Rossini, Herrera, and Vázquez. Despite two years of exhaustive litigation, including the review of millions of documents, grand jury transcripts, FBI reports, recorded conversations, and other discovery

---

[1]  Bancredito International Bank & Trust Corporation.
[2] "OCIF" is the Spanish-language acronym for the Office of the Commissioner of Financial Institutions.

materials, the government has produced no evidence that such a corrupt agreement—or the requisite "corrupt intent"—existed.

## I. THE GOVERNMENT'S CASE.

This wasn't bribery; it was lobbying conducted in the daylight. Like it or not, lobbying is a legal and constitutionally protected part of our political system. The government's case overlooks the legitimate political advocacy that Mr. Rossini and Mr. Herrera engaged in and ignores the clear evidence of Mr. Rossini's true intent: to expose what was believed to be possible corruption within OCIF and advocate for a shift toward a more professional and unbiased approach to bank examinations. Far from acting in secrecy, Mr. Rossini took his concerns about OCIF directly to the FBI. These concerns were also openly and repeatedly communicated to the Vázquez campaign, OCIF Commissioner Joyner himself, and even in an effort to inform the President. This transparency is the opposite of corruption, which thrives on secrecy and deception. By bringing these issues to light so publicly, Mr. Rossini showed a commitment to accountability, not corruption. This was not an effort to subvert the system but a lawful attempt to influence policy. The government's case misses this crucial context.

First, while the creation of a Super PAC to support Governor Vázquez was discussed, it was never proposed as a pre-condition to any specific act by Vázquez. Neither Herrera nor Rossini funded, directly or indirectly, any Super PAC—and the government does not allege they did. The government claims the alleged bribe involved removing Joyner and replacing him with Rodríguez

Bonilla. Yet, after Joyner was removed and Rodríguez Bonilla was confirmed, there is no evidence that Herrera or Rossini made any effort to fund a Super PAC. Despite ongoing communication between the parties, the issue of Super PAC funding never arose. A thorough review of their communications—text messages, emails, and other exchanges—confirms this. Moreover, the evidence shows no indication that Governor Vázquez or her staff ever followed up to request the alleged Super PAC funding. If this had truly been a bribe, it defies logic that they would not demand the fulfillment of the alleged *quid pro quo*, especially given the campaign's critical need for funds. This disconnect between the alleged agreement and the parties' actual conduct is a fundamental flaw in the prosecution's case.

Second, the government's own timeline shows that the actions purportedly part of this *quid pro quo* occurred before the alleged agreement even took place. For instance, the government claims that it was during the February 28, 2020, meeting at the Vanderbilt Hotel that Governor Vázquez first learned "that Herrera paid for or would be paying for the International Consulting Firm's services to benefit Vázquez's upcoming election campaign," and that they "discussed creating a Super PAC to support" her campaign. [ECF No. 3, ¶¶ 80-81]. However, the fact remains undisputed that by February 24, 2020, it was known Joyner would be asked to resign, and he was formally asked on February 26, 2020. [ECF No. 3, ¶¶ 70-75]. This timeline suggests that neither Herrera, Rossini, nor Vázquez could have acted with "corrupt

intent" before February 28, 2020: the government itself acknowledges Governor Vázquez was unaware of a potential Super PAC or Herrera's offer of financial support until after Joyner's resignation. [ECF No. 3, ¶¶ 80-81]. The critical issue here is not just the lack of a *quid pro quo* but the impossibility of acting with "corrupt intent" before the alleged agreement was made. Without a prior corrupt agreement, there is no basis for claiming that the parties acted "corruptly."

Third, the government conveniently ignores critical facts that directly undermine its narrative. According to the government's own evidence, before his nomination, Rodríguez Bonilla informed Herrera that, if confirmed as OCIF Commissioner, he would have to recuse himself from any Bancrédito investigations due to a prior consultancy relationship with the bank. After his confirmation, he did exactly that. If the goal was to install a commissioner at OCIF who would do Bancrédito's bidding, it makes little sense to nominate someone who openly stated he would recuse himself from all Bancrédito matters. This clearly shows there was no intent to secure improper influence or to manipulate the system for Bancrédito's benefit.

Fourth, the government's portrayal of Rodríguez Bonilla's nomination as a political favor unfairly diminishes his professional achievements and ignores the thorough vetting process conducted by more than a dozen Puerto Rico Senators who confirmed him as OCIF Commissioner. Rodríguez Bonilla has spent his career honing his expertise in financial compliance, anti-money

laundering, and banking regulation, making him highly qualified for this position. In addition to being a Certified Anti-Money Laundering Specialist and a member of the Puerto Rico Financial Crime Task Force, his resume also states that he graduated from the FBI's 6-week Citizens Academy program, which required an invitation from the Special Agent in Charge ("SAC") of the FBI San Juan Field Office. This further highlights Rodríguez Bonilla's strong law enforcement credentials, and it is notable that Mr. Herrera, fully aware of these deep connections to the FBI, still recommended him for the position. [**Exhibit A: Rodríguez Bonilla CV**]. His appointment was based on merit, not political maneuvering. The Puerto Rican Senate's thorough investigation validated Rodríguez Bonilla's qualifications, including financial, psychological, and field evaluations, finding no issues that would impede his service. [**Exhibit B: Puerto Rico Senate Minutes—June 4, 2020**].

Lastly, the government's assertion that the political survey constituted part of a *quid pro quo* arrangement is untenable. [ECF No. 3, ¶ 51]. The survey was not a covert instrument designed to advance Governor Vázquez's campaign; it was made publicly available and covered multiple candidates and broader political issues. Such a survey is a standard tool of political research, not a clandestine campaign benefit. The government's attempt to frame it otherwise is unsupported by the facts and mischaracterizes the nature of the survey.

The dangers of allowing federal prosecutors to casually file political bribery charges under these circumstances are significant. This Court must carefully distinguish between criminal conduct and "politics as usual." The concern is not simply that all individuals involved in routine political activities will face prosecution, but that the process by which prosecutors choose whom to charge can become politicized, leading to selective targeting based on partisan motives. To truly understand how routine political activities led to this federal indictment, it is essential to examine the facts of this case in their proper context.

## II.  SETTING THE RECORD STRAIGHT: THE ALLEGATIONS IN CONTEXT.

### A.  OCIF'S INVESTIGATION INTO BANCRÉDITO.

It began in 2015 when OCIF—responsible for overseeing Puerto Rico's financial sector—started a multi-year campaign targeting Bancrédito, a bank with fewer than 300 clients. This marked the start of a series of examinations led by ███ ████████ ("OCIF Official 1"), ████ ██████████ ███████████████████.

Under the direction of OCIF Official 1, Bancrédito was subjected to repeated and unreasonable scrutiny for various potential violations, including compliance with the Bank Secrecy Act ("BSA"). These were supposedly routine examinations, but despite Bancrédito's efforts to comply and cooperate— including a 2015 Consent Order and subsequent examinations in 2017 and 2018—OCIF continued to launch new investigations, the most recent of which began in 2019.

7

To better understand OCIF's unusual conduct and shifting demands, Bancrédito made multiple attempts to discuss these issues with OCIF Official 1. However, these efforts led nowhere, as OCIF continually changed its requirements without explanation solely as it related to Bancrédito investigations. In July 2016, OCIF Official 1 extended the examination timeframe yet again, delaying its start until the first quarter of 2017. These repeated delays and the lack of clarity left Bancrédito both confused and frustrated, raising significant questions about OCIF's true motives—questions that would later be clearly answered.

It later emerged that during OCIF's 2015 investigation into Bancrédito, OCIF Official 1 had been simultaneously taking his "concerns" to the FBI. On July 6, 2016, OCIF Official 1 not only presented unsubstantiated claims to the FBI, sparking a parallel federal investigation, but also provided them with a copy of OCIF's entire file on Bancrédito and Mr. Herrera. He pointed to perceived financial irregularities, such as questionable letters of credit and loans, but these claims were speculative and lacked any definitive proof of illegal activities. Despite having access to extensive financial records, OCIF Official 1's primary concerns were based on unreliable news articles from Venezuelan state media, which alleged Mr. Herrera's involvement in criminal activities in Venezuela and even suggested that Mr. Herrera might be listed under a different name on Interpol's watch list. It is paradoxical—and frankly absurd—that OCIF Official 1 chose to believe these unverified claims,

especially given their origins in a government known for its lack of transparency and democratic principles. Considering the dubious sources and the potential for politically motivated charges, these claims should have been regarded with much greater skepticism. **[Exhibit C:** ██████████ **Complaint to FBI 7-6-16.]**

The FBI investigated these claims, and by August 9, 2016, they confirmed that Mr. Herrera was not on any Interpol list, discrediting OCIF Official 1's accusations. This not only proved the information to be false but further suggested that OCIF Official 1 had his own agenda against Bancrédito, casting serious doubt on his credibility and the trustworthiness of his allegations. **[Exhibit C, pg. 5].**

Yet, despite confirming that OCIF Official 1's information was unreliable, FBI records show that in March 2017, they contacted him again, asking if he had "any further information" on Bancrédito. By April 2017, they were meeting with OCIF Official 1 once more. This continued reliance on a source who had previously provided false information raises questions about the FBI's approach and their decision to repeatedly seek input from someone whose credibility had already been compromised. **[Exhibit C, pg. 6].**

OCIF Official 1 was not the only OCIF employee moonlighting for the FBI. Over the years, the FBI effectively turned OCIF into its own investigative branch. The real question is, which OCIF officials weren't being used by the FBI?

In January 2017, ███ ██████████ ("OCIF Lead Examiner 1") took charge of an extensive four-month examination of Bancrédito, probing various operational aspects of the institution. Despite the examination concluding in May 2017, the report was not issued until November 28, 2017. **[Exhibit D: 2017 Examination Report]**. The long-awaited report ("2017 Report") depicted a generally positive view of Bancrédito's financial health and operations. It noted a strong liquidity position with $29.3 million in primary liquid assets—22.64% of total assets, well supported by a $76.3 million securities portfolio. **[Exhibit D, pg. 4].** The bank also met all board composition requirements for correspondent banking services, and the Compliance Department efficiently managed these operations. Additionally, Bancrédito demonstrated strong capital adequacy with financial ratios significantly above regulatory minimums. **[Exhibit D, pgs. 9, 17]**.

While the report flagged areas like earnings performance, asset quality, compliance practices, budgeting processes, and management of IT systems for improvement, these issues are typical in the banking sector, and Bancrédito promptly took steps to address them. **[Exhibit D, pgs. 1-15].** Importantly, the findings did not indicate criminal conduct or severe deficiencies that would justify drastic actions, such as bribing a governor to influence OCIF's decisions.

B.    REVELATIONS OF MISCONDUCT: OCIF'S CONTINUED HARASSMENT
AND INTERNAL WHISTLEBLOWING.

On November 29, 2017, just one day after OCIF issued its report, a highly unusual email surfaced, revealing the troubling dynamics behind the scenes at OCIF. It was disclosed that OCIF Lead Examiner 1 had sent an email on November 9, 2017 (the "November 9th Email") to OCIF Official 1 and ██

████████████ ("OCIF Official 2"), detailing how OCIF Lead Examiner 1 had been pressured by OCIF Official 1 and others to alter the report's tone and include new unsubstantiated findings. **[Exhibit E: ████████████ Emails 2017, pg. 2]**. The November 9th Email exposed deeply troubling concerns about the pressure exerted on OCIF Lead Examiner 1 to alter the examination's findings on issues that were not originally part of her examination, such as alleged violations related to "short sales," the cessation of fiduciary activities, an unjustified downgrade of the Management rating to 4 (indicating poorer management performance), and the continuation of a Memorandum of Understanding that she believed did not warrant revision. **[Exhibit E, pg. 2]**. OCIF Lead Examiner 1 firmly maintained that these subjects lacked any legal basis for inclusion in the report and emphasized that Bancrédito had demonstrated significant improvements in many areas that were being ignored. **[Exhibit E, pg. 2]**. However, despite her well-founded objections and efforts to uphold the integrity of her findings, OCIF Lead Examiner 1 was overruled by an OCIF attorney, ████████████ ("OCIF

11

Attorney"), with the backing of OCIF Official 1 and OCIF Official 2, effectively compelling her to incorporate these unwarranted changes.

Further revelations uncovered that OCIF Lead Examiner 1 had also sent an email on August 18, 2017 (the "August 18th Email"), raising similar concerns. **[Exhibit E, pg. 1]**. In this earlier email, she expressed her discomfort with the arbitrary changes being imposed on the Bancrédito examination report, noting that these changes deviated from the established format and included repetitive comments. She specifically criticized the lack of a solid legal foundation for these alterations, particularly concerning "short sales," and recounted a meeting where she was unexpectedly informed by OCIF Attorney that the Management rating should be adjusted. **[Exhibit E, pg. 1]**.

OCIF eventually acknowledged the validity of OCIF Lead Examiner 1's original findings and instructed her to realign the report with her initial conclusions. However, she refused to do so, even declining to sign the examination report unless it included an explicit statement exonerating her from what she described as a "dilated and irregular process." **[Exhibit E, pg. 2]**. This refusal highlighted her deep concerns about the integrity of the examination and her unwavering commitment to maintaining professional standards despite significant internal pressures. She was acutely aware of the potential for being implicated in OCIF's questionable actions and sought to

protect herself by distancing herself from the situation to avoid any negative repercussions. **[Exhibit E, pg. 2]**.

The November 9th and August 18th emails cast a shadow over the fairness of the examination process, making Bancrédito's suspicions of being unfairly targeted by OCIF entirely understandable and now possibly confirmed.

In May 2018, OCIF initiated a "visitation" to assess Bancrédito's liquidity and BSA compliance. Although this assessment yielded no specific findings, OCIF issued a report in August 2018, prompting a response from Bancrédito. The pressure continued when OCIF launched yet another examination in July 2019, focusing on various compliance aspects. Bancrédito was soon overwhelmed by nearly 200 requests for information and documentation, signaling that the ordeal was far from over.

As time passed, OCIF's inability to identify any significant or intentional wrongdoing by Bancrédito became increasingly apparent. The relentless examinations and audits only deepened the suspicions of Mr. Herrera and Bancrédito's executives that the investigation was baseless and driven by improper motives. The longer the investigation dragged on without uncovering any violations, the more Bancrédito became convinced that the real issue was corruption and misconduct within OCIF itself. This realization marked a turning point. Convinced that major policy changes at OCIF were

necessary and recognizing the institution's compromised integrity, Mr. Herrera knew it was time to turn to the FBI.

### C.   JULIO HERRERA AND MARK ROSSINI REPORT CORRUPTION TO THE FBI.

In July 2019, Julio Herrera hired former FBI Special Agent Mark Rossini, now a consultant, to report their suspicions of corruption within OCIF to the FBI. With extensive experience in sensitive investigations, Mr. Rossini was well-suited to ensure that Bancrédito's suspicions would be taken seriously by federal authorities.

On August 6, 2019—before Governor Vázquez declared her candidacy for the 2020 gubernatorial race—Mr. Rossini took action. He contacted Douglas Leff, the Special Agent in Charge ("SAC") at the FBI's San Juan Field Office, informing him of his engagement by Mr. Herrera and his upcoming visit to San Juan. Mr. Rossini hoped this would set the stage for a thorough investigation into potential corruption at OCIF.



Over the next year, Mr. Rossini met regularly with SAC Leff, providing detailed information about what was believed to be corruption within OCIF. He shared the November 9th Email, legal opinions from multiple law firms, and informed SAC Leff that Governor Vázquez was aware of these concerns and that efforts were underway to contact the President regarding the situation. Mr. Rossini also mentioned that the Governor's campaign was planning to hire a campaign management firm, and he would represent that firm on the island.

 

Throughout this period, SAC Leff engaged with Mr. Rossini, asking probing questions and repeatedly requesting further information. This level of interest encouraged Mr. Rossini to continue pursuing the matter. The ongoing interaction led Mr. Rossini to believe that the FBI either shared his concerns about corruption at OCIF or at least thought he might be onto something. The transparency of these exchanges, conducted openly and in full view, makes it clear that this was not a covert scheme.

15



> On Feb 3, 2020, at 18:21, DOUG LEFF <████████> wrote:
>
> Salve Mark,
>
> Is there any analysis by the attorney where he applies these criminal statutes to the facts? That would be interesting to see since many of these state laws have federal counterparts. But we would have to actually see what the theory is in order to do something with it.
>
> Good luck on the upcoming events.
>
> Doug

> On Oct 12, 2019, at 20:03, DOUG LEFF <████████> wrote:
>
> Hey Mark,
>
> Was great to hang out with you again. That email was interesting. What you're describing could be a potential color of law violation, which we would of course be interested in. I would be inclined to speak to the OCIF commissioner about it, because he has been a trusted ally. But we can wait to see what your team comes up with first, let me know what you think.
>
> Nel frattempo: buon viaggio, buona fortuna, e buon divertimento.
>
> Doug

Remarkably, Mr. Rossini even informed SAC Leff *ahead of time* about the February 28, 2020, meeting with Governor Vázquez and her campaign staff at the Vanderbilt Hotel—a meeting the government now alleges was central to the supposed bribery conspiracy. [ECF No. 3, ¶¶ 80-81]. First, on February 26, 2020, he notified SAC Leff of the upcoming meeting. Then again, on February 28, just hours before the meeting, he contacted SAC Leff to arrange a follow-up discussion that same evening. Mr. Rossini also asked about SAC Leff's successor, as he intended to keep the FBI informed about his investigation into potential corruption at OCIF despite its change in leadership.





Considering the detailed and valuable information Mr. Rossini provided to the island's top law enforcement official, it raises questions as to why the FBI believes he was part of a corrupt scheme. His transparency in sharing detailed information directly conflicts with the FBI's portrayal of him as part of a corrupt conspiracy; as far as Mr. Rossini was concerned, everything he was doing was open, obvious, and being shared with the head of the FBI office in San Juan. Moreover, the government seems to be omitting or attempting to bury the fact that Mr. Rossini informed the FBI about the meeting at the Vanderbilt Hotel beforehand. This omission, along with the fact that Mr. Rossini was asked to leave the February 28 meeting shortly after it began, suggests that the government's narrative is ignoring important facts.

D.     GOVERNOR VÁZQUEZ REPORTS CORRUPTION TO THE FBI.

In July 2019, as Julio Herrera enlisted Mr. Rossini to facilitate contact between Bancrédito and the FBI, Puerto Rico was in the midst of widespread political unrest. Governor Ricardo Rosselló resigned following massive protests sparked by the leak of offensive messages involving him and his inner circle. Although Rosselló named Pedro Pierluisi as his successor, the Puerto Rico Supreme Court later declared Pierluisi's appointment unconstitutional, leaving then-Secretary of Justice Wanda Vázquez as next in the constitutional line of succession.

In this charged atmosphere, a significant episode unfolded. **[Exhibit F: FBI Report Regarding Attempted bribery of Vázquez by** ▮▮▮

█████ █████.] According to the FBI, on July 30, 2019, retired judge ███

███████████, a friend of Wanda Vázquez's husband, Jorge Diaz Reveron,

received a call from ████████ ("Puerto Rican Attorney 1"). Puerto Rican

Attorney 1 conveyed that ██████████████ ("Puerto Rican Elected

Official 1"), █████████████████████, was seeking a meeting with

Ms. Vázquez. With Pierluisi's confirmation uncertain, Puerto Rican Elected

Official 1 aimed to negotiate with Vázquez, recognizing that if Pierluisi's

appointment failed, she would be positioned to become governor. **[Exhibit F:**

**pgs.2-3, 8-9].**

A few days later, Díaz Reverón received another call from █████████

███ ("Puerto Rican Attorney 2"), confirming Puerto Rican Elected Official

1's intentions. The proposal was clear: if Ms. Vázquez appointed Puerto Rican

Elected Official 1 as Secretary of State and then resigned, he would secure

Díaz Reverón a seat on the Puerto Rico Court of Appeals and offer Vázquez a

role in his administration. **[Exhibit F: pgs. 2-3, 8-9].**

On August 3, 2019, Vázquez reported this attempted bribery to the FBI,

leading to an investigation directed by SAC Doug Leff. Vázquez agreed to

assist the FBI, starting by recording a conversation with █████████, a

Department of Justice contractor ("Contractor 1"), who had been approached

by ████████, Puerto Rican Elected Official 1's cousin and a convicted

felon, about arranging a meeting between Vázquez and Puerto Rican Elected

Official 1 regarding the governorship. **[Exhibit F: pg. 9].**

18

In the weeks that followed, under the FBI's guidance, Vázquez recorded several conversations. On August 7, the Supreme Court of Puerto Rico ruled that Pierluisi's appointment was unconstitutional, making Vázquez the governor. Subsequently, at the FBI's direction, Vázquez met with Puerto Rican Elected Official 1 and another elected official, ███████████████. **[Exhibit F: pgs. 10].**

The situation escalated when ██████ ███████████ ██████ ████████ ███████ ("Puerto Rican Elected Official 2") met with Vázquez and suggested she consider a *different* high-level government position, hinting at Puerto Rican Elected Official 2's own interest in the governorship. When Vázquez reiterated her intention to accept the Governorship, Puerto Rican Elected Official 2 stated, "haven't you spoken to [Puerto Rican Elected Official 1]?" **[Exhibit F: pgs. 10].** This recorded conversation, led the FBI to believe in the existence of:

> "a conspiracy between [Puerto Rican Elected Official 1] and [Puerto Rican Elected Official 2] of their intention of removing the [Governor Vázquez] so either [Puerto Rican Elected Official 1] or [Puerto Rican Elected Official 2] can become the governor."

**[Exhibit F: pg. 10].** Despite this, the FBI closed the investigation in November 2019, citing difficulties in arranging meetings with Vázquez after she became governor. **[Exhibit F: pgs. 16].**

This situation is troubling—both Julio Herrera and Governor Vázquez sought assistance from the FBI, only to later find themselves under investigation by the same agency. Herrera, facing a prolonged investigation

19

by OCIF, believed there was corruption within the agency and turned to the FBI for help. When no assistance was forthcoming, he pursued change through legal political options.

Similarly, in the aftermath of Rosselló's resignation, Vázquez sought the FBI's help to report corruption within Puerto Rico's political ranks. At the time, the FBI indicated they believed a conspiracy existed between Puerto Rican Elected Official 1 and Puerto Rican Elected Official 2, aiming to remove Vázquez so that either one could assume the governorship. Despite this belief, the investigation's focus soon shifted, and Vázquez herself became the target. This reversal, where those who initially sought the FBI's assistance ended up under its scrutiny, raises serious questions about the process and motivations behind these actions—especially given that Puerto Rican Elected Official 1 and Puerto Rican Elected Official 2, who were implicated in the alleged conspiracy, not only faced no consequences but continue to serve the people of Puerto Rico in elected office.

III.    **LEGAL CRITERIA FOR CORRUPT INTENT IN POLITICAL ADVOCACY.**

In this case, determining guilt or innocence hinges on whether the government can prove that Mr. Rossini acted with "corrupt intent." 18 U.S.C. § 666(a)(2). This statute imposes federal criminal penalties on anyone who:

> "*corruptly* gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." § 666(a)(2). (Emphasis added).

20

A critical component of "corrupt intent" is the violation of an official duty owed to the government or the public. In *United States v. Terry*, 707 F.3d 607 (6th Cir. 2013), the court defined "corruptly" as acting with wrongful intent to secure some benefit in violation of official duty. Similarly, the Eleventh Circuit in *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010), held that corrupt intent involves actions taken with the expectation of receiving something of value in exchange for official influence.

Furthermore, there must be a clear connection between Mr. Rossini's alleged "corrupt" actions and a specific official act. In *United States v. Marinello*, 584 U.S. 1 (2018), the Supreme Court emphasized the need for a "nexus" between the conduct in question and the targeted government action. The Court required proof that the defendant's actions were aimed at interfering with a specific administrative procedure.

In *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), the Supreme Court made it clear: for an act to be considered "corrupt" under federal law, there must be a *quid pro quo*. The payment or benefit must be given with the intent to influence an official act. This *quid pro quo* requirement underscores that a direct exchange—an agreement where the benefit is tied to an official act—is essential.

Most recently, the Supreme Court reinforced this standard in *Snyder v. United States*. In *Snyder*, the Court addressed whether § 666 criminalizes both bribes and gratuities, or only bribes, particularly when officials receive gifts

21

after performing an official act. The government argued that § 666 should cover both, but the Supreme Court rejected this view, holding that § 666 applies solely to bribes—payments or benefits tied to an official act *through a pre-existing agreement*. Crucially, for a payment to be considered corrupt under § 666, the agreement must be made *before* the official act occurs. If the official act is completed without any prior agreement to exchange something of value, then the statute is not violated. *Snyder*, 144 S.Ct. at 1959, 1962.

The facts of this case mirror those in *Snyder*. Even according to the government, OCIF Commissioner Joyner resigned *before* any discussions about a Super PAC or financial support took place, and there was no prior agreement linking Governor Vázquez's actions to any promised benefits. [ECF No. 3, ¶¶ 72, 80-81]. This lack of a prearranged *quid pro quo* is crucial, as it directly undermines the government's claim of a corrupt scheme. There is no evidence of a prearranged *quid pro quo*, and subsequent discussions about financial support, at most, constitute gratuities—rewards that lack the "corrupt intent" required under § 666. As a result, under *Snyder*, the actions in this case fall outside the scope of the statute.

### A.   CORRUPT INTENT: LEGAL DEFINITIONS AND INTERPRETATIONS

Although the Pattern Criminal Jury Instructions for the District Courts of the First Circuit do not provide a definition for "corruptly" in the context of § 666, they define it in other contexts. For example, in the context of 26 U.S.C. § 7212(a), "corruptly" is defined as "act[ing] with the intent to secure an

unlawful advantage or benefit or financial gain, either for oneself or for another." The Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.26.7212 (2024).[3]

At least seven other circuits have also used this definition. *See, e.g., United States v. McBride*, 362 F.3d 360, 372 (6th Cir. 2004); *United States v. Kelly*, 147 F.3d 172, 177 (2d Cir. 1998); *United States v. Winchell*, 129 F.3d 1093, 1098 (10th Cir. 1997); *United States v. Valenti*, 121 F.3d 327, 331 (7th Cir. 1997); *United States v. Dykstra*, 991 F.2d 450, 453 (8th Cir. 1993); *United States v. Mitchell*, 985 F.2d 1275, 1278 (4th Cir. 1993); *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991).

Courts consistently require the government to demonstrate that the defendant acted with deliberate intent to secure an unlawful benefit. In *United States v. Strand*, 574 F.2d 993 (9th Cir. 1978), "corruptly" was defined as acting voluntarily and intentionally with a bad purpose to achieve an unlawful end or to accomplish a lawful end through unlawful means. The court in *Strand* held that "corrupt intent" requires proof of a "heightened criminal intent" rather than a simple *mens rea*, incorporating the concept of "the bribe being the prime mover or producer of the official act." *Strand*, at 995 (citing *United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974)). Similarly, in *United States v. Dorri*, 15 F.3d 888 (9th Cir. 1994), the court emphasized that "corrupt intent" involves actions aimed at achieving outcomes through deceit or

---

[3] *See* https://www.med.uscourts.gov/sites/med/files/crpjiLinks.pdf.

dishonest means, requiring proof of conscious wrongdoing. Even if some of these cases interpret statutes other than 18 U.S.C. § 666, their analysis of the definition of "corrupt intent" remains sound and valid.

### B.  CORRUPT INTENT IN THE CONTEXT OF CAMPAIGN CONTRIBUTIONS.

Against this backdrop, the Supreme Court has consistently ruled that campaign contributions are a form of constitutionally protected political speech. It has underscored a fundamental principle: political support through campaign contributions, while powerful, is not inherently corrupt, and has emphasized that "the First Amendment requires [the Court] to err on the side of protecting political speech rather than suppressing it." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 209 (2014) (quoting *Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 457 (2007)).

Recognizing the role campaign contributions play in our political system, the Supreme Court has been careful to delineate the boundary between legal and illegal conduct when public officials raise money from their constituents:

> [T]o hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.'

*McCormick v. United States*, 500 U.S. 257, 272 (1991). Instead, for political conduct to be considered criminal it must surpass a clear threshold of impropriety because "[t]o hold otherwise would open to prosecution not only

conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions . . ." *Id*.

In *Snyder*, the Supreme Court reaffirmed that campaign contributions and political support, *even if intended to curry favor*, do not constitute bribery without a clear "corrupt" agreement. *Snyder*, 144 S.Ct. at 1951-1952. This decision aligns with the principles established in *McCutcheon* and *McCormick*, reinforcing that political contributions are protected unless explicitly tied to corrupt agreements.

In 2022, the Supreme Court reaffirmed that an official act performed in the hope of securing campaign donations *is not a bribe*; rather, it is a fundamental element of the American political system.

> [I]nfluence and access "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." . . . To be sure, the "line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights."

*FEC v. Ted Cruz for Senate*, 596 U.S. 289, 307 (2022) (quoting *McCutcheon* at, 192, 209. Similarly, a campaign contribution given in the hope or expectation of receiving a favorable official act *is not a bribe. See, e.g., United States v. Inzunza*, 638 F.3d 1006, 1013 (9th Cir. 2011) ("[I]n our flawed but nearly universal system of private campaign financing, large contributions are commonly given in expectation of favorable official action."); *United States*

*v. Tomblin*, 46 F.3d 1369, 1379 (5th Cir. 1995) ("Intending to make a campaign contribution does not constitute bribery, even though many contributors hope that the official will act favorably because of their contributions.").

### C.    LOBBYING IS NOT A CRIME.

The founding fathers recognized the importance of non-elected individuals participating in governance, enshrining their right to petition the government for redress of grievances in the First Amendment: "Congress shall make no law...abridging...the right of the people...to petition the Government for a redress of grievances."  U.S. Const. amend. I.

Lobbying, as defined by Black's Law Dictionary, is "to try to persuade a government official...in an attempt to influence some action proposed to be taken." *LOBBY*, Black's Law Dictionary (11th ed. 2019). The Lobbying Disclosure Act of 1995 similarly defines "lobbying contact" as "any oral or written communication...to a covered executive branch official...regarding the nomination or confirmation of a person for a position subject to confirmation by the Senate." 2 U.S.C. § 1602(8)(A)(iv).

Congress and various jurisdictions have affirmed that lobbying is a protected form of petitioning the government. For example, the Puerto Rico House of Representatives, in its 2021 Administrative Order, defined lobbying as any act to manage or influence actions, decisions, or proceedings through direct communications, whether written, oral, or electronic. Puerto Rico House of Representatives, Admin. Order No. 2021-03, art. 3.

Historical perspectives also reinforce this principle. In 1935, then-Senator Hugo Black introduced a bill defining lobbyists broadly, encompassing efforts to influence both legislative and executive branches by any means, including public advocacy campaigns. S. 2512, 74th Cong. (1935). Later, as a Supreme Court Justice, Hugo Black authored the opinion in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), which protected lobbying activities under the First Amendment. The Court emphasized that in a representative democracy, the ability of the people to make their wishes known to their representatives is fundamental. *Id.* at 137-138.

In *Percoco v. United States*, 598 U.S. 319 (2023), the Supreme Court overturned the conviction of Joseph A. Percoco, a top aide to former New York Governor Andrew Cuomo. After resigning from his official state position to lead the Governor's re-election campaign, Percoco received payments from a private developer to secure favorable treatment from a state agency. After the campaign, Percoco resumed his official position in the Governor's office. The jury was instructed that Percoco could be convicted of mail and wire fraud charges based on a bribery theory because of his "special relationship" with state government and "domination and control" of state business. *Id.* at 322.

The Supreme Court overturned Percoco's conviction, holding that private individuals who influence government decisions cannot be easily subjected to criminal prosecution based solely on their influence. The Court

warned against imposing a fiduciary duty on individuals who, while lacking formal government positions, still exert significant influence over government decisions. As the Court noted:

> From time immemorial, there have been *éminence grises*, individuals who lacked any formal government position but nevertheless exercised very strong influence over government decisions. Some of these individuals have been reviled; others have been respected as wise counselors. *Id.* at 330-33.

The Supreme Court has consistently urged restraint in interpreting the scope of federal criminal statutes. In *United States v. Aguilar*, 515 U.S. 593, 600 (1995), the Court emphasized the need for clear and understandable boundaries in criminal law, ensuring that individuals have fair warning of what conduct may lead to criminal liability.

This restraint is particularly important here, where the actions of "offering" and "giving" something of value are not inherently corrupt. It is lawful for individuals to express grievances and offer support to elected officials. The key to criminal liability under § 666 lies in the term "corruptly," which requires proof of unlawful, dishonest, or depraved motives. Only those who act with such motives fall within the scope of criminal liability, as required by the level of culpability typically necessary for criminal punishment. *Aguilar*, at 602.

## IV.   THE EVIDENCE PROVES NO "CORRUPT" BEHAVIOR AMONG PARTIES.
### A.   THE SUPER PAC.

If the government's bribery theory were correct, Mr. Herrera and Mr. Rossini would have immediately funded a Super PAC once Governor Vázquez

nominated Rodríguez Bonilla as OCIF Commissioner. However, no such funding ever occurred. Neither Governor Vázquez nor her campaign team requested or followed up on contributions to a Super PAC. Even after Bonilla's confirmation by the Puerto Rico Senate, the Super PAC remained unfunded, and no one from the Governor's campaign ever complained or demanded contributions. In a high-stakes gubernatorial campaign where funding is critical, if Mr. Rossini and Mr. Herrera had promised to support a Super PAC in exchange for action from Governor Vázquez, we would expect clear and immediate demands for compliance once that action was taken. Even to the uninitiated, this glaring gap in the government's theory should be obvious.

The government points to a text message from Mr. Rossini to John Blakeman—the governor's campaign advisor—as evidence of "corrupt intent," claiming it suggests that Super PAC funding was contingent on the appointment of Rodríguez Bonilla as OCIF Commissioner. [ECF No. 3, ¶ 114]. However, this interpretation fails to consider the broader context of months of communication between Mr. Rossini and John Blakeman, where the primary focus was consistently on fighting corruption and positioning Governor Vázquez as an anti-corruption candidate. Throughout their discussions, Mr. Rossini repeatedly addressed the importance of promoting transparency and reform within the Puerto Rican government, emphasizing that support for the Governor's campaign would depend on her commitment to these principles. The appointment of Rodríguez Bonilla, known for his background in anti-

money laundering and compliance, was seen as a necessary step toward restoring integrity at OCIF, not as part of an illicit exchange. Furthermore, Rodríguez Bonilla's promise to Mr. Velutini recuse himself from any Bancrédito matters further underscores that his appointment was aligned with the anti-corruption agenda that Herrera and Mr. Rossini sought to advance, rather than a corrupt deal.

Mr. Rossini was acutely aware of the delicate political situation Governor Vázquez faced. In a February 5, 2020, email to Sean Buckley, a former head of the Terrorism and International Narcotics Unit of the U.S. Attorney's Office for the Southern District of New York, Mr. Rossini acknowledged the serious accusations and potential issues within OCIF. In the email, Mr. Rossini noted that the Governor was in a political bind, recognizing that any definitive actions—like comprehensive OCIF reforms or terminations—could be misinterpreted as politically motivated favors, despite being legally justified.



From: Mark Rossini [mailto: ▮▮▮▮▮▮▮▮▮ ]
Sent: Wednesday, February 05, 2020 2:10 PM
To: Sean S. Buckley < ▮▮▮▮▮▮▮▮ >
Cc: Julio M Herrera Velutini < ▮▮▮▮▮▮▮▮▮▮ >
Subject: Re: [EXTERNAL] Delitos AA

Whilst it is true that the Governor and her Chief of Staff are aware of the email's contents and the seriousness of the accusation, it is impossible to know if any action has been taken by her. It is no doubt a dilemma for the Governor in that it is no secret Julio and two other financial benefactors have contributed to her campaign and will continue to do so. This is her predicament, since if she acts now by overhauling OCIF, fires those in the email, and has them brought up on local criminal charges then she will be seen as doing a political favor (even thought its not the case since the law was broken and continues to be, the opposition, and opposition media, will spin and twist it as such)

The interactions between Mr. Herrera, Mr. Rossini, and Governor Vázquez's campaign team provide additional evidence against any "corrupt" agreement. For example, on January 17, 2020, Mr. Herrera explicitly told John Blakeman that his support for the governor was not conditioned on who she appointed as the next OCIF Commissioner.



On May 28, 2020—*two weeks after* Governor Vázquez nominated Rodríguez Bonilla as OCIF Commissioner—Mr. Herrera texted John Blakeman, emphasizing that the Super PAC would not be operational for the time being and reminding him that Dane Waters, a political consultant, was available to help the campaign.



Then, on July 18, 2020—more than a month *after* the Puerto Rico Senate confirmed Rodríguez Bonilla as OCIF Commissioner—John Blakeman informed Mr. Herrera about the aggressive advertising campaign carried out by Pedro Pierluisi's Super PAC but solicited no funding in response.



This moment would have been especially opportune for John Blakeman to solicit Mr. Herrera to fund a Super PAC supporting the Governor if he believed it was owed to the campaign, yet no such request was made.

On July 23, 2020, Mr. Herrera again communicated this clearly while unknowingly speaking with ███████, an FBI Informant ("FBI Informant 1").

[7/23/20, 7:51:15 AM] ███ So we stay on the side till after the primary
[7/23/20, 7:52:10 AM] Julio Bancredito: Yesss
[7/23/20, 7:52:42 AM] Julio Bancredito: Silence 100%
[7/23/20, 7:52:51 AM] Julio Bancredito: On Vacation

Then, in August 2020, Mr. Rossini reiterated this point while speaking with a political consultant.

[8/6/20, 09:16:04] ███ Whatsapp: Thanks Marco. Anything else we can do for Julio?
[8/6/20, 09:21:23] Mark Rossini: It looks like Wanda will win the primary. Once that happens Julio and his friends ███████ and ███████ will finally fund the PAC and CTF will be engaged.

This is yet another example of the government selectively choosing its narrative, failing to mention key details, and neglecting to correct inaccurate media accounts. That neither Governor Vázquez nor her campaign demanded immediate funding for the Super PAC, along with Mr. Herrera and Mr. Rossini's lack of urgency in providing it, clearly demonstrates a mutual understanding that there was no obligation or expectation to engage in a "corrupt" agreement.

**B.    THE SURVEY.**

The government's alternative theory that political research and a survey was part of a "corrupt" agreement fails when considering the broader context of how the survey was used and disseminated. The government alleges that Herrera funded a survey conducted by the political consulting firm, CT Group, as part of a scheme to benefit Governor Vázquez in exchange for her appointing Rodríguez Bonilla as OCIF Commissioner. [ECF No. 3, ¶ 51]. The survey was purportedly a covert tool designed to support Governor Vázquez's campaign. **[Exhibit G: CT Group Survey]**.

First, Diario Las Americas—owned by Mr. Herrera—published the survey on July 23, 2020. The survey results were accessible to all candidates and the general public, not just to Governor Vázquez's campaign.[4] This

---

[4] *Wanda Vázquez, Una gobernadora que toma las riendas de la isla* (2020) *diariolasamericas.com.* Available at: https://www.diariolasamericas.com/america-latina/wanda-vazquez-una-gobernadora-que-toma-las-riendas-la-isla-n4203674 (Accessed: 30 May 2024).

transparency contradicts the claim that the survey was a secret benefit intended solely for Governor Vázquez's campaign. In fact, Diario Las Americas also uploaded the survey to Scribd, an online digital document library, making it freely accessible without a paywall.[5] Political surveys are a standard tool in election campaigns, used to gauge public opinion and inform strategy. They are commonly shared among campaign teams, media, and even opposing candidates. The survey in question was no different; it was disseminated widely and made available to all candidates, demonstrating that it was not an exclusive or secretive benefit.

Second, the contents of the survey also undermine the government's theory. The survey was comprehensive, covering voter preferences, key issues, and favorability ratings for multiple candidates. **[Exhibit G, pg. 15]**. It included data on candidates such as Pedro Pierluisi, Eduardo Bhatia, and Carmen Yulin Cruz, not just Wanda Vázquez. For instance, the survey indicated that while Vázquez had a 29% approval rating, Pierluisi followed closely with 23%, and other candidates also had significant support. *Id*. at pg. 34. It also addressed critical issues for voters, such as health, economy, education, and corruption, reflecting a broad-based political research effort rather than a targeted campaign tool. **[Exhibit G, pg. 51]**.

---

[5] *Encuesta Para Elecciones Puerto Rico* (2020) *Scribd.* Available at: https://www.scribd.com/document/470157816/Encuesta-para-elecciones-Puerto-Rico#from_embed (Accessed: 30 May 2024).

Third, the government's allegations are also factually inconsistent. The government blindly accepts John Blakeman's unverified claim that CT Group was paid $500,000. [ECF No. 3, ¶ 66]. Yet, a few paragraphs later, they assert that Mr. Herrera paid CT Group $315,000. [ECF No. 3, ¶ 96]. Citing to John Blakeman's inaccurate claim in a federal indictment without verification is both reckless and irresponsible.

Either Mr. Herrera received an unexplained $185,000 discount, or the government has constructed a narrative to fit its agenda. If the government cannot accurately state the amount allegedly paid, how can their claims of a "corrupt" agreement be trusted? This inconsistency alone should make any reasonable observer question the reliability of the entire case.

Fourth, the government's theory is further weakened by the fact that it was FBI Informant 1—not Herrera or Rossini—who sent the survey to Governor Vázquez. [ECF No. 3, ¶ 101]. This is an important detail: the individual acting under the government's direction delivered the document that the government now claims was part of a corrupt scheme. The government does not allege, nor does the evidence show, that either Rossini or Herrera instructed FBI Informant 1 to send the survey to Vázquez; FBI Informant 1 acted on his own. This raises additional questions about the accuracy of the government's narrative and the true nature of the events it seeks to portray as corrupt.

Finally, when Mr. Rossini sent a copy of the survey report to John Blakeman, he clearly instructed him to "please do print or share with anyone." However, in the indictment, the government quotes this text as "please do [sic] print or share with anyone," implying there was a typographical error, and that Mr. Rossini intended to say, "do not print or share." [ECF No. 3, ¶ 102]. There is no factual basis for this assumption, and the actual text does not suggest any error or misunderstanding. The government's reinterpretation of Rossini's statement to fit their theory is speculative, unsupported by the evidence, and irresponsible.



This public dissemination of the survey and its results negate the notion of a "corrupt" agreement held secretly amongst conspirators. Had the intent been to secretly benefit Vázquez in exchange for her actions regarding OCIF, the survey results would not have been openly shared.

Ultimately, the lack of immediate demands for Super PAC funding, combined with the public nature of the survey, clearly demonstrates the absence of a *quid pro quo* arrangement. Mr. Herrera and Mr. Rossini's actions were consistent with supporting a candidate committed to anti-corruption

efforts, conditional upon her success and demonstrated integrity, rather than engaging in corrupt dealings.

## V. THE GOVERNMENT'S CLAIMS OF "SECRETIVE" AND "CORRUPT" COMMUNICATIONS ARE BASELESS.

Further highlighting the weakness of their case, the government characterizes the communications between Mr. Herrera, Mr. Rossini, Governor Vázquez, and other supposed "co-conspirators" as "secretive" to suggest a corrupt motive. [ECF No. 3, ¶ 33]. However, this claim is misleading and fundamentally misrepresents the nature of their communication.

The government does not allege that the parties deleted any communications, text messages, or phone calls, nor does it claim that the parties used untraceable phones, aliases, or code words. Instead, the accusation rests on the flawed assumption that using encrypted messaging applications such as WhatsApp, Facebook Messenger, iMessage, Telegram, Signal, and Zoom is inherently secretive and corrupt. This argument is misleading and reflects a fundamental misunderstanding of modern communication practices.

Encrypted messaging applications are used by millions of people every day, including businesses, government officials, and regular citizens and even Special Agents for the Federal Bureau of Investigation. If you have an iPhone or an Android, you are already using encrypted messaging—it is a default feature. These applications, like WhatsApp and iMessage, protect the privacy of your messages as they travel from sender to recipient. This does not mean

the messages are immediately deleted after they are sent; they stay on the devices and can be accessed later. This basic privacy feature is about keeping conversations secure, not about hiding illegal activities.

Furthermore, law enforcement was able to retrieve messages from the devices they extracted, further proving that encryption does not equate to deletion. Yet, curiously, despite FBI Informant 1 being a confidential informant for the government, his phone is one of the few devices the Government mysteriously chose not to image, download, retrieve or analyze.

Characterizing in-person meetings as secretive is equally misleading. Many meetings were documented in the governor's official schedule and held in public venues such as Fortaleza and, on one occasion, a conference room at the Vanderbilt hotel. The government's argument loses additional ground considering that Mark Rossini personally informed the head of the FBI San Juan Field Office about the scheduled meeting at the Vanderbilt Hotel *before* it took place.

If Mr. Herrera intended to act "corruptly" and intended to bribe Governor Vázquez, it would be counterintuitive for him to simultaneously hire a prominent law firm like Kobre & Kim to address the issues directly with OCIF and FinCEN. On June 10, 2020, Kobre & Kim sent a detailed, 98-page letter to Viviana Muñoz-Fernandez at FinCEN, requesting assistance in ending the unjustified and repetitive investigations by OCIF. **[See Exhibit H: Kobre Kim Letter June 10, 2020]**. The letter provided extensive evidence of

Bancrédito's transparency and compliance, showing how OCIF's examinations found no significant wrongdoing and how Bancrédito fully cooperated with even excessive ongoing demands. This transparency and cooperation are inconsistent with any intent to engage in corrupt activities.

The decision to involve a high-profile law firm and openly communicate with regulators directly contradicts the government's narrative of secretive and corrupt behavior. Instead, it demonstrates a transparent, lawful approach to resolving regulatory challenges.

## VI. CONCLUSION

The government's case against Mr. Rossini is not only legally weak but also fundamentally flawed, which seriously undermines its credibility. The prosecution has wrongly tried to portray lawful political advocacy as "corrupt intent," ignoring the legal standards that clearly separate criminal actions from constitutionally protected activities. The evidence clearly demonstrates that Mr. Rossini and his co-defendants acted transparently, lawfully, and with the genuine intent to improve the integrity of Puerto Rico's financial regulatory system.

The government's theory collapses under scrutiny. The supposed *quid pro quo* involving the creation of a Super PAC never materialized, despite the alleged agreement. The timeline of events, as established by the government's own evidence, contradicts the notion that any "corrupt intent" existed *before* key actions were taken. Additionally, the appointment of Mr. Rodríguez Bonilla—who openly recused himself from Bancrédito matters—further

discredits the idea that his nomination was part of a "corrupt" deal. The public dissemination of the political survey, which the government inaccurately labels as part of a secretive scheme, only further highlights the lack of any covert or "corrupt" behavior.

Equally troubling is the suspicious turn of events where Mr. Herrera, Mr. Rossini, and Governor Vázquez, who originally sought the FBI's help to expose corruption within the OCIF and Puerto Rican political circles, ended up being accused of corruption by the very agency they approached. This unexplained reversal casts serious doubt on the integrity of the government's investigation. It is especially concerning that the government has selectively presented evidence to support its narrative while ignoring key facts that challenge its case.

**WHEREFORE**, Mr. Rossini respectfully requests that this Court dismiss Counts One, Two, and Four of the Indictment. Furthermore, an evidentiary hearing is warranted to thoroughly examine the discrepancies and legal deficiencies in the government's case. Such action is not only necessary to uphold the rule of law but also to protect the integrity of our judicial system from being misused to target those who challenge corruption.

Respectfully submitted,

*/s/ Lydia Lizarribar Masini*
**LIZARRIBAR MASINI LAW OFFICE**
G-14 O'Neill Street, Suite A
San Juan, PR 00918
(787) 250-7505
lizarribarlaw@gmail.com

40

**STUMPHAUZER KOLAYA NADLER &
SLOMAN, PLLC**
Two South Biscayne Boulevard,
Suite 1600
One Biscayne Tower
Miami, FL 33131
Telephone: (305) 614-1400
Facsimile: (305) 614-1425

/s/ *Michael B. Nadler*
Michael B. Nadler
Fla. Bar No. 51264
mnadler@sknlaw.com
*Admitted pro hac vice*

/s/ *Juan J. Michelen*
Juan J. Michelen
Fla. Bar No. 92901
jmichelen@sknlaw.com
*Admitted pro hac vice*

*Attorneys for Mark T. Rossini*

## CERTIFICATE OF SERVICE

I certify that on September 26, 2024, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF, causing a copy to be

served on counsel of record.

/s/ *Juan J. Michelen*
Juan J. Michelen