THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>[1] WANDA VÁZQUEZ GARCED,<br>[2] JULIO M. HERRERA VELUTINI,<br>[3] MARK T. ROSSINI,<br>**Defendants.** | CRIMINAL NO. 22-342 (SCC) |

### THE UNITED STATES' RESPONSE TO DEFENDANT JULIO HERRERA' MOTION TO COMPEL THE GOVERNMENT TO IDENTIFY *BRADY* MATERIAL

### I. INTRODUCTION

The United States meets its *Brady* obligations when it provides any exculpatory or impeachment material within its possession to a defendant. Virtually every Circuit to address the question of whether the Government must identify *Brady* material within produced discovery has found that the law imposes no such requirement. In this case, the United States has not only produced discovery required by the Federal Rules of Criminal Procedure, but it also produced the investigate files from two adjacent investigations. Any evidence favorable to the defendants in the prosecution team's possession is in the defendants' possession.[1]

Defendant Julio Herrera wants more. Herrera seeks to require the United States to identify all *Brady* material within its past and future discovery productions, which he describes as "consistent with the practice in other similar document cases." Herrera's Motion, ECF No. 662, p. 2. His motion cites to a half dozen non-binding cases – all district court cases from outside the First Circuit – which don't even support granting the relief Herrera that seeks from this Court.

---

[1] The Government's Filter Team has also made productions of potentially protected material to identified privilege holders.

Importantly, Herrera fails to notify the court of contrary authority from the First Circuit and its sister Circuits. Herrera also quotes the Department of Justice's Justice Manual out-of-context, portraying its guidance as supporting his position when it actually directly refutes it. Finally, he invites chaos in this District by asking the Court to mandate identification of *Brady* material, which could affect virtually any case where cellular phones, email accounts, or a hard drive have been seized and produced in discovery. The Court should not establish such a rule in this case, or any case for that matter, based on such sparse legal support. The United States respectfully requests that the Court deny his request.

## II. BACKGROUND

### A. The United States' Discovery Productions

In August 2022, a grand jury indicted the defendants on multiple counts related to two bribery schemes. The Government's broad production of discovery commenced soon thereafter, and has included not only the FBI file opened in September of 2021 in the bribery case, but the file related to an earlier money laundering investigation of Defendant Julio Herrera's bank (which never resulted in charges) and the file of a conduit campaign contribution scheme related to a cooperating witness in this investigation.[2] Much of the discovery material has come from eighteen search warrant returns or consensual searches of phones and email accounts, including 1) two personal email accounts and a phone belonging to Defendant Wanda Vazquez; 2) two email accounts belonging to Defendant Julio Herrera; 3) two email accounts belonging to Defendant Mark Rossini; 4) two email accounts and two phones belonging to the president of Herrera's bank; 5) a phone and two email accounts belonging to a man who advised Vazquez and was dating the

---

[2] The typical practice would be to produce just statements and evidence that relates to the charges in the indictment, as well as any impeachment material for the cooperating witness. Here, out of an abundance of caution, the prosecution team produced the FBI Sentinel file.

president of Herrera's bank; 6) phones seized from two members of Vazquez's staff; and 7) two email accounts belonging to a confidant of Vazquez who also had a relationship with Herrera. At no time did the United States seize any corporate servers or corporate email accounts.

In November 2022, the defendants filed motions seeking the return of the material contained within their searched accounts on the basis that some of it was potentially attorney-client privileged. ECF No. 114. The Court ultimately denied that motion, but implemented a filter protocol which required a filter team from outside the prosecuting office to complete a filter review. ECF No. 170. Subsequently, the filter review was assigned to the Criminal Division's Fraud Section, which conducted a privilege review of the phones and accounts using search terms based on attorney and law firm names submitted by the defendants. Herrera submitted dozens of attorneys' names, many of whom represented his bank and not him in his personal capacity. Nonetheless, the Filter Team applied his dozens of filter terms and segregated the identified potentially privileged material. The Filter Team then released the identified non-potentially protected material to the Prosecution Team, which immediately produced that non-privileged material to the defendants. The Filter Team directly produced to the defendants any respective potentially privileged material. The filter process, which had to overcome language barriers, took approximately 13 months. The Court set discovery deadlines for July 30, 2024 (general discovery) and August 30, 2024 (*Jencks* material), both of which were met by the United States.[3] Any potential *Brady* material in the prosecution team's possession is now in the defendants' possession.

The United States' productions of electronic evidence from searched email accounts and phones have been consistent with the standard practice of the legal industry in general and the Department of Justice in particular. The United States has produced nearly all of its discovery in

---

[3] The Government submitted a status report of the discovery on August 5, 2024. ECF No. 605.

load-ready files capable of importation to searchable electronic databases.[4] The United States' method of production in this case allows for, among other things, efficient review using keyword searches, relevancy "tagging" by attorneys, investigators, and paralegals as defendants wish to utilize, filtering by date, file type, and source, and de-deduplication. Herrera's own motions have demonstrated that he has had no difficulty finding what he characterizes as *Brady* material. *See, e.g.*, Herrera's Motion to Dismiss, ECF No. 262, p. 11 (stating that the exculpatory and impeachment material found in discovery entitled him to dismissal and attaching 21 documents produced in discovery in support; motion denied at ECF No. 506); Herrerra's Motion to Continue Trial, ECF. No. 592 (noting that "[t]he overwhelming majority of this discovery is new and contains quintessential *Brady* and *Giglio* material."; motion denied at ECF No. 593).

Herrera's Motion repeatedly mischaracterizes the record. His assertion that the Government has missed deadlines prior to July 30, 2024 (*see* Herrera's Motion, p. 2) was refuted by the Court during a status conference on June 4, 2024. *See* ECF No. 578, p. 7 (Court: "I think that we should clarify the issue of the discovery deadline cutoff date. I actually reviewed the transcript of the hearing, because there is mention in that transcript of March 31st and March 1st. There was no actual discovery cutoff deadline imposed. It was mentioned, but it was not imposed."). His assertion that the Government missed the Court's July 30, 2024 deadline by making productions on August 9, 21, 29, and 30 (*see* Herrera's Motion, pp. 2 and 6) omits the following: the August 9th Prosecution Team production was a load-ready production of discovery produced prior to the July 30, 2024 deadline (meaning it was a duplicative production in a searchable format); the August 21st Prosecution Team production was Delta File material for

---

[4] Some material was also produced in UFDR format, along with other formats, including PDF, Excel, and HTML. Additionally, certain material was also produced in Axiom format.

which the Court had ordered an *in camera* review and had not made its final ruling until the August 7th status conference, also after the deadline; the August 21st Filter Team production consisted of redacted Excel files of identified potentially privileged material produced to Herrera for his review pursuant to the Court's order on August 7, 2024. *See* ECF No. 615; the August 29th Filter Team production contained identified waived material from a phone belonging to a third party who had not submitted her privilege log by July 30th deadline[5]; and the August 30th Prosecution Team production was the *Jencks* material, which was produced consistent with the separate *Jencks* deadline set by the Court.

Additionally, Herrera's assertion that discovery problems have been "well-documented" cites to his own complaints, not any finding by the Court. *See* ECF No. 641, pp. 22-39. Contrary to Herrera's self-referential support for his own allegations, the Court stated at the last status hearing "I believe that the Government has been very forthcoming with the production," *see id.*, at p. 23, and noted the inherent contradictions of Herrera's complaints, which vacillate between alleging the Government is under-producing and over-producing. *See id.*, pp. 23-24 (noting that Herrera has alleged both "the Government is withholding" and then "the issue is that they are flooding us and overwhelming us with documents.").

### III. DISCUSSION

A.   **Defendant's Argument Has Been Refuted By Virtually Every Circuit to Consider It**

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "[T]here are three components of a true *Brady* violation: The evidence at issue

---

[5] The Government noted the delay in production of this material in its filing on August 5, 2024, because it had not yet received the third party's privilege log. *See* ECF No. 605.

must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Josleyn*, 206 F.3d 144 (1st Cir. 2000) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-83(1999)). The rule outlined in *Brady* is therefore one of disclosure. Where, as in this case, the United States has disclosed its evidence, including any potential exculpatory evidence that may be contained within it, the *Brady* rule has been satisfied.

Every circuit that has addressed the argument that the United States must specifically identify all exculpatory information within its discovery productions has flatly rejected it. *See United States v. Morales-Rodriguez*, 467 F.3d 1, 14-15 (1st Cir. 2006); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) ("The government's duty to disclose generally does not include a duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." (internal quotation marks and citation omitted)); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny permit the Government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."); *United States v. Yi*, 791 F. App'x 437, 438-39 (4th Cir. 2020), *cert. denied*, 140 S. Ct. 2542 (2020) (unpublished) (noting that "fulfillment of the Government's obligation under *Brady* [does not require] it to identify exculpatory material"); *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), *aff'd in part and vacated in part on other grounds*, 561 U.S. 358 (2010) (rejecting argument that the government's open file, which consisted of several hundred million pages of documents, "resulted in the effective concealment of a huge quantity of exculpatory evidence."); *United States v. Warshak*, 631 F.3d 266, 297-98 (6th Cir. 2010) (rejecting the defendant's argument that "the Government was obliged to sift fastidiously through the evidence — the vast majority of

which came from Berkeley itself — in an attempt to locate anything favorable to the defense"); *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (finding that the Government "is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence." (internal quotation marks omitted)); *cf. United States v. Velasco*, No. 98-50525, 2000 U.S. App. LEXIS 440, at *10-11 (9th Cir. Jan. 7, 2000) (unpublished) ("Since disclosed material cannot be the subject of a *Brady* claim, this element of Velasco's appeal is without merit.").

The First Circuit, specifically, has refuted the argument that the government is under a duty to direct a defendant to potentially exculpatory material within a larger mass of disclosed evidence. In *United States v. Morales-Rodriguez*, an embezzlement case, the defendant claimed that the government suppressed potentially exculpatory material by failing to identify two allegedly exculpatory FBI reports in an open-file discovery production. 467 F.3d 1, 14 (1st Cir. 2006). The First Circuit rejected the argument, stating "we find no *Brady* violation because the government did not suppress it." *Id.* at 15. Similarly, in *United States v. Rodriguez-Marrero*, 390 F.3d 1, 29 (1st Cir. 2004), a drug conspiracy case, the defendant argued that the government violated *Brady* by failing to identify allegedly exculpatory evidence produced as part of pretrial discovery. The First Circuit quoted the district court's ruling, which stated, "[h]ad defense counsel thoroughly examined the discovery materials provided by the government, Defendant could have learned of the [potentially exculpatory information] and investigated the matter accordingly." The First Circuit affirmed this ruling, stating simply, "We agree." *Id.*

And despite Herrerra's focus on the amount of discovery in this case, courts have rejected defendants' *Brady* designation arguments regardless of the size of the discovery. The Fifth Circuit rejected the argument in *Skilling*, where the Government's prosecution of Enron's CEO involved

the production of several hundred million pages of documents. 554 F.3d at 576. The Sixth Circuit rejected the argument in *Warshak*, where the Government's prosecution of the owner of the pharmaceutical company that distributed Enzyte involved the production of three "tera-drives" seized from the imaged contents of the company's computers and servers, 506,000 pages of hard copy documents, and 275 discs of material gathered by the grand jury. 631 F.3d at 297-98. As the Seventh Circuit has noted, "To charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an unreasonable extension of the *Brady* rule. The courts, rightly in our view, have refused to make it." *Gray*, 648 F.3d at 567; *see also United States v. Healey*, 860 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2012) (finding, in the *Brady* context, that "the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that larger mass is enormous" (internal quotations omitted)); *see also United States v. Sotomayor*, No. 1:22-CR-122 (RDA), 2022 WL 17363020, at *3 (E.D. Va. Dec. 1, 2022) (rejecting argument that the Government must identify all known *Brady* material because of its "immense amount of discovery"; "[s]till, every court of appeals, including the Fourth Circuit, that has considered arguments similar to the one Defendant makes here has squarely rejected them.").

Bereft of any circuit court law supporting his arguments, Herrera cites to six district court decisions that appear to be the only of their kind in requiring a specific identification of *Brady* material, all from outside the First Circuit. *See* Herrera's Motion, p. 9-10. He also never mentions to the Court the overwhelming contrary authority noted above. *See generally, id.* Moreover, several of the decisions he cites have facts that are readily distinguishable themselves from the case here. For example, in *Saffarina*, the court recognized that "[p]ersuasive authority has articulated a 'general rule' that 'the government is under no duty to direct a defendant to

8

exculpatory evidence within a larger mass of disclosed evidence.'" 424 F. Supp. 3d 46, 85 n.15 (D.D.C. 2020) (citing *Skilling*, 554 F.3d at 576). But it nonetheless required identification of known *Brady* material in large part because the defendant was under-resourced:

> "Like the defendant in *Salyer*, Mr. Saffarinia is an individual defendant who neither has the benefit of parallel civil litigation, nor access to voluntary corporate assistance to sift through the massive amounts of documents within the government's voluminous production. . . Mr. Saffarinia's "counsel is handling this matter pro bono" with "time constraints" and "limited financial resources.""

And in *Salyer*, the court noted in support of its finding that "there is a singular, individual defendant, who is detained in jail pending trial, and who is represented by a relatively small defense team." No. S–10–0061 LKK, 2010 WL 3036444, *7 (D.D.C. Dec. 28, 2022) (emphasis added)).

Herrera, on the other hand, is "the *Pater familia*[6] of a family fortune estimated at $1.8 billion," according to his Wikipedia page. *See* Wikipedia, "Julio Herrera Velutini", https://en.wikipedia.org/wiki/Julio_Herrera_Velutini (as of September 27, 2024). Herrera has had, at various times, nine different attorneys and two national corporate law firms appear on his behalf in this case. He has pursued an extremely aggressive litigation strategy, filing motions to dismiss, change of venue, continue, compel, and exclude. He has separately engaged the Office of the Commissioner for Financial Institutions ("OCIF") in discovery litigation in this case. He has sued one of the witnesses against him, *see Bancredito Holding Corporation v. DMRA Law, et al.*, 3:23-CV-01238-PAD, ECF No. 31 (D.P.R. August 15, 2023), making good on a threat that "if he didn't hear anything in the next few weeks, he was going to go to Puerto Rico with a team of lawyers and leave [the witness] kicking and screaming." *See* Interview of Frances Diaz, ECF No. 301-6. He has sued his bank's receiver, *see Bancredito Holding Corporation v. Driven Administrative*

---

[6] This is a Latin term meaning that one "was the oldest living male in a household, and could legally exercise autocratic authority over his extended family." See Wikipedia, "Pater familia", https://en.wikipedia.org/wiki/Pater_familias (as of September 27, 2024).

*Services, LLC*, 5:23-cv-00575-M, ECF No. 1 (E.D.N.C., October 12, 2023), after it acknowledged a willful violation of the Bank Secrecy Act. *See* Bancredito/FinCEN Consent Order, dated September 15, 2023.[7] Prior to this litigation, he hired a private investigator to follow one of OCIF's examiners, *see* ECF No. 301-5, confirming the suspicions of the very same OCIF commissioner that Herrera bribed Vazquez to terminate, who told the FBI that his examiners "felt like they were being watched." ECF No. 301-4. Herrera is well within his right to use his significant resources to mount an aggressive litigation strategy, but one thing is for certain: he is not Salyer and he is not Saffarinia.

Moreover, the factors identified by the cases Herrera cherry-picked undermine his argument. *Saffarinia* distinguished itself from *Skilling* on the basis that the *Skilling* prosecution team provided the defense with "hot documents."[8] *See Saffarinia*, 424 F. Supp. 3d at 89. Similarly here, the United States produced its own hot documents – which it has referred to as the "Timeline Exhibits" – on December 4, 2023, over a full year before the scheduled trial date. *United States v. Blankenship* similarly noted that the Enron prosecutors provided hot documents, as well as that evidence was electronic and searchable. No. 5:14-CR-00244, 2015 WL 3687864, at *6 (S.D.W. Va. June 12, 2015). Here, too, all of the evidence is electronic and searchable. And the *Salyer* and *Cutting* courts noted that the discovery included more than two storage containers and 23 boxes of hard paper documents, respectively. *See Salyer*, 2010 WL 3036444, at *3; *Cutting*, 2017 WL 132403, at *2. Although Herrera repeatedly refers to the discovery in this case in terms of page numbers, it's electronic and searchable, not paper in bankers boxes.

---

[7] Available at: https://www.fincen.gov/sites/default/files/enforcement_action/2023-09-15/Bancredito_Consent_FINAL_091523_508C.pdf

[8] "Hot documents" were documents that the United States "thought were important to its case or were potentially relevant to Skilling's defense." *Skilling*, 554 F.3d at 577.

Finally, Herrera's own motions have demonstrated that he has had no difficulty finding what he characterizes as *Brady* material on his own. *See, e.g.*, Herrera's Motion to Dismiss, ECF No. 262, p. 11 (asserting in motion alleging outrageous government misconduct that the exculpatory and impeachment material found in discovery entitled him to dismissal and attaching 21 documents produced in discovery in support; motion denied at ECF No. 506); Herrerra's Motion to Continue Trial, ECF. No. 592 (noting that "[t]he overwhelming majority of this discovery is new and contains quintessential *Brady* and *Giglio* material."; motion denied without prejudice at ECF No. 593). This further weakens his position. *See Warshak*, 631 F.3d at 298 (noting that defendants' motion practice "demonstrated they were capably navigating the discovery" in finding the government had not "abdicated its duties under *Brady*"). The request in this case is not one of need, but is rather a litigation tactic.

**B.     Defendant's Argument is Directly Refuted by the Justice Manual**

Herrera also cites to the Justice Manual to assert an "affirmative obligation to review all discovery gathered and produced." Hererra's Motion, p. 7. He quotes the Justice Manual's admonitions that "[t]o ensure that all discovery is disclosed on a timely basis, generally all potentially discoverable material within the custody or control of the prosecution team should be reviewed" and "prosecutors must ensure that the material is reviewed to identify discoverable information." *Id*. First, as the Justice Manual itself states, "[i]t is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal." U.S. Dept. of Justice, Justice Manual, 1-1.200. Second, the full context of this language makes clear the Justice Manual is referring to the review of evidence not yet produced. For example, within the same section Herrera quotes about the need to review "all potentially discoverable information," the Justice Manual specifically states, "[a]s discussed

11

more fully below in Step 2, in cases involving a large volume of potentially discoverable information, <u>prosecutors may discharge their disclosure obligations by choosing to make the voluminous information available to the defense</u>." *Id.*, 9-5.002(B)(3).   Herrera also removed the language about reviewing the material to "identify discoverable information" from context.  The quote comes from the following paragraph, which states in full:

> **Step 2: Conducting the Review**
>
> Having gathered the information described above, prosecutors must ensure that the material is reviewed to identify discoverable information. It would be preferable if prosecutors could review the information themselves in every case, but such review is not always feasible or necessary. The prosecutor is ultimately responsible for compliance with discovery obligations. Accordingly, the prosecutor should develop a process for review of pertinent information to ensure that discoverable information is identified. Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling. This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying potentially discoverable information, prosecutors should not delegate the disclosure determination itself. <u>In cases involving voluminous evidence obtained from third parties, prosecutors should consider providing defense access to the voluminous documents to avoid the possibility that a well-intentioned review process nonetheless fails to identify material discoverable evidence.</u> Such broad disclosure may not be feasible in national security cases involving classified." *Id.*, 9-5.002 (Step 2) (emphasis added).

In other words, where review of all material is not practical or possible, prosecutors are encouraged to make everything in their possession available within the confines of the law.

This is now the second time Herrera has misstated the Justice Manual and prevailing case law in making an allegation against the United States.  The first time, he accused the United States of outrageous government misconduct for contacting a represented party during an investigation stage, ECF No. 262, p. 41-42, despite the very well-recognized "authorized by law" exception to the no-contact rule.  *See* ECF No. 301, pp. 19-20 (United States' response citing circuit court law recognizing the exception and explaining that neither the Justice Manual nor the American Bar Association prohibit such contact) and ECF No. 506, p. 12 (Court noting that "[h]aving a lawyer

12

on retainer or providing representation in a distinct matter does not wholly forestall law enforcement efforts to investigate crime."). Here, he asserts not only that the Justice Manual "imposes an affirmative duty on the Government to actually review all material gathered and produced," but that it's "a constitutional requirement enforced by the courts." Herrera's Motion, pp. 7 and 8. This is an egregious misstatement of the law not even supported by the handful of aberrational cases he cites, which required only identification of information <u>the Government was already aware of</u>. *See United States v. Sheppard*, No. CR 21-203 (JDB), 2022 WL 17978837, at *14 (D.D.C. Dec. 28, 2022) ("to the extent <u>that the government knows</u> of any [*Brady*] material in its production, the Court will require [the government] to identify it." (internal quotations and brackets omitted; emphasis added)); *United States v. Saffarinia*, 424 F. Supp. 3d 46, 86 (D.D.C. 2020) ("the Court agrees with Mr. Saffarinia that the government's *Brady* obligations require it to identify any known Brady material <u>to the extent that the government knows of any such material in its production</u>" (emphasis added)); *Blankenship*, 2015 WL 3687864, at *6 and *7 ("The Court finds that the United States should specifically designate <u>any known</u> Brady material as such and disclose the same to defense counsel"; "designation, <u>to the extent it can be given</u>, is appropriate." (emphasis added)); *United States v. Hsia*, 24 F. Supp. 2d 14, 29–30 (D.D.C. 1998) ("<u>To the extent that the government knows of any documents or statements that constitute *Brady* material</u>, it must identify that material to Ms. Hsia." (emphasis added)).

**C.    Granting Herrera's Motion Will Having Lasting Ramifications in this District**

If the Court grants Herrera's motion, it should expect many more such motions to come. Unlike the relatively rare massive corporate cases such as *Skilling* and *Warshak*, where the headquarters of major U.S. corporations were searched and their servers were seized, this case involves the seizure of personal phones and the defendants' and third-party witnesses' Yahoo and

13

Google accounts. Cases involving such seizures are common in this district. And virtually any case where phones or email accounts are seized can generate an enormous amount of data. As the Ninth Circuit has noted, "The average 400–gigabyte laptop hard drive can store over 200 million pages—the equivalent of five floors of a typical academic library." *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013); *see also Riley v. California*, 573 U.S. 373, 394 (2014) ("The current top-selling smart phone has a standard capacity of 16 gigabytes (and is available with up to 64 gigabytes). Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos."). Today, commercial hard drives often hold several times[9] the roughly one terabyte of discovery produced in this case, by Herrera's own numbers. *See* Herrera's Motion, Exhibit A (calculating the size of discovery at less than one (.882) terabyte and 8,617,277 pages). Therefore, the impracticality of any party reviewing the entire contents of electronic devices – and the quagmire of litigation that will result if a court requires it – will exist in any case where a hard drive is seized (such as those involving child pornography), multiple phones are seized (such as those involving narcotics trafficking), or multiple email accounts are seized (such as those involving corporate fraud).

Thus, aside from the fact Herrera requests something utterly unsupported by the law, his request also threatens the opening of a Pandora's box where cases are stalled as prosecutors conduct document reviews for defense teams, followed by district and magistrate judges having to oversee and rule upon disputes where the parties disagree over the exculpatory value of evidence not highlighted by the prosecutors. Given that any such argument would concern evidence <u>already in the defense's possession</u>, this would open a new, vast, and completely unnecessary docket-clogging basis for litigation. Further, because none of the cases cited by Herrera involved a post-

---

[9] Standard hard drives such as the Seagate Portable 4TB External Hard Drive HDD and Dell 400-AUXC 7KDP0 8TB hold four and eight terabytes, respectively, while larger hard drives can store up to 80 terabytes.

trial finding, none of them offer this Court any guidance on how such disputes over *Brady* designation would be resolved. Indeed, the fundamental weakness of *Saffarinia* and the other cases cited by Herrera is that they all fail to explain how material in the possession of the defense is actually "suppressed." *See Morales-Rodriguez*, 467 F.3d at 15 ("we find no *Brady* violation because the government did not suppress it.); *United States v. Hall*, 557 F.3d 15, 19 (1st Cir. 2009) ("To justify a new trial, Hall must show that the government's failure to disclose evidence caused him prejudice.").

## IV.     CONCLUSION

As the size of discovery productions have increased, so too has the capability to perform targeted searches. And despite Herrera's repeated attempts to view his 21st century discovery review through a 20th century lens, suggesting that phone and emails accounts must be reviewed page-by-page, this remains a false premise. Most importantly, there is no basis on which Herrera can compel the Government to do this type of review for them.

**Certificate of Service**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify all counsel of record.

**RESPECTFULLY SUBMITTED**, this 1st of October, 2024.

| | |
|---|---|
| COREY R. AMUNDSON<br>Chief, Public Integrity Section | W. STEPHEN MULDROW<br>United States Attorney |
| */s/ Ryan R. Crosswell*<br>Ryan R. Crosswell (G03502)<br>Nicholas W. Cannon<br>Trial Attorneys<br>Department of Justice<br>Public Integrity Section<br>1301 New York Ave., NW - 10th Floor<br>Washington, D.C. 20530 | *s/ Myriam Y. Fernandez-Gonzalez*<br>Myriam Y. Fernandez-Gonzalez - 218011<br>Assistant U.S. Attorney<br>Torre Chardón, Suite 1201,<br>350 Carlos Chardón Street<br>San Juan, Puerto Rico 00918<br>Office: 787-766-5656<br>myriam.y.fernandez@usdoj.gov |

(202) 616-5699
ryan.r.crosswell@usdoj.gov