## THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
Plaintiff

Vs

WANDA VAZQUEZ GARCED,

Defendant.

Criminal No. 22-cr-342-01(SCC)

## INFORMATIVE MOTION TO CLARIFY THE RECORD REGARDING PLEA NEGOTIATIONS

**TO THE HONORABLE COURT**:

COMES NOW defendant WANDA VAZQUEZ GARCED, by and through her undersigned attorneys, and respectfully moves this Honorable Court to clarify the record regarding the circumstances that precipitated the plea agreement in this case, and in support thereof states:

### I. Introduction

Twenty-two months of methodical investigation uncovered evidence that fundamentally changed this case. (See: *Parties Motion in Compliance with Court Order* at docket number 881.)  However, the Court's July 8, 2025, Order has transformed what should be celebrated as justice working properly into an unwarranted tale of political favoritism. By inferring that the plea agreement resulted from "directives presumably issued by Main Justice," (D. 885) the Court inadvertently obscured a simple truth: this resolution emerged from defense counsel doing their job and prosecutors doing exactly

what we expect of them—reassessing their case when confronted with compelling and exculpatory evidence.

The Court's statements have generated damaging media coverage that distorts reality.[1] The actual record reveals something fundamentally different: a methodical investigation that uncovered evidence so compelling that seasoned prosecutors acknowledged their case had "collapsed." The defense is concerned about how the outcome of this case might have been interpreted by the Court and reported upon by media outlets.

This motion seeks to explain to the Court the sequence of events that led to the resolution of the case. We will first provide a summary of the defense's investigation and then will explain how these findings were presented to the Department of Justice.

## II. The Government's Own Words Prove Professional Judgment, Not Political Directive

Nowhere in the record does it appear that prosecutors received any "directive[] …

---

[1] See, for example: https://news.bloomberglaw.com/us-law-week/dismayed-judge-signs-off-on-dojs-deal-for-puerto-rico-governor

This article published in a national legal media outlet exemplifies how the Court's language has been seized upon to create precisely the incorrect impression the defense seeks to correct. The article cites the Court's Order and echoes the Court's mistaken belief that the case was resolved case through "directives presumably issued by Main Justice" that provided "leniency" and resulted in merely "a slap on the wrist." It suggests defense attorneys "forced" prosecutors to change course through political connections rather than legal argument. Notably absent from this coverage is any mention of the compelling exculpatory evidence, timeline problems, or prosecutorial admissions that we will address here and drove the resolution.

issued by Main Justice." When the government informed this Court of plea negotiations, its language reflected professional judgment, not political directive. Throughout these proceedings, the government never once suggested external pressure or reluctant capitulation. Instead, their filings consistently describe voluntary, professional negotiations — language fundamentally incompatible with any suggestion of Washington mandates. The government's characterizations speak for themselves:

- **May 22, 2025 (Dkt. 863)**: "the parties have agreed to enter good-faith discussions to resolve this case in the interests of justice," emphasizing avoiding "considerable time and resources filing and adjudicating numerous motions, engaging in pre-trial activities, and conducting a lengthy trial."

- **May 30, 2025 (Dkt. 869)**: the parties were "acting in good faith with an eye towards resolving the matter short of trial and to conserve substantial judicial and private resources."

These are the words of prosecutors exercising their discretion, not implementing orders from above. The government also informed this Court (Dkt. 869) that "The United States Department of Justice and counsel for two of defendants had a productive meeting in Washington, D.C. on May 30, 2025, with members of the prosecution team and senior officials in the Department." They characterized this as part of their efforts "to resolve the case and alleviate the need for trial," emphasizing that "the parties are acting in good faith." The government's consistent characterization of "productive" meetings and "good faith"

negotiations is incompatible with any directive from Main Justice. Instead, their language reflects autonomous professional judgment, not compliance with orders.

## III. The Defense Investigation: Twenty-Two Months of Methodical Discovery

What transformed this case was a methodical investigation, not political intervention conducted by Vazquez's lead counsel Luis Plaza Mariota ("Plaza") and pro bono investigator and former supervisory United States Marshal Roberto Vizcarrondo ("Vizcarrondo"). Over twenty-two months, Plaza and Vizcarrondo conducted dozens of witness interviews, analyzed thousands of documents, and pursued court-authorized subpoenas – focusing on the precise legal standard governing this case.

The investigation focused on *McCormick v. United States*, 500 U.S. 257 (1991), which requires proof of an explicit *quid pro quo* in campaign contribution cases—not inferences, not timing, but an actual agreement. Every investigative decision aimed at this standard, seeking evidence that would reveal whether such an explicit agreement (the "*pro*") ever existed.

## A. The Defense Argued from the Beginning of the Case that there was no "*Pro*"

While the Court accurately describes the plea agreement as a "turn of events" after years of litigation, the underlying timeline problems were apparent from the start. Our May 2023 *Motion to Dismiss*, researched and filed by Ignacio Fernandez de Lahongrais,

identified the fatal flaw: Governor Vázquez had decided to fire Commissioner Joyner before any alleged contact with Herrera, making any quid pro quo impossible under *McCormick*. See Dkt. 193-1 at 30. We argued then that

> *McCormick* holds that an elected official's acceptance of campaign contributions is sanctionable "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct *will be controlled* by the terms of the promise of undertaking." 500 U.S. at 273 (italics added). The second sentence is key to understanding the limits of the *McCormick* rule: the explicit agreement must precede the official conduct. It then follows that if the official act is done *prior* to any agreement, then there is no criminal conduct - the official conduct *must* have been controlled by the terms of the explicit agreement. *Id.*

Our *Motion to Dismiss* was limited by its very nature to an attack on the pleadings themselves, without the benefit of the extensive investigation that followed. However, the deficiencies we identified in the indictment's allegations provided the roadmap for our subsequent twenty-two-month investigation.

Our methodical examination of witnesses, documents, and electronic records confirmed what we had argued from the beginning based solely on the government's own pleadings: the timeline made their conspiracy theory impossible.

What appeared sudden to outside observers was simply the government's

recognition of what the defense had argued from the beginning: their own timeline precluded the possibility of a *quid pro quo.*

**B. The Decision to Terminate Joyner was made in November 2019 – Part of a Systematic Administrative Reform – and Months Before Vazquez's Alleged First Contact Met Herrera**

The investigation revealed a timeline that fundamentally undermined the government's conspiracy theory: Governor Vazquez decided to replace Commissioner George Joyner ("Joyner") in November 2019, months before any alleged contact with Herrera. This November 2019 decision created an insurmountable legal obstacle to the government's conspiracy theory under *McCormick*, as the explicit agreement must precede the official conduct it purports to control.

**C. Administrative Overhaul, Not Corrupt Agreement**

Joyner's termination was not an isolated decision but part of comprehensive administrative reform. After unexpectedly becoming governor in August 2019, Governor Vazquez inherited an entire cabinet appointed by and loyal to her predecessor, Ricardo Rosselló. Between September 2019 and August 2020, she systematically replaced more than 20 agency heads from institutions including the Department of Natural Resources, the Ports Authority, the Housing Department, the Department of Health, and the Department

of the Family. By February 26, 2020, when Joyner was actually terminated, at least 13 other agency heads and cabinet secretaries had already left the Vazquez administration.

Governor Vazquez replaced Joyner for two reasons: his loyalty to the prior administration and his chronic absenteeism. Like many of these officials, Joyner owed his position to Rosselló and represented the holdover cabinet that Governor Vazquez was carefully replacing with her own team. More importantly, electronic punch card records obtained through court subpoenas[2] revealed that Joyner worked full days only 9% of the time during the Vazquez administration. This chronic absenteeism was well-documented. Governor Vazquez's Chief of Staff, Antonio Pabon—a prosecution witness who refused to meet with defense counsel—told the government during their investigation that Joyner was terminated because he was "never present."

Joyner's termination was vindicated by subsequent events. When his successor, Victor Rodriguez Bonilla, arrived at OCIF he found "chaos": bank audits that had been open without resolution for over four years, auditors lacking computers to conduct their work, and staff refusing to comply with basic operational directives. This pattern of personnel changes demonstrates that Joyner's removal was standard executive transition practice combined with performance-based termination, not the result of any corrupt agreement.

---

[2] These records were provided to the government through reciprocal discovery.

The timing delay reflected administrative realities and emergency response priorities. The OCIF Commissioner position requires extensive banking regulation expertise, making qualified candidates difficult to find. More critically, devastating earthquakes struck Puerto Rico on January 6 and 7, 2020, requiring Governor Vazquez's full attention during the emergency response. Her decision to replace Joyner was postponed until this crisis was resolved—a reasonable administrative decision, not evidence of conspiracy.

The government, however, did not investigate these legitimate grounds for termination.

### D. The Wedding: Pleasantries, Not Plotting

The indictment emphasizes that on January 4, 2020, Governor Vazquez attended Individual C's wedding and was seated at the same table as Herrera. *See*: Indictment, Dkt. 3 at ¶¶ 39, 42. The government suggested this proximity enabled corrupt communications. But, the investigation revealed a different reality. While at the same table, Governor Vazquez and Herrera were not seated adjacent to each other. The government interviewed billionaire investor John Paulson who attended the wedding and was seated in the same table. During his government interview Mr. Paulson confirmed no one discussed the Office of the Commissioner of Financial Institutions ("OCIF"), political candidates nor any sort of campaign contributions during the event.

Contemporaneous text messages from Herrera during the wedding—created without knowledge of any future prosecution—revealed the innocent nature of their interaction. Herrera's messages indicated that he did not bring up any issues with Governor Vazquez because she was relaxing and having a good time dancing with her husband, and he did not want to be remembered by the Governor as the person who ruined her evening.

Mr. Paulson's Interview as well as these contemporaneous communications directly contradict any suggestion of corrupt discussions or conspiracy formation at the wedding.

**E. Government's Own Witness Refutes Conspiracy Theory**

**1. The January 14th Meeting at La Fortaleza**

According to the indictment, on January 14, 2020, Governor Vazquez and some staff held a meeting at La Fortaleza with Herrera, Bancredito's President Frances Diaz, and John Blakeman. Both Diaz and Blakeman are cooperating with the government. See Indictment, Dkt. 3 at ¶ 46. The indictment suggests that this meeting was significant to the conspiracy theory. Yet the indictment remained silent about what actually transpired and alleges no quid pro quo agreement.

The investigation revealed why: documents produced in discovery memorialized that Frances Diaz told the government that no one discussed Joyner or OCIF during this meeting. This wasn't a minor detail, it directly contradicted the indictment's *quid pro quo* allegations. With no corrupt agreement discussed at the second of only three meetings

between Governor Vazquez and Herrera, any inferences drawn in the indictment from the timing and proximity of events lose their foundation.

## 2. The February 28th "Critical Meeting"

According to the indictment, on February 28, 2020, Governor Vazquez met with Herrera, members of the International Consulting Firm, and others at a hotel in the Condado area of San Juan so that the International Consulting Firm could present services it could offer to support her gubernatorial campaign. *See*: Indictment, Dkt. 3 at ¶ 77. The government has characterized this as "the critical meeting at the Vanderbilt Hotel, where Herrera and Vazquez convened for the first time to discuss his funding of her political consultants." *See*: Docket 301, page 17.

However, Individual C, an FBI asset, directly contradicted the government's theory. When the FBI specifically asked him whether anything inappropriate occurred during this "critical meeting," Individual C told them that nothing inappropriate happened, that he was unaware of any attempts to bribe Governor Vazquez, and that he did not know if Joyner's replacement was tied to anything of value. This testimony is memorialized in an official FBI document from October 2020.

Individual C even offered to wear a recording device to record the meeting participants, but the FBI declined.

The entire presentation came to nothing. What occurred at the Vanderbilt was simply a presentation of what the British group could do to professionalize the campaign.

The presentation never materialized into any services because Herrera ultimately decided to support Governor Vázquez's opponent.

## F. Rodriguez Bonilla: The FBI Asset Who Recused Himself

The investigation uncovered important information about Joyner's successor, Victor Rodriguez Bonilla ("Rodriguez Bonilla"), that made the government's theory implausible.

Through extensive interviews, the defense learned that Rodriguez Bonilla met only with Chief of Staff Pabon during his recruitment process and never met with Governor Vazquez. Critically, he never disclosed to anyone in the Vazquez administration, nor to the Senate during his confirmation process, that he had previously worked as a consultant for Bancredito.

This nondisclosure was particularly significant because Rodriguez Bonilla was not just any banking professional—he was a graduate of the FBI Citizens Academy and served as an FBI asset, assisting the Bureau in money laundering and suspicious banking activity investigations. Furthermore, Rodriguez Bonilla immediately reported his appointment offer to the appropriate federal authorities, demonstrating his commitment to transparency and proper procedures throughout the process. Upon assuming his position as OCIF Commissioner, Rodriguez Bonilla immediately recused himself from all matters involving Bancredito; precisely because of his undisclosed prior relationship with the bank.

During his interviews with Plaza, he was clear that if called to testify at trial, his testimony would be that no one told him he was appointed as OCIF Commissioner to intervene in the ongoing audit of Bancredito or to favor the bank. He never met Governor Vazquez, and neither she nor anyone else asked him to do anything improper in exchange for his appointment.

The government's theory required believing sophisticated conspirators would orchestrate the appointment of someone who they knew would immediately disqualify himself from assisting their scheme. More critically, if corrupt activity had occurred as alleged, Rodriguez Bonilla—with his FBI training and connections—was perfectly positioned to report it. No such reports were made because no corruption occurred.


## G. Comprehensive Electronic Discovery Reveals No Corrupt Communications

The government's investigation included extensive electronic surveillance and discovery that further undermined their conspiracy theory. Governor Vázquez's cellphone and cloud accounts were searched by the government and revealed not a single text message or email suggesting participation in any quid pro quo arrangement.

The government obtained electronic communications from all key government witnesses—John Blakeman, Frances Díaz, Lillian Sánchez, and Marisol Blasco—and found no texts or communications of any type to or from Governor Vázquez regarding any

alleged quid pro quo. (Similarly, there were no texts or electronic communications between Governor Vazquez and co-defendants Herrera Velutini and Mark Rossini.)

The scope of this electronic discovery was unprecedented. The government reviewed approximately 65 million documents throughout their investigation. In all 65 million documents, investigators found not a single incriminating text message, email, or other communication by Governor Vázquez that supported the conspiracy allegations.

This absence of electronic evidence is particularly significant in modern corruption cases, where conspirators typically communicate through digital channels. The complete lack of any supporting electronic communications across millions of documents and multiple devices demonstrates that no conspiracy existed.

## H. The Survey That Never Was

The indictment places significant emphasis on an alleged survey as evidence of the purported *quid pro quo*, suggesting that Herrera commissioned political research to benefit Governor Vazquez's campaign as part of the corrupt arrangement. See Indictment, Dkt. 3 at ¶¶ 51, 96. The government treated this survey as a key component of the alleged "thing of value" that constituted the quid in their bribery theory.

However, the investigation also revealed important context about the alleged survey that the government claimed was a benefit provided to Governor Vazquez's campaign.

Rather than an exclusive benefit to Governor Vazquez, the defense discovered that this survey was never actually provided to her campaign staff. Instead, the survey was given to John Blakeman and Individual D, who provided it to a high-level official in the opponent's campaign in the primary election—rather than passing it on to the Vazquez campaign.[3]

The defense interviewed key members of the Vazquez campaign, including the campaign president, media specialists, and image consultants. All confirmed they never saw the alleged survey the government claimed was a corrupt benefit. The supposed "quid" in the government's *quid pro quo* theory actually benefited Governor Vazquez's political opponent.

Moreover, Governor Vázquez's campaign had independently commissioned and paid for its own survey, with the first payment made on February 28, 2020—the same day as the alleged "critical meeting" at the Vanderbilt hotel. Under Puerto Rico law, electoral campaigns must certify all expenses to the electoral comptroller, and these reports are audited by certified public accountants. The defense obtained all campaign financial records from the electoral comptroller, confirming that Governor Vazquez's campaign was

---

[3] FBI asset Individual C sent a summary of the survey to Governor Vazquez. That same informant, at the direction of the FBI, also shared information from the surveys with the campaign manager of her opponent. The research was also shared with bank clients, other investors in Puerto Rico including John Paulson, the Bancredito's Board of Directors and the FBI. Nonetheless, according to the indictment, the mere act of sharing this information with Governor Vazquez – who made no use of it and had no need for it – somehow constituted an illicit quid pro quo arrangement, with the cost of commission the survey constituting the "bribe" under that purported arrangement.

already paying for its own political intelligence research.

## IV. The Washington Presentation: When the Defense's Investigation is Presented to Professional Prosecutors

In March 2025, two months before meeting with Department of Justice officials, defendants submitted a comprehensive brief documenting the investigation's findings. It demonstrated that the government's own discovery, as well as newly discovered evidence, revealed the absence of any explicit *quid pro quo* as required under *McCormick* for campaign contribution cases.

The submission showed the case possessed "neither a quid, nor a quo, nor any pro." This is not rhetoric, the investigation revealed facts known and unknown to the government that were not presented to the grand jury.

On May 30, 2025, counsel for Vazquez and Herrera met with the government at the Department of Justice in Washington, D.C. The government was represented by Associate Deputy Attorney General Aakash Singh, Senior Counsel to the Deputy Attorney General Vance Day, United States Attorney Stephen Muldrow, Chief of the Criminal Division Timothy Henwood, and Trial Attorney Nicholas W. Cannon from the Public Integrity Division. Notably, Deputy Attorney General Todd Blanche was not present and did not participate in the negotiations. Plaza was present representing Governor Vazquez, and for co-defendant Herrera, Christopher Kise, Sonia Torres, Lilly Ann Sanchez, and other

attorneys participated.

The meeting began with Associate Deputy Attorney General Singh establishing clear parameters: "Just to be crystal clear, the indictment will not be dismissed." This declaration of the government's unwavering position at the outset would prove significant in light of what followed. Notably, if these proceedings were driven by political directives from Washington, one would expect a fundamentally different opening posture from senior Department officials—not an emphatic declaration that dismissal was off the table.

Counsel Luis Plaza Mariota then presented a methodical walk-through of the defense findings. Asked about the investigation's focus, he answered with one word: "The "*pro*." What followed was systematic presentation of evidence that systematically showed that there was no "pro" in this case.

## 1. The Fatal Timeline

Plaza began with the timeline that proved fatal to the government's theory. Commissioner Joyner's termination decision was made in November 2019, with actual termination on February 26, 2020—two days before the February 28 meeting the government called "critical" for conspiracy formation.

This created an insurmountable *McCormick* problem – precisely what we argued in our *Motion to Dismiss*: the explicit agreement must precede official conduct, as *"the official asserts that his official conduct will be controlled* by the terms of the promise or

undertaking." 500 U.S. at 273. The *Motion to Dismiss* highlighted the timeline in the indictment itself showed that Joyner's termination occurred before the "critical meeting" at the Vanderbilt.[4]

Given that the indictment contained this critical flaw, the investigation focused on finding evidence to support what the indictment actually alleged – a flawed timeline that made any "*pro*" impossible.

### 2. Three Meetings, No Conspiracy

Plaza then showed the limited contact between Governor Vázquez and Herrera: only three meetings in total. At the January 4 wedding, they exchanged pleasantries while she danced with her husband. At the January 14 La Fortaleza meeting, the government's own witness confirmed no OCIF discussion occurred. At the February 28 Vanderbilt meeting, the government's own FBI asset confirmed nothing inappropriate happened.

The investigation also confirmed that no cooperating witness—including

---

[4] As we argued in our *Motion to Dismiss*:

According to the Indictment, Governor Vazquez-Garced had decided as early as January 2020 to fire OCIF Commissioner A (*see* ¶ 52), and up to that point, had not received any promise of campaign contributions from Herrera. In fact, according to the Indictment's allegations, it can be inferred that Vazquez was not informed of Herrera's offer to provide funding for her election campaign until February 28 "or shortly thereafter." (*See* ¶ 80.) And, as for the meeting at the Condado hotel, the Indictment does not allege that OCIF was discussed at this meeting, and it would have been impossible for the parties to have reached the alleged *quid pro quo* at this meeting because Vazquez had already fired OCIF Commissioner A. Docket 193-1, page 30.

Blakeman—ever discussed any quid pro quo with Governor Vázquez, that Herrera used no intermediaries to convey corrupt proposals. This absence of evidence was itself evidence of absence.

### 3. Additional Evidence

As Plaza continued, it became clear that the indictment's allegations could not survive:

- **Joyner's attendance records**: When presented with Joyner's attendance records showing his chronic absenteeism, prosecutors recognized that the government had received this evidence in reciprocal discovery but "not yet viewed it."

- **Díaz's account**: No one discussed OCIF at the January 14 meeting—prosecutors offered no rebuttal.

- **Individual C's statement**: The government's own FBI asset categorically stated that nothing corrupt occurred at the "critical meeting," yet prosecutors provided no contradiction to this exculpatory testimony.

### 4. The Rodriguez Bonilla Disclosure

Plaza then disclosed to the government for the first time that he had interviewed Victor Rodriguez Bonilla on three occasions. These interviews revealed that Bonilla had not disclosed to anyone in the Vazquez administration that he was a consultant to Bancredito. Moreover, after he assumed the position of Commissioner of Financial Institutions, he recused himself from any dealings with Bancredito and provided no assistance to any alleged scheme.

When confronted with the overwhelming evidence that contradicted their conspiracy theory—including Pabon's explanation that Joyner was fired for documented absenteeism, cooperating witness Frances Díaz's testimony that undermined the government's case, and the fact that Bonilla had recused himself from any Bancredito matters—prosecutors could not provide reasonable explanations for proceeding with the indictment.

Associate Deputy Attorney General Singh, troubled by the admissions, asked the prosecutors: "And yet you decided to indict anyway?" Their response was simply: "We took our chances."

## 5. The Decisive Moment

When a senior official asked the prosecutors "where is the pro?" the response was only "inferences"—precisely what *McCormick* prohibits in campaign contribution cases. As we consistently argued in our *Motion to Dismiss*, the government cannot rely on mere inferences to establish the explicit agreement required under *McCormick*.

The defense's approach was methodical and coherent: we identified the same factual claims the government made in the indictment and conducted our own investigation to test their validity. Plaza's investigation ultimately proved that the indictment was correct on the crucial point—the timeline showed Joyner's termination occurred before any alleged agreement. By corroborating what the government's own pleadings revealed, we demonstrated that their theory was legally impossible under *McCormick*.

The decisive moment arrived when a senior a DOJ official asked, "And nothing happened?" Plaza's response was clear: "No, nothing happened. So much so that the audit continued and the bank had to close."

The alleged conspiracy achieved nothing, benefited no one, and the regulatory process continued unimpeded. Confronted with this reality, prosecutors could only acknowledge they "took our chances" despite the troubled timeline.

## V. Professional Recognition of the Case's Collapse

After Plaza's presentation, prosecutors left the meeting to confer amongst themselves. Once the local prosecutors left the room, Associate Deputy Attorney General Singh announced a fundamental shift: "the indictment has collapsed and is no longer viable." Remarkably, what began seven hours earlier with Singh's emphatic declaration that "the indictment will not be dismissed" had transformed into a recognition that the case was no longer viable. At this point, Singh and Day transformed from adversaries into mediators, acknowledging that the evidence had fundamentally altered the case's viability. From this moment forward—after senior officials at the Department of Justice recognized that the indictment was no longer sustainable—the parties began plea negotiations for the first time. Plea negotiations lasted for several weeks until an agreement was reached on June 17, 2025. This extended timeline reflects the thorough, deliberative process we expect from professional prosecutors, not order implementation.

## VI. The Record's Silence on External Directives

The record's complete absence of any reference to "Main Justice" directives speaks louder than any affirmative denial. Across multiple filings, status conferences, and joint motions, the government consistently characterized these proceedings as "good faith negotiations." Not once did prosecutors hint at external pressure or reluctant acquiescence. This consistency reflects the reality of prosecutors exercising professional judgment.

The Court's inference appears rooted solely in the dramatic nature of the charge reduction. Yet when new evidence emerges that fundamentally alters a case, significant modifications aren't suspicious—they're what we expect from prosecutors committed to justice rather than convictions.

## VII. The Reputational Consequences and the Need for Correction

### A. The Press Conference That Started the False Narrative

The reputational damage began not with this Court's July 8, 2025 order, but with the government's press conference on the day of Governor Vázquez's arrest. During that press conference, the United States Attorney and the head of the FBI in Puerto Rico publicly implied that Governor Vázquez had personally benefited from approximately $300,000, creating a narrative of personal enrichment and corruption that dominated media coverage

and public perception.

This characterization turned out to be inaccurate. The plea agreement's Stipulation of Facts to be filed in 25-cr-0296 (SCC) explicitly states that "Defendant Vazquez-Garced did not accept the political contribution for her personal monetary gain; but for her political committee to support her candidacy." The government now acknowledges that any alleged contributions were campaign-related, not personal enrichment. Moreover, the plea agreement stipulates that "the value of the promised contribution was more than $15,000 but did not exceed $25,000"—a far cry from the $300,000 benefit implied at the press conference. Most significantly, the plea agreement confirms these were "promised" contributions that were never actually received.

Still, the press conference's mischaracterization of substantial personal corruption followed Governor Vázquez throughout the three years of this prosecution. The narrative of personal enrichment, amplified by media coverage, damaged her reputation and subjected her family to public scrutiny and personal threats. Professional relationships were severed, business opportunities were lost, and the stigma of alleged personal corruption became attached to her name based on representations that the government's own plea agreement reveals were completely unfounded.

## B. The Court's Inference Compounds the Damage

This Court's statements about local prosecutors "following directives presumably issued by Main Justice," while understandable given the dramatic charge reduction, creates

a mistaken impression of political favoritism that ties directly into the false narrative from the press conference and reinforces the stigma of corruption that has unfairly followed Governor Vázquez since then. Both statements were made publicly, and both have shaped public perception in ways that obscure the legal merits that drove the resolution.

The public now sees a pattern: first, allegations of personal corruption that proved unfounded, and now, suggestions of political intervention that the record does not support. This combination creates a lasting impression that Governor Vázquez's case was resolved through improper means rather than through the proper functioning of our legal system when confronted with compelling exculpatory evidence.

The Court's statement has inflicted additional profound reputational damage, transforming exemplary advocacy and a textbook example of prosecutors responding appropriately to exculpatory evidence into a tale of political favoritism. Media coverage has seized on the "influence" narrative rather than recognizing how the system should work when compelling new evidence emerges.

Governor Vázquez deserves recognition for what actually occurred: her investigation uncovered crucial exculpatory evidence, and professional prosecutors had the integrity to respond appropriately. This exemplifies our adversarial system functioning exactly as designed.

The defense respectfully submits that accuracy in public statements about criminal cases serves justice better than interpretations, whether it comes at the beginning of a case

or at its conclusion.

## C. Addressing the Court's Concerns About Electoral Integrity

The defense respectfully acknowledges this Court's observation that the misdemeanor offense "lacerates the integrity of our democratic electoral process" and "represents an attack on a fundamental principle of our democratic society: free and fair elections." The defense shares the importance of protecting electoral integrity.

However, the defense respectfully submits that the specific facts underlying this case present a markedly different picture than these characterizations suggest. The plea agreement's Stipulation of Facts establishes that candidate Vázquez accepted promised contributions that were never actually received, for her political committee rather than personal gain, and crucially, that no official action was ever taken in exchange for these promises. The original seven-count indictment alleging conspiracy, bribery, and honest services fraud—charges that truly would have represented a grave threat to democratic governance—was dismissed because the evidence could not support those serious allegations.

What remains is a violation of campaign finance law involving a promised contribution that never materialized and produced no corrupt official action.

## VIII. The Professional Reality of Local Practice

The defense attorneys in this case have practiced before this Court for decades and

have established personal and professional relationships with the United States Attorney's Office built on mutual respect and legal advocacy. We pray that it would be unthinkable for the Court to believe that we would compromise our professional ethics by seeking political intervention rather than pursuing legal remedies. Throughout this case, we maintained our commitment to zealous advocacy while never resorting to professional or personal attacks on the prosecutors. As attorneys who must continue practicing in this district, our reputation depends on zealous advocacy within proper bounds, not on political connections or influence. We respectfully submit that the record reflects exactly what occurred: defense counsel uncovered compelling new evidence, presented it professionally to experienced prosecutors, and those prosecutors exercised sound professional judgment in response.

## IX. Conclusion

This case exemplifies not the corruption of justice but its proper administration. When defense counsel uncovers evidence that fundamentally alters the factual landscape, when that evidence is presented to experienced prosecutors who carefully evaluate its import, and when those prosecutors have the professional integrity to adjust their position accordingly; that is the system working exactly as designed.

The government's consistent characterizations of "good faith negotiations" undertaken to "conserve substantial judicial and private resources" confirm that the plea

agreement is the result of professional judgment, not political directive. No directive was issued. No political pressure was applied. Instead, previously unknown facts discovered through investigation led professional prosecutors to do exactly what we hope they will do: pursue only charges the evidence can support.

The three years under indictment have exacted a devastating personal toll on Governor Vázquez and her family that extends far beyond any legal proceedings. The false narrative of personal corruption created by the government's press conference subjected Governor Vázquez to public ridicule, professional ostracism, and personal threats. Business relationships that had been cultivated over decades of public service were severed. Professional opportunities were lost as potential clients and partners distanced themselves from the stigma of alleged corruption. Most painfully, the allegations exposed Governor Vázquez's family, including her daughters, to harassment and threats on social media, forcing them to endure public scrutiny and personal attacks based on false characterizations of personal enrichment that the government now admits never occurred. This is not "a mere slap on the wrist"—it represents three years of unjustified suffering based on a prosecution that collapsed when subjected to proper scrutiny.

Governor Vázquez respectfully clarifies the record to reflect the truth: the plea agreement resulted from the government's professional evaluation of new compelling and exculpatory evidence uncovered through defense investigation and presented during good faith negotiations, not from any directive from Main Justice.

WHEREFORE, defendant Vazquez Garced respectfully requests from this Honorable

Court to TAKE NOTICE of the clarifications noted above.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this August 12, 2025.

| | |
|---|---|
| **s/ Ignacio Fernández de Lahongrais**<br>IGNACIO FERNANDEZ DE<br>LAHONGRAIS<br>USDC - PR 211603<br>Tel. 787-923-5789<br>ignacio@bufetefernandezalcaraz.com<br><br>255 Avenida Ponce de León, Suite 1210<br>San Juan, Puerto Rico 00918-1475 | **s/ Luis A. Plaza-Mariota**<br>Luis A. Plaza-Mariota<br>USDC - PR 124806<br>Luis A. Plaza Law Offices<br>P.O. Box 362122<br>San Juan, PR  00936-2122<br>Tel: 787-764-0310<br>plaza@luisplazalaw.com |
| **s/ Edgar Sanchez Mercado**<br>EDGAR SANCHEZ MERCADO<br>USDC-PR 227004<br>Tel. 787-565-0916<br>esmlawoffice@gmail.com<br><br>255 Avenida Ponce de León, Suite 1210<br>San Juan, Puerto Rico 00918-1475 | **s/Peter John Porrata**<br>PETER JOHN PORRATA<br>USDC – PR 128901<br>POB 3943<br>Guaynabo, PR 00969-3943<br>Tel. 407-953-9888<br>peterjohnporrata@gmail.com<br><br>*Attorneys for Wanda Vazquez Garced* |

*Informative Motion to Clarify the Record*
*Regarding Plea Negotiations*
-28-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this same date, the undersigned attorney filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to counsel for all parties in this action.

**s/ Ignacio Fernández de Lahongrais**
IGNACIO FERNANDEZ DE LAHONGRAIS
USDC - PR 211603
Tel. 787-923-5789
ignacio@bufetefernandezalcaraz.com

255 Avenida Ponce de León, Suite 1210
San Juan, Puerto Rico 00918-1475